# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

V.

**CRIMINAL COMPLAINT**

TYRONE McMILLIAN
a/k/a "HK"

CASE NUMBER  11-M-271

I, Dawn R. Jones, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about the below-listed dates, in the State and Eastern District of Wisconsin and elsewhere, TYRONE McMILLIAN, the defendant herein, engaged in the following conduct:

**Please see Counts One through Three as set forth in Attachment A.**

I further state that I am a Detective with the Milwaukee Police Department (MPD), and that this complaint is based on the following facts:

**Please see the attached affidavit of Detective Dawn R. Jones.**

Continued on the attached sheet and made a part hereof:   _X_ Yes   ___ No

_____
Signature of Complainant
Dawn R. Jones

Sworn to before me and subscribed in my presence,

_August 12, 2011_
Date

at Milwaukee, Wisconsin
City and State

The Honorable Patricia J. Gorence
United States Magistrate Judge
**Name & Title of Judicial Officer**

_____
Signature of Judicial Officer

**Attachment "A" to McMillian Criminal Complaint**

| | |
|---|---|
| **Count One:** | ***"Sex Trafficking of a Child"***:  Beginning sometime in late December 2006 and continuing until early January 2007, in the State and Eastern District of Wisconsin and elsewhere, the defendant, TYRONE McMILLIAN, knowingly, in or affecting interstate commerce . . . recruited, enticed, harbored, transported, provided, or obtained by any means Child Victim #1  . . . knowing that Child Victim #1 had not attained the age of 18 and would be caused to engage in a commercial sex act.  All in violation of Title 18, United States Code, Section 1591. |
| **Count Two:** | ***"Sex Trafficking of a Child"***:  Beginning sometime in June 2007 and continuing through July 2007, in the State and Eastern District of Wisconsin and elsewhere, the defendant, TYRONE McMILLIAN, knowingly, in or affecting interstate commerce . . . recruited, enticed, harbored, transported, provided, or obtained by any means Child Victim #2 . . . knowing that Child Victim #2 had not attained the age of 18 and would be caused to engage in a commercial sex act.  All in violation of Title 18, United States Code, Section 1591. |
| **Count Three:** | ***"Sex Trafficking of a Child"***:  During July 2008, in the State and Eastern District of Wisconsin and elsewhere, the defendant, TYRONE McMILLIAN, knowingly, in or affecting interstate commerce . . . recruited, enticed, harbored, transported, provided, or obtained by any means Child Victim #3  . . . knowing that Child Victim #3 had not attained the age of 18 and would be caused to engage in a commercial sex act.  All in violation of Title 18, United States Code, Section 1591. |

## Affidavit in Support of Criminal Complaint

I, Dawn R. Jones, being duly sworn, depose and state as follows:

**Introduction**

1.  I am a law enforcement officer, a detective, employed with the City of Milwaukee Police Department, located at 749 W. State Street, Milwaukee, WI and have been so employed for seventeen years. I am currently assigned to the Sensitive Crimes Division and was formerly assigned to the Organized Crime Division. In both assignments, I was assigned to investigate Human Trafficking. I have received training in the investigation of the crimes of Soliciting Prostitutes, Pandering, Keeping a Place of Prostitution, Prostitution, Human Trafficking, and Soliciting a Child for Prostitution. As a result of this training and experience, I have conducted investigations of prostitution-related offenses that have included the arrest and conviction of numerous individuals. I have also worked with informants and undercover officers in the investigation of prostitution related offenses. I am familiar with the street terms associated with prostitution and sex trafficking.

2.  I make this affidavit in support of a criminal complaint charging Tyrone McMillian (12-7-81) with various sex-trafficking offenses in violation of federal criminal law.

