UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WICONSIN

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                          11CR193

TYRONE MCMILLIAN,
                Defendant.

## MOTION AND MEMORANDUM OF LAW
## TO QUASH THE SEARCH WARRANT

NOW COMES, the above-named defendant, Tyrone McMillian, upon all proceedings had herein and hereby requests that this Honorable Court quash the search warrant that was issued in this matter. Furthermore, the defendant would request that any and all evidence seized on that date be suppressed and any evidence or leads that were discovered as a result of the evidence that was seized on that date be suppressed as fruits of the poisonous tree. Lastly the defendant would request a <u>Franks</u> hearing as it relates to the second issue that is presented for review in this matter. That this request is based upon the following information and memorandum of law.

### SUMMARY OF THE FACTS

On July 6, 2011 Milwaukee Police Department went to 6333 West Darnell Avenue, Brown Deer, Wisconsin. This residence was occupied by Tyrone McMillian

and Ashley Knueppel. On that date, members of the Milwaukee Police Department went to that residence to check for a subject wanted for a Homicide. The homicide was in 2005 and involved two victims. The Milwaukee Police indicated that they had received information from an Informant, Todd Carter, that Tyrone McMillian had related that he had to "pop" the victims over an argument and that McMillian indicated that the argument was over a failed lease contract. The reports indicate that there was a Suspect Card for Tyrone McMillian. The undersigned is aware that Todd Carter and others supplied this information on April 30, 2009, May 27, 2009 and February 1, 2010. It should also be noted that on one prior occasion, law enforcement approached Mr. McMillian and he spoke with them without any incidents of violence or problems.

      Upon arrival at the residence, Office Shull went to the side door and knocked on the door. He announced "Milwaukee Police, Ashley come to the door." The reports indicate that a white female came to the door and she was later identified as Ashley Knueppel. Officer Shull asked her if she lived in the home and she indicated that she did. He further asked who was also in the home and she replied that it was just her and her boyfriend. Shull inquired who that was and Ms. Knueppel indicated that it was "Tyrone." Officer Shull then yelled into the house – "Tyrone Milwaukee Police Department, come to the door." Officer Shull's reports indicate that he stated this 3 times and Mr. McMillian finally came to the door. Officer Shull then placed Mr. McMillian into custody in the threshold of the residence. A protective sweep of the residence was conducted for any other suspects. There were no other suspects located. However during the protective sweep of the residence, Officer Witkowski observed a black rifle case

2
Case 2:11-cr-00193-CNC   Filed 10/21/11   Page 2 of 10   Document 28

underneath the bed in what appeared to be a child's bedroom.[1]  Finally, prior to taking Mr. McMillian to the jail, officers noticed that he did not have any shoes on.  Mr. McMillian indicated that he wanted a specific pair that was located in his bedroom.  An officer accompanied Ms. Knueppel to the bedroom.  The officer bent over to pick up the shoes and noticed a blue gun case and a grey gun case approximately 2 feet away from where he was.  He indicated that the gun cases were between the bed and the small nightstand with the blue case on the bottom and the gray case on top.  Furthermore, he indicates that the only words that he could make out were HK Arms.  He proceeded to walk out of the room.

## MEMORANDYM OF LAW TO
## QUASH THE SEARCH WARRANT

The issue is whether or not the search warrant in this matter was properly issued.  It should be noted at the outset that the basis that formed the request for the search warrant was due to the observations that were made during the protective sweep, to wit: the observation of the black gun case.  The search warrant was also based upon the fact that a police officer accompanied Ms. Knueppel to obtain shoes for the defendant and noticed two gun cases in the bedroom and the only words that the officer could see on one of the cases were "HK Arms."  As a result a search warrant was applied for and ultimately granted by Judge Kevin Martens.[2]  The defendant asserts that there are a number of problems with the warrant and as a result the warrant and any evidence derived from said search warrant should be suppressed.

---

[1] The Defendant is a convicted felon for a felony offense in Minnesota on March 5, 2003.
[2] The undersigned has attached the filed stamped copy of the search warrant.