**Sex-Trafficking Evidence**

3.  On July 10, 2009, I interviewed Child Victim #1 (CV-1), date of birth March XX, 1990, regarding her prostitution activities for Tyrone McMillian. Among other things, CV-1 stated the following:

    a.  She met McMillian in late November 2006, near Thanksgiving Day, when she

was 16. McMillian, whom she knew as "HK," talked to her about working for him. He told her that he was a pimp and that he wanted her to do "dates" (acts of prostitution) for him.

b.  She agreed and within a week he posted her services on Craig's List (craigslist.com) and she began doing prostitution dates. He took pictures of her using a digital camera and then used his computer to post them on the internet to Craig's List. McMillian had her wear a schoolgirl outfit for the photos and gave her the name "CoCo." At this point, McMillian believed that she was 23-years old.

c.  McMillian gave her instructions on how to prostitute, including requiring the customer to expose his penis such to prove that he was not a police officer. McMillian provided her with condoms for the "dates." He told her to charge $200 for "full service" (intercourse), and $100 for "half service" (oral sex). She obtained dates from the Craig's List posting as well as at private parties that McMillian would arrange for her. McMillian also provided her with a cell phone so that she could receive calls from the Craig's List postings. Throughout her time working for McMillian, she always gave him all of the money she earned from prostituting.

d.  She prostituted for McMillian until just after January 1, 2007. Sometimes she had two or three prostitution dates in one day. She did approximately 80 prostitution dates for McMillian during the time she worked for him.

e. At the end of November or beginning of December 2006, McMillian drove her to Minnesota to dance and do prostitution dates. "Tease," McMillian's most trusted prostitute also went with them. She and Tease did prostitution dates for McMillian in Minnesota. She recalls that they stayed at a Super 8 Motel in Brooklyn Center, Minnesota. Sometimes McMillian put the hotel rooms in his name (see below).

f. She was afraid of McMillian. He beat Tease almost every other day. On one occasion CV-1 raised her voice at him and he slapped her. McMillian also had two guns, both semi-automatics – one with a laser scope, which he kept in a safe in his bedroom.

g. On December 31, 2006, McMillian read through her cell phone text messages and found out that she was 16-years old. He was very angry with her because he had set up a private party for her in Mequon, Wisconsin. She told him that she did not want to go to the party but he told her that she had to go. He told her that if she did not go, he would take away her shoes and coat. Since it was cold outside, she felt that she had to go to the party. She did go to the party and conducted two prostitution dates while there. She made $600 at the party and gave all that money to McMillian. On the way to the party, the police stopped McMillian near the house where the party was being held.

h. CV-1 always gave her money to McMillian. He promised her that they were going to be stable and that they would have a career in rap music. He told her

that he was investing his money (from prostitution dates) in rap music and in a magazine.

    i.    She continued to work for McMillian for about two more weeks. Law enforcement officers came to McMillian's residence looking for CV-1 because she was reported missing. He then gave her to another pimp, "Tut" (Todd Carter), for whom she then began prostituting.

4.    On September 20 and November 13, 2007, I interviewed Child Victim #2 (CV-2), date of birth October XX, 1989, regarding her prostitution activities for Tyrone McMillian. Among other things, CV-2 stated the following:

    a.    She met Tyrone McMillian on June 7, 2007, the day after she graduated from high school. She went out with him the next day, became sexually active with him, and then began living with him. She stated that McMillian had a recording studio in his basement.

    b.    McMillian told her that she should start stripping to make money. He told her that she would need to get a fake identification card. Once she did obtain one, she began stripping at the Airport Lounge in Milwaukee. Initially, McMillian drove her to and from her stripping job and eventually "Tease," McMillian's prostitute drove her there and back. She made approximately $400 a night stripping and gave McMillian at least $300 of that amount. During her time with McMillian, she stripped almost every day beginning at 5:30 p.m. until 2:00 a.m.

c.  McMillian then told her that she could make more money by "dating," which
    she understood to be prostitution. He told her that he was going to put her on
    the internet, specifically Craig's List, in order to get dates. McMillian took
    photos of her using two separate digital cameras. The first was a small silver
    one and the second was black and had a tripod. McMillian told her how to
    pose for the photographs. He posted the photos on the internet to Craig's List.

d.  McMillian gave her a cell phone on which she could receive calls from the
    Craig's List posting. He also provided her with Magnum (Trojan) condoms for
    the dates. He also gave her instructions such as to call him before the date
    started, get payment before sex, and call him before she left the location of the
    date.

e.  CV-2 stated that she went on two dates. The first one turned out to be fake;
    when she arrived at the house the people there denied calling her. On her
    second date she was arrested by a police officer (see below).

f.  CV-2 stated that McMillian took her, Tease, and another minor female named
    Cherish to a nightclub called Augie's in Minneapolis to strip. McMillian told
    her that they had been there before and that the money was good. They worked
    there for two-and-a half days, each making between $500 and $600 a day
    stripping. She and the others gave McMillian all the money they made from
    stripping. Tease also did prostitution dates out of Augie's. The manager of
    Augie's learned about it and eventually kicked all of them out of the club

saying he did not allow that kind of activity at his establishment.