3

First off, as indicated in the search warrant, the residence that was indicated in the search warrant was 6633 West Darnell Avenue. This is indicated seven different times throughout the application and the affidavit. It is clear that the residence that was to be searched and was ultimately searched was 6333 West Darnell Avenue. Upon review of the police reports in this matter Detective Rudy Gomez prepared the search warrant application and attached affidavit. After this was signed under oath before the Honorable Kevin Martens, he proceeded to the residence and ultimately realized that the address that was contained in the documents was incorrect. He indicated in his reports that he contacted Judge Martens and he authorized Detective Gomez to change and initial the change in the address. Detective Gomez indicates that he did this and the search warrant was then executed. Detective Gomez indicates in his report the following information regarding this issue: "On 7-6-11, at 10:08 p.m., I informed my Supervisor and made telephonic contact with Judge Martens. I explained the error and was advised by Judge Martens to correct the errors on the Warrant and Affidavit and initial the corrections. I corrected the errors and proceeded to execute the warrant."

The Defendant submits that any changes made to the search warrant and attached affidavit renders the search warrant invalid and therefore, any evidence that was obtained must be suppressed. The undersigned would also submit that this is an issue that does not arise often in the law. One can only assume that it does not arise often because the better course of action would have been to obtain a new search warrant with the correct information instead of making changes to a signed document that was previously signed under oath before the issuing magistrate.

4

Therefore the undersigned would submit that it is first necessary to examine this issue in the context of an unsigned affidavit. In State v. Tye, 248 Wis.2d 530, 636 N.W.2d 473 (2001) the Wisconsin Supreme Court was faced with this issue. A police officer had prepared an affidavit in support of a search warrant for a residence. The investigator presented the affidavit to an assistant district attorney for review and approval. The document was approved. The investigator presented it to Racine County Judge Dennis Flynn but the investigator failed to sign and swear to the truth of the affidavit. The investigator noticed that he failed to sign under oath the affidavit after the execution of the search warrant. He proceeded to create a new affidavit indicating that he failed to sign the original document but the information was correct in the original affidavit. This was done in order to cure any issues with the fact that he did not sign the original document.

In its decision on this issue, the Supreme Court of Wisconsin indicated that this was a fatal error. The Court indicated that an oath was a matter of substance and not form. Furthermore it stated that it was an essential component of the Fourth Amendment. The Court stated that the "purpose of an oath or affirmation is to impress upon the swearing individual an appropriate sense of obligation to tell the truth. The purpose of an oath or affirmation to support a search warrant is for both the investigator seeking the search warrant and the magistrate issuing it to emphasize the importance and solemnity of the process involved." Id at 541. As a result the Court indicated that the trial court's ruling to suppress the evidence was correct.

The undersigned recognizes that the affidavit drafted and signed by Detective Gomez was originally issued under oath. This oath was administered at the time of the

signing at approximately 9:10 p.m. on July 6, 2011. However, one hour later there were changes made to the document. Pursuant to the information contained on the documents Judge Martens authorized a change from 6633 to 6333. There is no indication that this was done under oath or affirmation.[3] Since none of the reports indicate that Judge Martens administered an oath to Detective Gomez prior to authorizing the changes it is assumed that Detective Gomez only notified Judge Martens of the issue and Judge Martens indicated that he could change the document without putting Detective Gomez under oath.

As stated above, this issue has not arisen much throughout the Country so there is very little discussion on the issue. However, in State v. Workman, 272 S.C. 146, 249 S.E.2d 779 (1978) the issue was addressed. In that matter, police officers obtained a search warrant for apartment K-5 naming the defendant as an occupant. Before executing the warrant, the officers realized that the correct apartment was K-6. The officer that signed the warrant contacted the issuing magistrate to relate the new information and upon **taking an oath** received permission to amend the apartment number. The court addressed the issue of whether a search warrant can be validly amended prior to execution by **sworn oral communication** to the issuing magistrate. The Court found that "because the original warrant was thus procured, the telephone call relating **new information under oath**, followed by the issuing magistrate's permission to amend the apartment number substantially complied with the South Carolina statues." Id at 780.

In this matter there is no evidence to suggest that Detective Gomez was placed under oath in his phone call with Judge Martens. As a result the undersigned would

---

[3] There are additional changes that were made to the document. The undersigned is not aware of when those changes were made and therefore would reserve any argument on those changes when additional information is obtained.

submit that the changes to the affidavit were not done under oath and this is an issue of substance that cannot be overcome. The undersigned would suggest that the search warrant was not valid due to the changes that were made to the document. As a result, the search warrant should be suppressed as well as any evidence that was obtained on that date. Finally when the affidavit was signed under oath the residence that Detective Gomez was swearing under oath was the residence to be searched was **6633 West Darnell** and not 6333 West Darnell. The undersigned submits that **6633 West Darnell** should have been searched because that is what Detective Gomez had sworn was the correct and accurate address. As a result the search warrant should be quashed and the evidence should be suppressed.