g.   A friend of McMillian's named "Tut" came with them to Minneapolis and brought a girl who was CV-2's age. While in Minneapolis, they stayed at a Super 8 motel. McMillian paid cash for the rooms. Also, a female named "CoCo," who was a year younger than CV-2, stripped with them at Augie's.

h.   Eventually, she told McMillian that she could not longer strip and date for him. He told her that he did not want her to leave and that he could "give her the world."

5.   On July 3, 2007, the Anti Prostitution Unit investigated complaints of prostitutes advertising on the Internet website www.craigslist.org. This website allows individuals to post advertisements offering acts of prostitution on the Internet. These advertisements contain nude or partially nude photos of women, their physical measurements, hourly rates, "services" offered, days and hours available and contact information (telephone number, e-mail address or personal website). Many of these listings specify the particular sexual act or acts each woman is willing to perform, using street terms that officers know to mean sexual intercourse, sexual gratification, sexual contact and masturbation. These street terms are well recognized in the adult entertainment/escort/prostitution industry as having this same meaning. Many of these listings specify the fee charged by each woman for these sexual acts. The Anti Prostitution Unit has conducted investigations regarding advertisements posted on the Internet, which have led to the arrest and conviction of numerous individuals for

prostitution related offenses.

a.  On this date at approximately 4:25 p.m., MPD officers found the following
advertisement (with two nude photos) posted in the "Erotic Services" section of
the Internet website www.craigslist.org: "the sparkle in yo eyes. Reply to:
pers-367383912@craigslist.org <mailto:pers-
367383912@craigslist.org?subject=the%20sparkle%20in%20yo%20eyes>Date
: 2007-07-05, 7:18PM CDTLets make your fantasy a reality! call me now!!
professional on all levels so please serious inquirys only, no bs, no blocked
calls, and no emails!!! 4*1*4*3*2*4*8*3*9*3***

b.  On July 10, 2007, at approximately 4:30 p.m., a Milwaukee Police Department
officer called the above listed phone number (414-324-8393) and spoke with an
unknown female who identified herself as "Sparkles." Sparkles was later
identified as CV-2. CV-2 arranged to provide "full service" for $200.00 per
hour to the undercover officer. The officer said based on his training and
experience, "full service" means non-marital sexual intercourse (penis to
vagina) and sexual gratification in exchange for money, or something of value.

c.  CV-2 arrived at 8:25PM at the Suburban Hotel, 4600 S. 47th St, room # 3 and
knocked on the room door and was allowed inside. CV- 2 said " Show me your
stuff, to prove you're not a cop." The officers knew from his experience in
dealing with escorts, this meant CV-2 wanted him to expose my penis. CV-2
was taken into custody.

d. CV-2 was later advised of her Constitutional Rights, which she agreed to waive. CV-2 admitted to posting an advertisement on craigslist.org with then intention of engaging in prostitution. CV-2 stated she came to the motel with the intention of having non-marital sexual intercourse and sexual gratification with the undercover police officer in exchange for $ 200.00 dollars in United States currency, but was arrested. CV-2 stated she knows it is illegal to engage in prostitution in the State of Wisconsin. CV-2 signed her advertisement, acknowledging that it was her photos and posting on www.criagslist.org. The evidence collected from CV-2 was placed on MPD inventory # 383982 as item 1, a condom and item 2, the advertisement.

6. On September 19, 2007, I interviewed MJ, the mother of CV-2. Among other things, MJ stated the following:

a. CV-2 graduated from high school on June 6, 2007. About one week later, a man driving a blue truck came to her house looking for her daughter. She asked him how old he was and he stated that he was 26. She told him that he was too old for her daughter and that her daughter was only 17. The man then drove away. MJ's other daughter was present during this conversation. CV-2 later told MJ that the man's name was Tyrone.

b. MJ stated that eventually CV-2 moved out of her house and she could not locate her. She then reported CV-2 to the police as being missing. Through a

tip from her other daughter, she went on the internet to Craig's List and saw a suspected prostitution advertisement for CV-2.