The second issue that presents itself in the search warrant is the issue that there is information contained therein to support the request for a search warrant that was inaccurate. In order to fully examine this claim, one must examine the mistakes or wrong information in the search warrant affidavit to find out whether or not a neutral magistrate would have granted the same without the mistaking or inaccurate information. Therefore, the undersigned will examine these claims one at a time.

First off in Paragraph Five (5) of the affidavit there is a statement that on July 6, 2011, Officers executed an arrest warrant at the residence for Tyrone McMillian based upon the homicides that occurred in October 2007. This would lead any reasonable, neutral magistrate to believe that there was an arrest warrant for Tyrone McMillian. There was not an arrest warrant for Mr. McMillian. There was only a suspect card. The undersigned would submit that any magistrate reading that there is an arrest warrant for an individual would lead any person to believe that either a criminal complaint had been

7

issued or there was enough information regarding the individual to file a criminal compliant. Therefore, Judge Martens was misled regarding the reasons for the Milwaukee Police to have been at this residence.

The next problem occurs in Paragraph Six (6). It states that Officers gained entry into the residence and arrested McMillian in the residence, which was also occupied by another person. Upon conducting a protect weep of the home for other subjects (confederates) hiding in the residence, officer Jonathan Witkowski observed a black in color AK047 assault rifle under an [air] mattress, within the residence. Further sweep of the residence reveals two additional gun cases, with the letters, "HK' displayed on the outside of the case.

This paragraph contains a number of errors. The first error is that Officers did not gain entry into the residence and arrest McMillian. It is clear from all of the reports that he was arrested in the threshold of the residence. Furthermore, there was absolutely no information to suggest that there would be any other confederates located in the residence.

What is more troubling is the final aspect of Paragraph Six. There was not an AK-47 found during the protective search. Specifically that affidavit states that Officer Jonathan Witkowski observed a black in color AK-47 assault rifle under an [air] mattress.[4] The undersigned submits that Officer Jonathan Witkowski does not indicate this information in any police report that was written regarding the events on that date. Furthermore, there is no information in any of the police reports that indicates that any

---

[4] The word air was crossed out and RG (Detective Rodolfo Gomez) initialed this cross out. The undersigned is not aware of when this change took place vis a vie prior to his oath or after.

Milwaukee Police Officer found an AK-47 assault rifle prior to the execution of the search warrant.

The undersigned can only assume based upon the documents that have been prepared in this matter that this information was relayed to Detective Gomez and he used this information in his affidavit to support the search warrant. Since the undersigned knows that an AK-47 was found in the residence, the undersigned can only assume that a Milwaukee Police Officer exceeded the scoop of the protective search and this information was used to support a search warrant.

The defendant is requesting a hearing under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In order to obtain a Franks hearing, a defendant "must make a 'substantial preliminary showing' that: 910 the affidavit contained a material false statement; (2) the affiant made the false statement intentionally, or with reckless disregard for the truth; and (3) the false statement was necessary to support the finding of probable cause." United States v. Maro, 272 F.3d 817, 821 (7th Cir. 2001).

In this matter, we have information that was supplied to a judge to support probable cause that was false or was made with reckless disregard for the truth and this information was necessary to support the finding of probable cause. First off, the information that there was a valid arrest warrant would leave an impression that Mr. McMillian was the main suspect and there was probable cause to believe that he committed the homicide. This was not true. In addition, there was no gun found on the protective search. Therefore, the neutral magistrate believe that there was a gun found based upon the affidavit. This was a material false statement that was made either intentionally or with reckless disregard for the truth. This statement obviously supported

probable cause because Mr. McMillian was a convicted felon. Finally the two additional gun cases were described as being found on the protective search after Mr. McMillian was arrested inside the home. This statement is also false. One can only wonder if Judge Martens would have inquired why a protective sweep was being performed when a person was arrested in the threshold of his residence.

The defendant has indicated enough information to justify a <u>Franks</u> hearing in this matter and would make the request for the same.

Dated this 21st day of October, 2011.

              BOYLE, BOYLE & BOYLE, S.C.


            By: <u>/s/ Bridget E. Boyle</u>
              BRIDGET E. BOYLE
              Attorney for Defendant

              State Bar ID No. 1024879
              Boyle, Boyle & Boyle, S.C.
              2051 West Wisconsin Avenue
              Milwaukee, WI 53233
              bboyle@boylelaw.com
              Telephone: (414) 343-3300
              Facsimile: (414) 343-3310