7.    On August 25, 2008, an agent from the Federal Bureau of Investigation interviewed Child Victim # 3 (CV-3) date of birth, April XX, 1991.  I have reviewed that interview report, and, among other things, CV-3 stated the following:

   a.    She began prostituting in April 2008 for Todd Carter, also known as "Tut," and his son, Nicholas Harrison.  A man named Tyrone, who she knew as "HK," was a friend of Carter's, and was also a pimp.

   b.    In late May or early June 2008, Carter drove her to Minnesota to prostitute. They stayed at a Super 8 motel.  Tyrone and his long-time prostitute, "Tease," were also staying in the motel at that time.  "Tease" worked at Augie's in Minneapolis as a stripper.

   c.    On July 8, 2008, Carter evicted her from his apartment.  In mid-July, she moved in with Tyrone and began to prostitute for him.  She told him that she was 17-years old.  About two years previous, Tyrone had another prostitute working for him named "Cocoa."  She was 16-years old at the time but CV-3 did not believe Tyrone knew her real age.  Tyrone told her that Todd Carter had stolen Cocoa away from him.

   d.    Tyrone bragged to her about all the cars that he owned, including a blue Tahoe, a black and orange Cutless, a "candy painted" purple Impala, and a red and black van with "Block Royalty" graphics and pictures on it.  Tyrone also

owned "Soft Bottom" magazine. He was also a rapper who had a song played on the radio called, "Put Your Hoodie On."

e.  Tyrone gave her instructions on how to prostitute for him. He advised her to "get in and get out" while performing prostitution dates. He also talked about trying to get his "Ho's on payroll," which she understood to mean that he wanted to use the credit ratings of his prostitutes to his advantage.

f.  Tyrone took photographs of her with a Sidekick LX cellular telephone so as to post her prostitution services on the internet to Craigslist.org. He also sent these photos to his email account. Tyrone took the photos of her with a Sidekick LX cellular telephone. At that time, Tyrone was living near 63rd and W. Darnell in Brown Deer, Wisconsin. At this residence he had a Dell computer and another computer with a wireless connection.

g.  A few days after she moved in with Tyrone, CV-3 had a prostitution date with a man who lived in Brookfield, Wisconsin. She charged him $200, which she gave to Tyrone, and he gave her a $50 tip, which she secretly kept. Shortly after that date, Tyrone sent her, "Tease," and a third prostitute, Danielle, to a bachelor party at a hotel on Bluemound Road. They stripped and earned $180 in tips which they gave to Tyrone.

h.  After that date, Tyrone took her, "Tease," and another of his prostitutes named Danielle, to the Wisconsin Dells. Tyrone took $20,000 in cash on the trip. They stayed at the indoor water park Mount Olympus for one night and then

came home. On their return trip, Tyrone stopped at the Midtown Branch of U.S. Bank and went inside with a three-ring binder full of documents and a small metal box with a handle. When he came out of the bank, he did not have either item.

i. CV-3 prostituted for Tyrone for approximately one week. After their return from the Wisconsin Dells she told him that she wanted to leave. He was upset about her decision and when she tried to retrieve her belongings from his truck, he told her that she could leave but then he locked her belongings in his truck. She left and then called the Brown Deer police whom she understood responded to her call. They were unable to obtain her property and she did not pursue the matter.

8. On December 14, 2007, I interviewed LL, the manager of the Super Motel 8 in Brooklyn Center, Minnesota. Among other things, LL stated the following:

a. Tyrone McMillian often stayed at the motel. He usually paid for his rooms using $1 bills. McMillian came to the motel with very young looking girls who dressed like they were strippers. She asked McMillian if the females were strippers and he replied that they were "dancers." When she responded that it was the same thing he became visibly upset.

b. She stated that on one occasion one of McMillian's females sat in the front lobby and looked upset. After about 15 to 20 minutes, McMillian came to the lobby and ordered her to go back to her room. Eventually, McMillian grabbed

her by the arm and told her that they were going to go back to the room. She said that McMillian was very possessive of his females and did not want to let them out of his sight.

c.   She later learned from a Brooklyn Center task force investigation that McMillian's females stripped at Augie's. LL was able to identify McMillian from a photo array and stated that CV-2 looked familiar.

9.   I have reviewed Super 8 Motel records attached to the above report. These records show that on the following dates, McMillian rented a room at the motel, always paying for the room with cash: September 15, 2006; December 3-9, 2006; and March 31, 2007. On June 6, 2008, "Tease," using her real name, rented a room there paying for it in cash.

10.  On May 8, 2009, I interviewed BM, the owner of Augie's Bourbon Street Cabaret, located in Minneapolis, Minnesota. Among other things, BM stated the following: when shown a list of names of females, he stated that he was familiar with CV-2, who danced under the name "Bubbles"; was familiar with the real name of the woman referred to as "Tease" in this affidavit; and was familiar with the last name of the female who danced under the stage name of "CoCo" (CV-1).

11.  On July 1 and 2, 2009, BM called an FBI agent who was working on this investigation with me, and I have read her report of those two interviews. Among other things, BM stated that the woman referred to in this affidavit as "Tease" (BM used her real name) came to Augie's recently to work there as a dancer. BM stated

that previously this female stripped at Augie's. In his July 2, 2009 call to the FBI agent, BM stated that earlier that day Tyrone McMillian and another male came into Augie's. The female known to your affiant as "Tease" left Augie's and entered a BMW that was being driven by either McMillian or the other male. BM provided the agent with the license plate number of that car. The license plate number is not registered to the BMW but is registered to a blue 2000 Cadillac DeVille that is owned by McMillian's brother.

12. On August 4, 2011, I reviewed an FBI transcript of a recorded telephone call that McMillian made to an unidentified female on January 26, 2009 at 7:50 p.m. while he was an inmate at the Dodge County Detention Facility. The relevant portion of that call is transcribed as follows:

TM:  I was just thinking how much I was glad I made you my girlfriend.

UF:  You glad you what?

TM:  Made you my girlfriend.

UF:  Why?

TM:  I was just glad I stopped pimpin'.

UF:  Why?

TM:  Huh?

UF:  Why?

TM:  I don't know. The hassle, the headache and just a lot of the, umm, problems that I'm going through now, that we going through now, came from that.

**July 6, 2011 Search Warrant Evidence**

13. On July 6, 2011, fellow officers from the Milwaukee Police Department arrested
    Tyrone McMillian at his residence, 6333 W. Darnell, Brown Deer, Wisconsin, and,
    pursuant to a state search warrant, searched his residence. Among other items seized
    were the following valuables:

    a.  $94,600 cash;

    b.  A bank statement in McMillian's name at J.P. Morgan Chase showing a
        balance of $99,955.76 as of June 20, 2011, in an account under the name
        "Tyrone McMillian." (See below for analysis of this bank account and the
        account that funded it.);

    c.  A Bentley automobile and a sales contract for its purchase by McMillian for
        $79,500 via a cashier's check on or about June 13, 2011. The cashier's check
        was funded from the proceeds of the account mentioned above, but the
        automobile was recently titled in the name of McMillian's girlfriend, Ashley
        Knueppel;

    d.  A 2008 Mercedes Benz S550 titled in the name of Bryan Alexander of
        Marietta, Georgia;

    e.  Four jewelry pieces, three of which were purchased at Pak's Jewelers in
        Milwaukee. One piece was a large pendant with the emblem "HK" (known to
        be McMillian's nickname) at the end of a long chain. Accompanying this
        piece was a written appraisal for $75,000, dated April 27, 2011. Also found in

the search were appraisals of other items of jewelry for McMillian from Pak's Jewelry: one item, appraised at $15,850 on May 25, 2011; two items appraised at a total value of $30,000 on March 20, 2009; one item appraised at $35,000 on March 20, 2009, and two items appraised at a total value of $7,900 on March 20, 2009.

14.   During the search, MPD officers also found two firearms (McMillian is a convicted felon): (1) a black 45 automatic pistol with a laser pointer and (2) a Zastava 7.62 x 39mm caliber rifle. The officers also found gun cases, various firearms magazines, various firearm cartridges, and numerous boxes of ammunition in McMillian's residence.

15.   MPD officers also found numerous electronic items in the residence including the following: an Apple MacBook Pro; a Dell computer tower; a blue Western Digital portable external hard drive with "HK" written on it; a black Western Digital portable a Mac G4 computer tower; an HP computer tower; five cameras; a Sony Handycam video camera on a tri-pod mount; an HP USB thumb drive; and five cell phones.

16.   In addition to the Bentley and Mercedes Benz, MPD found a third car in McMillian's driveway. That car was a 2011 Lexus, GS 450H Hybrid, four door that listed to Ashley Knueppel.

17. On July 6, 2011, Detective Lynda Stott went to McMillian's residence and interviewed Ashley Knueppel. I have reviewed that report of interview. Among other things, she told Detective Stott that:

    a. McMillian is her boyfriend and she is employed as an exotic dancer at "On the Border" located in Oak Creek, Wisconsin. (I know that this establishment is a strip club.)

    b. She met McMillian in April 2009 at a shopping mall. She moved in with him in February 2010 at the current residence.

    c. On three occasions – October 2010, January 2011, and either March or April 2011 – she traveled with McMillian to Frisco, Texas, which is near Dallas, to visit one of his relatives. While they were in Frisco she danced at an exotic nightclub called "Baby Dolls."

**Financial Evidence**

18. I have received the following information from a Special Agent from the Internal Revenue Service who also is part of this investigation:

    a. Records subpoenaed from Pak's Jewelers in October 2008 show the following cash transactions by McMillian:

        i. On November 27, 2007, a $22,400 cash payment to Pak's Jewelers, 208 W. Wisconsin Ave., Milwaukee, for the purchase of jewelry;

        ii. On April 2, 2008, a $14,000 cash payment to Pak's Jewelers for the purchase of jewelry totaling $26,140;

    b.    Other records from Pak's Jewelers show that on September 21, 2007, McMillian ordered and then paid $5,500 in cash for a piece of jewelry costing $6,864, and on January 4, 2008, he ordered and then paid $2,202 in cash for a piece of jewelry costing $5,298.

    c.    Records maintained by the Wisconsin Department of Workforce Development show that McMillian has not earned wages for at least the last 18 months.

    d.    On January 5, 2011, the Wisconsin Department of Health Services approved McMillian to receive $200 in food stamps from the Food Shares Program.

19.    Attached to this affidavit and incorporated herein are two schedules showing deposits into McMillian's checking account at J.P. Morgan Chase bank. These schedules were prepared by an agent from the IRS who is participating in this investigation.

    a.    Exhibit #1 shows wire transfers into the account as well as transfers from the account to other bank accounts. The wire transfers into McMillian's account came from a Wells Fargo account in Rosemead, California in the name of "Danny D. Cilli." The total amount of wire transfer deposits into McMillian's account from April 4, 2011 through June 1, 2011 is approximately $334,502.91.

    b.    Exhibit #2 shows other deposits into McMillian's account from January 31, 2011 through May 31, 2011. These deposits total approximately $28,719.76.

**Custodial Interview of Tyrone McMillian**

20. On July 8, 2011, MPD detectives interviewed Tyrone McMillian while he was in custody. McMillian was Mirandized, the interview was recorded, and I have listened to the recording. Among other things, McMillian made the following statements regarding his financial affairs:

   a. He denied having any income in 2010. He stated that he last filed a tax return in 2004 or 2006 and has not filed a return since then.

   b. He has investors who are looking to expand their businesses. A woman named Rose, whose last name he did not know, from Los Angeles, California has wired him money through her account at Wells Fargo. A man named Daniel, whose last name he did not know, introduced him to Rose. Daniel and Rose are investing in his music business, clothing line, and rim wipes business. All of the money is wired into his personal account, which he then transfers to his business account. All the wire transfers came from Rose. Money he earns from his t-shirt business he deposits into his FLHIGH Boy bank account.

   c. He put the Bentley automobile in his girlfriend's name because the Department of Motor Vehicles told him that he could not get the license plates in his name because of a child support lien that he believes is approximately $4,600.

   d. A man named Brian Kelly (ph.) financed the purchase of his Mercedes 500 auto. Kelly put it in his name because McMillian's credit is bad. McMillian gave Kelly $12,000 to put the Mercedes in his name and pays him $1,500 a

month toward the total purchase price of the car, which was $66,000. The monthly payment is made from a joint account at TCF bank that he has with his girlfriend, Ashley Knueppel. Knueppel signs and sends the checks to Kelly because, McMillian stated, he does not have checks.

e.  He stated that he has a clothing line under FLHIGH Boy clothing, a new company called Carpriciant which makes Rim Wipes, a music label called Block Royalty Entertainment, and Harwood Wars, which is going to be a basketball tournament but has not yet started. He does not keep books for any of his companies. He does not use an attorney or an accountant for his businesses.

JP Morgan Chase
Tyrone McMillian
Chase Checking
Account # 952656676
Account opened 01/07/2011

---

**March 22, 2001 - April 21, 2011**

| Date | Wire Deposits | Item |
|------|---------------|------|
| 4/8/2011 | 40,313.00 | Wire: Wells Fargo: Danny D Cilli, Rosemead CA |
| 4/19/2011 | 40,763.00 | Wire: Wells Fargo: Danny D Cilli, Rosemead CA |
| 4/21/2011 | 40,763.00 | Wire: Wells Fargo: Danny D Cilli, Rosemead CA |
| | 121,839.00 | |

**Transfers**

| | | |
|------|---------------|------|
| 4/20/2011 | 4,000.00 | transfer to 2950 (unknown account) |

---

**April 22, 2011 - May 20, 2011**

| Date | Wire Deposits | Item |
|------|---------------|------|
| 5/3/2011 | 44,019.10 | Wire: Wells Fargo: Danny D Cilli, Rosemead CA |
| 5/6/2011 | 41,874.65 | Wire: Wells Fargo: Danny D Cilli, Rosemead CA |
| 5/10/2011 | 36,648.00 | Wire: Wells Fargo: Danny D Cilli, Rosemead CA |
| | 122,541.75 | |

**Transfers**

| | | |
|------|---------------|------|
| 5/16/2011 | 20,000.00 | 05/14 transfer to 4695 (Carpriciat) |
| 5/16/2011 | 3,000.00 | 05/14 transfer to 4687 (Flhigh Boy Clothing) |

---

**May 21, 2011 - June 21, 2011**

| Date | Wire Deposits | Item |
|------|---------------|------|
| 5/24/2011 | 35,583.84 | Wire: Wells Fargo: Danny D Cilli, Rosemead CA |
| 6/1/2011 | 54,538.32 | Wire: Wells Fargo: Danny D Cilli, Rosemead CA |
| | 90,122.16 | |

**Transfers**

| | | |
|------|---------------|------|
| 5/24/2011 | 10,000.00 | transfer to 4687 (Flhigh Boy Clothing) |
| 5/24/2011 | 5,000.00 | transfer to 4695 ( Carpriciat) |
| 5/31/2011 | 1,000.00 | transfer to 4695 ( Carpriciat) |
| 6/6/2011 | 9,000.00 | transfer to 4695 ( Carpriciat) |
| 6/14/2011 | 5,000.00 | transfer to 4695 ( Carpriciat) |
| 6/14/2011 | 3,687.00 | transfer to 4687 (Flhigh Boy Clothing) |

---

**Total Wires from Cilll**          **334,502.91**

Update info* Carpriciat was found by JPMorgan Chase -- awaiting further account info.

HK states Carpriciat is rim wipes company



JP Morgan Chase
Tyrone McMillian
Chase Checking
Account # 952656676
Account opened 01/07/2011

*****regular deposits into account: deposit ticket info pending*

### Jan 25, 2011 through Feb. 22, 2011

| Date | Amount |
|------|--------|
| 1/31/2011 | 2,500.00 |
| 2/7/2011 | 400.00 |
| 2/8/2011 | 1,600.00 |
| 2/16/2011 | 2,900.00 |
| 2/18/2011 | 2,500.00 |
| 2/22/2011 | 3,000.00 |
| 2/22/2011 | 1,200.00 |
| | **$14,100.00** |

### February 23, 2011 through March 21, 2011

| | |
|------|--------|
| 2/28/2011 | 4,500.00 |
| 3/7/2011 | 1,000.00 |
| 3/9/2011 | 1,200.00 |
| 3/14/2011 | 2,000.00 |
| 3/15/2011 | 1,000.00 |
| 3/17/2011 | 600.00 |
| | **$10,300.00** |

### March 22 2011 through April 21, 2011

| | |
|------|--------|
| 3/25/2011 | 120.00 |
| 4/7/2011 | 1,760.00 |
| 4/15/2011 | 1,439.76 |
| | **$ 3,319.76** |

### May 21, 2011 through June 21, 2011

| | |
|------|--------|
| 5/31/2011 | 1000.00 (transfer from carpriciat account) |

| total transfers | **$28,719.76** |

