1      UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF WISCONSIN

3  ----------------------------------------------------------------

4   UNITED STATES OF AMERICA,            )
                                         )
5                       Plaintiff,       )      Case No. CR 11-193
                                         )      Milwaukee, Wisconsin
6        vs.                             )
                                         )      November 29, 2011
7   TYRONE McMILLIAN, a/k/a "HK,"        )      1:30 p.m.
                                         )
8                       Defendant.       )

9  ----------------------------------------------------------------

10                **TRANSCRIPT OF EVIDENTIARY HEARING**
                BEFORE THE HONORABLE NANCY JOSEPH
11                UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13   For the Plaintiff
     UNITED STATES OF AMERICA:        Office of the US Attorney
14                                    By: JOSEPH R. WALL
                                      517 E Wisconsin Ave - Rm 530
15                                    Milwaukee, WI 53202
                                      Ph: 414-297-1700
16                                    Fax: 414-297-1738
                                      joseph.wall@usdoj.gov
17   For the Defendant
     TYRONE McMILLIAN:               Boyle Boyle & Boyle SC
18   (Present)                        By: BRIDGET E. BOYLE-SAXTON
                                      2051 West Wisconsin Avenue
19                                    Milwaukee, Wisconsin 53233-2003
                                      Ph: (414) 343-3300
20                                    Fax: (414) 343-3310
                                      bboyle@boylelaw.com

21


22
     U.S. Official Reporter:         JOHN T. SCHINDHELM, RMR, CRR,
23                                    johns54@sbcglobal.net

24   Proceedings recorded by computerized stenography,
     transcript produced by computer aided transcription.
25

1          P R O C E E D I N G S (2:34 p.m.)

2          THE COURT:  Good afternoon, please be seated.  Clerk

3    the court calls United States of America vs. McMillian, Case No.

4    11-CR-193.  May I have the appearances, please?

5          MR. WALL:  Joseph Wall for the United States.  Good

6    afternoon, Your Honor.

7          THE COURT:  Good afternoon, Mr. Wall.

8          MR. BOYLE:  Good afternoon, Your Honor.  Bridget

9    appears on behalf of Mr. McMillian, who is present.

10          THE COURT:  Good afternoon, Ms. Boyle, and good

11    afternoon to you, Mr. McMillian.  We are here this afternoon for

12    an evidentiary on a motion filed by the defendant.

13          Before we begin talking housekeeping, I'd like to

14    sequester any witnesses that are in the courtroom.  There's an

15    officer in the back of the courtroom, is he anticipated to be a

16    witness?

17          MR. WALL:  He's the first witness, Your Honor.

18          THE COURT:  I would ask that he please step out.

19          The housekeeping matter that I want to take up before

20    we call your first witness here, is I received the pleading

21    entitled, "Evidentiary Hearing Memorandum" filed yesterday.  I

22    wanted to check with the defendant, Ms. Boyle, is that your

23    understanding of what the issues are in this hearing?

24          MR. BOYLE:  Yes, it is.

25          THE COURT:  As to Section C-1, validity of the state's

1    search warrant, I want to make sure I understand the question.

2    The way I understand the question is that assuming the entry to

3    the bedroom was unlawful, whether the remaining paragraphs would

4    still support probable cause.  Is that correct, Mr. Wall?

5            MR. WALL:  That would be paragraphs 1 through 5 which

6    are the homicide probable cause paragraphs.

7            THE COURT:  Ms. Boyle, do you agree with that summary

8    of the question?

9            MR. BOYLE:  It would be paragraphs 1 through 5?  I

10   will -- yes.  If -- can you restate it?  I'm sorry.

11           THE COURT:  Sure.  If we excise all the information

12   regarding what was observed in the bedroom, whether the

13   remaining paragraphs would support probable cause.  That would

14   be the question.

15           MR. BOYLE:  Correct.

16           THE COURT:  If it is found to be unlawful.

17           MR. BOYLE:  That is a correct statement.

18           THE COURT:  Okay.  With that, are we ready to proceed?

19           MR. WALL:  We are, Your Honor.

20           THE COURT:  Mr. Wall, you may call your first witness.

21           THE CLERK:  Please raise your right hand.

22           BRIAN SHULL, GOVERNMENT WITNESS, DULY SWORN

23           THE CLERK:  Please be seated.  Please state your full

24   name and spell your last name for the record.

25           THE WITNESS:  Brian Shull.  B R I A N, S H U L L.

1                          DIRECT EXAMINATION

2    BY MR. WALL:

3    Q.  Good afternoon, Mr. Shull.  Where do you work?

4    A.  City of Milwaukee Police Department.

5    Q.  And how long have you been with the City of Milwaukee Police

6    Department?

7    A.  Approximately 15-1/2 years.

8    Q.  And what's your general assignment at this time?

9    A.  My assignment at this time is I work with Neighborhood Task

10   Force.  I'm on a Fugitive Apprehension Unit.

11   Q.  How about this summer, let's say July?

12   A.  Same assignment.

13   Q.  Direct your attention to July 6th, 2011, this summer.  Were

14   you on duty that day?

15   A.  Yes.

16   Q.  And move ahead a little bit.  Did you have an opportunity to

17   look at some suspect cards earlier that day?

18   A.  Yes.

19   Q.  And did one in particular create an interest in you?

20   A.  Yes.

21   Q.  And for whom was that?

22   A.  Tyrone McMillian.

23   Q.  And what was the suspect card for?

24   A.  It was for a homicide.

25   Q.  Double homicide or homicide?

4

1  A.  It's for a double homicide.

2  Q.  Briefly, what is a suspect card, for the court?

3  A.  A suspect card is just that.  It's probable cause for an

4  arrest.  Your suspect, whether you've been identified by a

5  coactor, somebody identified you by a photo array, you left

6  fingerprints, you left DNA, wasn't reviewed by district attorney

7  yet, or could have been reviewed by a district attorney and they

8  would like an arrest to be made and see if a statement would be

9  given and then they would make a final decision on what would

10  happen in that incident.

11  Q.  And have you used suspect cards all 15 years of your

12  employment at MPD?

13  A.  I haven't used them in all 15 years, but they have been

14  around since I've been employed, yes.

15  Q.  Regarding the homicide suspect card for Tyrone McMillian,

16  after reviewing that what did you decide to do?

17  A.  I did what I call is a workup or a background on him.  That

18  consists of doing everything that I have access to, Internet,

19  departmental records, reports, anything with Tyrone McMillian's

20  name on it, vehicles associated to him, addresses, family

21  members, aunts, uncles, brothers, sisters, dads, moms, places of

22  employment.  Things like that.

23  Q.  Okay.  Did that information ultimately lead you to the

24  address of 6333 West Darnell Avenue in Milwaukee/Brown Deer?

25  Brown Deer.

1    A.   Brown Deer, yes.

2    Q.   And approximately when did you get to that address?

3    A.   About 1:00 o'clock p.m.

4    Q.   And what did you observe?

5    A.   We drove by the address.  I observed a red Lexus which

6    through my investigation listed back to an Ashley Knueppel, who

7    gives that address as a home address.  I saw a maroon Bentley

8    with no plates parked in front of that which through my

9    investigation was owned by Mr. McMillian and driven by

10   Mr. McMillian.  And to the right of that was a black Mercedes

11   Benz which I had no clue whose that was.

12   Q.   Okay.  Knueppel is K N U E P P E L.

13        After seeing these vehicles did you observe any

14   individuals in or outside that residence?

15   A.   Not at the time that we passed.  However, we did sit down

16   the block waiting for more cars to come because we were going to

17   knock on the house.  During that waiting process we did see the

18   red Lexus leave the residence and then come back to the

19   residence.

20   Q.   Did you see whether a male or female was driving that?

21   A.   No.

22   Q.   After that red Lexus returned to the Darnell Street

23   residence, what did you do?

24   A.   We still waited for our backup.  Once all our officers that

25   we had requested arrived on scene, we cultivated a plan on what

1  we were going to do and we executed that plan.

2  Q.  And who arrived on scene?

3  A.  Couple Brown Deer officers were there.  I don't have their

4  squads or names.  They were basically traffic control.  Also

5  members of our tactical enforcement unit arrived.  I don't

6  recall everybody's name without reviewing reports, but around

7  six to seven officers, including two sergeants — my sergeant,

8  Sergeant Rick Burmeister, B U R M E I S T E R, and their

9  sergeant.  And my partner was with me as well, Police Officer

10  Kenneth Walkowiak, W A L K O W I A K.

11  Q.  And what does the tac squad do?  What's their duties?

12  A.  Tactical enforcement unit, their duties are -- it ranges

13  from barricaded subjects, to high felony arrests, to clearing

14  houses, making -- if it's considered to be a dangerous arrest

15  they would be the ones to go in and execute it.

16  Q.  Was this considered to be a high felony arrest or a

17  dangerous arrest?

18  A.  For a double homicide?  Yes.

19  Q.  What happens next?  The tactical squad is there, you and

20  your fellow officers are there.

21  A.  We're there.  The house is pretty much surrounded.  I don't

22  know who is where, but I'm behind the side door.  I knock on the

23  side door, I announce myself, "Milwaukee police, Ashley, come to

24  the door."

25  Q.  And how did you know to ask for Ashley?

1    A.  I'm assuming it's her.  It was her car that left.  She

2    claims she lives there so I'm taking a guess that it's her.

3    Q.  What happens after you knock on the door and ask for Ashley?

4    A.  A female does come to the door.  I basically ask if she was

5    Ashley, she stated, "Yes."  I confirmed it more by saying,

6    "Ashley Kneuppel?"  She said, "Yes."  I asked if she lived

7    there, she said, "Yes."  I asked if there's anybody else in the

8    home with you, she said, "Yes, my boyfriend Tyrone."  I

9    reconfirmed that saying, "Tyrone McMillian?"  She said, "Yes."

10            At that point I advise all the squads around the

11   house, and wherever else they're at, that our suspect is inside

12   the residence.

13   Q.  And what did you tell Ashley to do at that point?

14   A.  I asked Ashley to step outside, which she did.  At that

15   point I yelled out, "Tyrone, Milwaukee Police Department, come

16   to the door."  There was no response.  I did this about two to

17   three times.  On the third time he finally came to the door.

18   Q.  And where were you standing when you were yelling into the

19   house for Tyrone McMillian?

20   A.  At the side door.

21   Q.  Were you inside the house yet?

22   A.  No.

23   Q.  Still outside.

24   A.  Yes.

25   Q.  Door was open?

1    A.   Yes.

2    Q.   Okay.  Mr. McMillian comes to the door?

3    A.   Yes.

4    Q.   Does he identify himself?

5    A.   I don't think he does.  But with me looking at him, I viewed

6    his booking photos prior to all this, I knew it was him.  So I

7    don't -- I don't remember -- I didn't ask him if he was -- I

8    knew he was Tyrone so I didn't ask him if he was Tyrone and he

9    didn't say he was Tyrone.

10   Q.   Do you see in court today the individual who came to the

11   door when you yelled for Tyrone McMillian?

12   A.   Yes.

13        MR. BOYLE:  I'll stipulate that Tyrone McMillian is

14   seated next to me.

15   BY MR. WALL:

16   Q.   Okay.  He comes to the door, what do you do?

17   A.   I tell him to turn around, place his hands behind his back.

18   Which he does.  He was handcuffed and he was walked back,

19   backwards.

20   Q.   Okay.  And where are you at the time you put the handcuffs

21   on him?

22   A.   Still by the side door.  I don't remember if I took one step

23   in but I was at the side door.  He was placed into custody.

24   Q.   Where was Mr. McMillian at the time that you put the

25   handcuffs on him?

1    A.   He was inside the threshold, the frame of the door.

2    Q.   Within reaching distance?

3    A.   Yes.

4    Q.   Okay.  You -- he's in custody, do you hand him off to any

5    other officers?

6    A.   I hand him off to my partner, Police Officer Walkowiak.

7    Q.   Before you did that did you notice whether he had shoes on

8    or was barefoot?

9    A.   I noticed he had no shoes on.

10   Q.   And did you make a comment about that to him?

11   A.   Yes, I asked him if he wanted any shoes.

12   Q.   And what did he say?

13   A.   He said, he requested he would like his black Air Jordan

14   Nike flip flops.

15   Q.   And at that time did he go with your partner Ken -- sorry.

16   A.   He did.  Before that I did notice a pair of black and white

17   Air Jordan Nike flip flops at the door and I asked him were

18   these them right here, he said, "No, those are hers, mine are in

19   the back bedroom."

20   Q.   So he was still standing right by the doorway.

21   A.   Yes.

22   Q.   And you were able to show him the Air Jordans that were --

23   A.   Yes.

24   Q.   -- there.  Okay.  After he said that "mine are in the back

25   bedroom," what did you do?

1  A.  At that time our tactical officers were conducting a

2  protective sweep for any other confederates or people inside the

3  house that didn't produce themselves outside the house.

4  Q.  Okay.  Approximately how many officers were involved in that

5  sweep?  Approximately.

6  A.  I believe four to five, because two of the officers were

7  still on the outside corners of the house.

8  Q.  When they finished their protective sweep did anybody make

9  any statements to you about what was found in the house?

10  A.  Somebody did.  I don't recall who.  But they did advise me

11  that the house was clear, but also that in one bedroom there was

12  a long black rifle case.

13  Q.  Okay.  So going back now, Tyrone McMillian says that "those

14  are hers."  When he said "those are hers," who did you take him

15  to be referring to?

16  A.  The only female that was there, Ashley.

17  Q.  Okay.  He says, "Mine are in the back bedroom."  Do you have

18  any follow-up conversation with Ashley regarding the flip flops?

19  A.  The only conversation I had with her is I asked her if she

20  knew where they were at.  She said, "Yes."  I said, "Let's go

21  get them."  And we went to go get them.

22  Q.  And where did she take you?

23  A.  She took me to the -- I believe that would be the -- I'm not

24  sure of the direction, but it's -- it's the bedroom opposite of

25  where the black rifle case was.

1  Q.  And how do you know it was the bedroom opposite the black

2  rifle case?

3  A.  Because upon entering the bedroom I could see the black

4  rifle case to my right in the other room, where it was at.

5  Q.  Now, at this time did you have any intent to search the

6  house at all?

7  A.  No.

8  Q.  Did you search any area of the house, at this time?

9  A.  At this time, no.

10  Q.  When she was directing you to this bedroom where the Air

11  Jordan flip flops were, did you have any intent to search that

12  bedroom?

13  A.  No.

14  Q.  Okay.  So you go -- she leads you into the bedroom.

15  A.  Yes.

16  Q.  And, I show you a couple exhibits here.  The court has them

17  and defense counsel has them.  Exhibit Number 1, is that

18  familiar?

19  A.  Yes.

20  Q.  Okay.  And what is that?

21  A.  That's the -- would be the bedroom to my right.  As you're

22  entering into the bedroom it would have been to my left.  And

23  that's a picture of the long black rifle case, gun case.

24  Q.  Was it in that position when you saw it or was it halfway

25  under the bed?

1  A.  No, it was -- it was -- I would say it was more than halfway

2  under the bed.  You can see the handle part sticking out.

3  Q.  Other than that is that -- other than the gun case being

4  more under the bed, is that an accurate photo of that scene at

5  that time?

6  A.  Yes.

7          MR. WALL:  Judge, with that condition and caveat I

8  would move that into evidence.

9          MR. BOYLE:  No objection.

10          THE COURT:  Received.

11          (Exhibit 1 offered and received.)

12  BY MR. WALL:

13  Q.  Okay.  So you and Ashley go into the bedroom that she led

14  you to, correct?

15  A.  Yes.

16  Q.  And what do you do?

17  A.  She went to the left, I went to the right, to the foot of

18  the bed.  When I went to the right of the bed I saw a pair of

19  pants and I saw the black and white Nike Air flops sitting on

20  the floor.  I bent down to pick them up, saying, "Are these

21  them?"

22          As I did, I then further observed two cases in-between

23  the bed and nightstand, one was blue, one was gray.  The top

24  one, which I believe was the gray one, I can make out "HK Arms."

25  The other one, I couldn't make out if it was a gun case or not.

1    Q.   Okay.  Have you seen handgun cases before?

2    A.   Yes.

3    Q.   More than a thousand?

4    A.   Not that many.

5    Q.   More than 500?

6    A.   Realistic number, I would say 200.

7    Q.   These look like gun cases to you?

8    A.   Yes.

9    Q.   Did the HK Arms tell you it was a gun case?

10   A.   That told me it was a gun case, yes.

11   Q.   Did you move these gun cases in any way?

12   A.   No.

13   Q.   Did you touch either one of them?

14   A.   At that time, no.

15   Q.   I show you Exhibits 2 and 3.  And again, there's a caveat on

16   these too.  Exhibit 2 first.  What does Exhibit 2 show?

17   A.   That's the right side of the bed which is -- the bedroom

18   which is opposite of this bedroom.

19   Q.   Exhibit 1.

20   A.   Yes.  Where the -- on Exhibit 2, on the floor where it's now

21   bare carpet were a pair of jeans and the Nike flip flops.  I

22   don't remember exactly if the jeans were on top, to the left, to

23   the right, they were all together.

24   Q.   Okay.  Do you recall enough where the jeans and the flip

25   flops were to draw a red circle?

1    A.   Yes.

2    Q.   Okay.  Why don't you do that on Exhibit 2.  Just drew a red

3    circle where the jeans and the flip flops were.

4            (Witness complies.)

5    BY MR. WALL:

6    Q.   Why don't you put a number 1 in that circle.

7            (Witness complies.)

8    BY MR. WALL:

9    Q.   Okay.  And now we see the bed, or at least looks like the

10   right side of the bed.  And is that the nightstand that you

11   referred to earlier?

12   A.   Yes.

13   Q.   And the two gun cases that you just talked about, where were

14   those?

15   A.   Two gun cases were in-between the headboard and the

16   nightstand, sitting vertical on each other's base.

17   Q.   You're indicating with your hands that they were stacked

18   vertically one on top of the other.

19   A.   Yes.  With I believe it was the blue on the bottom and the

20   gray on the top.

21   Q.   Okay.  I think that's good enough.

22            Okay.  Exhibit Number 2, is that -- let me put it this

23   way.  This scene was disturbed after you first viewed it; would

24   that be correct?  Or is this how the scene looked when you

25   walked in that bedroom the first time?

1   A.  No.  This looks after the search warrant.

2   Q.  Disturbed.

3   A.  Yes.

4   Q.  Other than that, with pillow on the ground, the drawers

5   being open on the nightstand, is that essentially an accurate

6   photo of the bed, the nightstand, the drapes, the wall, the area

7   between the wall and the bed?

8   A.  Yes.

9        MR. WALL:  Your Honor, I move into evidence Exhibit 2,

10  with that caveat.

11       MR. BOYLE:  I have no objection.

12       THE COURT:  Received.

13       (Exhibit 2 offered and received.)

14       MR. WALL:  I'll show the copy to Ms. Boyle first.

15  Give the officer's copy to the court.

16       MR. BOYLE:  Fine.

17  BY MR. WALL:

18  Q.  Okay.  Exhibit Number 3.  Again, photograph of pretty much

19  the same area in Exhibit 2, correct?

20  A.  Yes.

21  Q.  And again, this is not how you saw the bedroom the first

22  time you went into it, correct?

23  A.  No, this is after.

24  Q.  Okay.  After the --

25  A.  Search.

1  Q.  After your fellow officers did the search warrant.

2  A.  Yes.

3  Q.  Okay.  On the bed there there is a gray container and a blue

4  container.  See that?

5  A.  Yes.

6  Q.  Are those the two gun cases that you saw between the

7  headboard and that nightstand there?

8  A.  Yes.

9  Q.  And again, other than the fact that the jeans are on the bed

10  and the drawers are removed and the gun cases have been moved,

11  is that otherwise an accurate depiction of that scene?

12  A.  Yes.  The only thing that was on the bed that I remember

13  when I first came in there was -- I think that's a laptop.  But

14  there's a laptop.

15  Q.  You're pointing to this pink object on the left margin

16  there.

17  A.  Yes.

18  Q.  Middle way up the photo.  Okay.

19          Your Honor, I move into evidence Exhibit Number 3.

20          MR. BOYLE:  No objection.

21          THE COURT:  Received.

22          (Exhibit 3 offered and received.)

23  BY MR. WALL:

24  Q.  Okay.  Now, after you grabbed the flip flops and verify with

25  Ashley that those are the ones that Mr. McMillian was looking

1    for, what do you do?

2    A.   We both walked out of the room.  I passed the flip flops off

3    to somebody, I'm not sure who, but he wound up getting in

4    possession of his flip flops.

5    Q.   Okay.  Now, you accompanied Ashley to this back bedroom,

6    correct?

7    A.   Yes.

8    Q.   Did she at any time ever object or say I'll go get these, or

9    I will get the flip flops, or anything like that?

10   A.   No.

11   Q.   Under your policy would you have let her back into the house

12   alone to retrieve the flip flops?

13   A.   No.

14   Q.   Why not?

15   A.   With the knowledge of at least one gun inside the residence,

16   but then with the additional knowledge of a possibility of

17   having two additional guns inside a residence, not knowing if

18   they're in cases, not knowing where they're at, period, bad idea

19   to let her wander around the house.

20   Q.   We gotta take a step back.

21   A.   Sure.

22   Q.   I'm saying before you went into the bedroom with her,

23   following her.

24   A.   Oh, no.  Not with the knowledge of one -- at least one gun

25   being somewhere in the house, no.

1    Q.   Did the fact that it was a double homicide investigation

2    have an impact on the decision that you would not let somebody

3    wander around that house?

4    A.   That added to it.  But that along with the fact that there

5    is a possible gun that's in the house.  You just do not let

6    people walk around the house when you know there's a firearm

7    within the house.

8    Q.   Standard operating procedure?

9    A.   Yes.  I would like to go home at night.

10   Q.   Officer safety, right?

11   A.   Yes.

12   Q.   Common sense?

13   A.   Yes.

14   Q.   Okay.  At some point did the squad car leave with

15   Mr. McMillian?

16   A.   Yes.

17   Q.   Okay.  Did there come a point in time when you had a

18   conversation with one of your fellow officers about

19   Mr. McMillian having the status of a felon?

20   A.   We did.  And that was through Brown Deer.  Brown Deer --

21   somebody from Brown Deer had mentioned that he was a felon.  But

22   when I looked him up in CCAP, it always showed an open case out

23   of Walworth County, open felony case.

24        I then called into our clerk to run a SNEW on him,

25   basically to get his FBI number ran.  At that point we found out

1  that he was a felon in Minnesota but his first name was spelled

2  Tyron, without an E.  So when I did that in Wisconsin, that's

3  when felony cases came up in Wisconsin so I knew that he was a

4  felon here as well.

5  Q.  Again, stepping back a little bit, your conversation with

6  Tyrone McMillian when he said, you know, I want my Air Jordan

7  flip flops, and he indicated that the ones in the doorway were

8  not his, did he give you any type of indication that you could

9  not retrieve them for him?

10  A.  No.

11  Q.  Did you have the understanding that he was requesting that

12  you retrieve them?

13        MR. BOYLE:  I'm going to object to the form of the

14  question as being leading.  And calls for speculation.

15        MR. WALL:  Well, it goes to his state of mind.

16        THE COURT:  The objection is sustained.  Perhaps the

17  question can be rephrased.

18  BY MR. WALL:

19  Q.  After your conversation with Tyrone McMillian about him

20  wanting his Air Jordan flip flops, did you form an opinion as to

21  what you should do regarding that, him saying that he wanted his

22  flip flops.

23  A.  That I should get his flip flops for him.

24  Q.  That's what was in your head.

25  A.  Yes.

1    MR. WALL:  Okay.  I have no further questions.

2    THE COURT:  Ms. Boyle?

3    MR. BOYLE:  Thank you.

4                    CROSS-EXAMINATION

5 BY MR. BOYLE:

6 Q.  Okay.  Officer, just so I understand this, at some point in

7 time on the morning of July 6, you learn that there's a suspect

8 card for a double homicide for Mr. McMillian, correct?

9 A.  Yes.

10 Q.  And as a result of that you went and did some background

11 information regarding Mr. McMillian.

12 A.  Yes.

13 Q.  You have indicated here today that it came to your attention

14 that there was a felony out of another state that you came to

15 learn about eventually, correct?

16 A.  Yes.

17 Q.  All right.  You knew, though, prior to going to that

18 residence that he had an open Walworth County felony matter?

19 A.  Yes.

20 Q.  What other information did you learn regarding his

21 background prior to going to the residence?  In regard --

22 specifically in regard to criminal history.

23 A.  Criminal history?  I know that he was convicted of -- I

24 believe it was robbery.  I would have to look it up just to --

25 look it up and see what it's listed.  I just remember it was a

1   robbery charge.

2   Q.  And you knew a robbery was a felony.

3   A.  Yes.

4   Q.  And so you knew prior to going to 6333 West Darnell, that he

5   was a convicted felon, correct?

6   A.  No.  At that time, no.

7   Q.  You didn't know, prior to going to the residence, that he

8   was a convicted felon?

9   A.  No.  Not the way I ran him the first time, no.

10  Q.  All right.  When you ran him what are you talking about?

11  Are you talking about just looking at CCAP?

12  A.  Just looking at CCAP.

13  Q.  Just looking at CCAP.  So when you do a background record

14  check, as a fugitive task force member, you just looked him up

15  on CCAP, correct?

16  A.  That's not all I did but, yes, that's part of what I do.

17  Q.  And you knew he had an FBI number, though, prior to going to

18  that residence.

19  A.  Yes, because he's had an open case so I assume -- it was an

20  open felony case so he was arrested, so he should have a FBI

21  number, yes.

22  Q.  And, so you knew he had an FBI number prior to going to the

23  residence, correct?

24  A.  Yes.

25  Q.  And you're aware based on your knowledge and experience with

1    the police department that people are given FBI numbers when
2    they're convicted also of felonies, correct?
3    A.   Yes.
4    Q.   So as you're going to that residence, did you have a belief
5    as to whether or not you were dealing with a felon?
6    A.   At that time, no.
7    Q.   And you did not -- you do have computer systems and data
8    bases within the Milwaukee Police Department to run a person's
9    FBI number, correct?
10   A.   Yes.
11   Q.   And, as you sit here today, you're telling us that you did
12   not run the FBI number of Tyrone McMillian to get a proper --
13              MR. WALL:  Objection, asked and answered.
14              MR. BOYLE:  I'm not done.
15              THE COURT:  Let her ask the question first.
16   BY MR. BOYLE:
17   Q.   So you're telling us that you did not use one of those
18   computer systems to run the FBI number of Tyrone McMillian prior
19   to going to that residence to get a full idea of his prior
20   record.
21   A.   No.
22   Q.   So when you went to the residence you contacted Brown Deer
23   Police Department to let them know you needed some traffic help,
24   right?
25   A.   Yes.

1    Q.   You then also asked for backup assistance from a number of

2    tactical members in the Milwaukee Police Department, yes?

3    A.   Yes.

4    Q.   And you knew that this was a high-risk felony arrest.

5    Correct?

6    A.   Yes.

7    Q.   One more question about the FBI number.  Is it you only get

8    an FBI number upon conviction of a felony offense or do you get

9    it upon arrest of a felony offense, based upon your knowledge?

10             MR. WALL:  Objection, relevance.

11             THE COURT:  Ms. Boyle, the relevance?

12             MR. BOYLE:  Well, the relevance is because I think you

13   only get it upon conviction.  And if he had an FBI number, that

14   means that this officer should have been aware that he had a

15   felony conviction prior to going there.

16             MR. WALL:  He said he didn't run it.  Twice.

17             MR. BOYLE:  But I'm not asking him again about that.

18   I'm just asking him what you get it.

19             THE COURT:  Officer Shull, do you know?

20             THE WITNESS:  I don't know, truthfully, no.

21   BY MR. BOYLE:

22   Q.   Okay.  So you go to the residence and you are the person

23   that goes up to the door and knocks on it, right?

24   A.   Yes.

25   Q.   When you go up there what happens is Ashley Kneuppel comes

1  to the door, right?

2  A.  Yes.

3  Q.  Does she get taken outside of the doorway by any officers?

4  Or do you ask her to come out?  What happens?

5  A.  I asked her to come out.

6  Q.  And did she come out?

7  A.  She came out, yes.

8  Q.  And where did she go?

9  A.  Wherever -- behind us.  I don't know.  More than 10 feet

10 away from the door.

11 Q.  She was not handcuffed or anything like that, correct?

12 A.  No.

13 Q.  You then call for Mr. McMillian to come to the door and

14 after two to three times she shows up in the doorway?

15 A.  Yes.

16 Q.  And you handcuff him.

17 A.  Yes.

18 Q.  And at that point in time Ashley is someplace else out of

19 the area, right?

20 A.  She's still there.  She didn't leave anywhere.

21 Q.  Sure.  But she's about 10 feet away from you guys?

22 A.  Yeah.

23 Q.  And it is at this point in time when you noticed that

24 Mr. McMillian doesn't have shoes on, correct?

25 A.  I believe after handcuffing him and walking him backwards

1  out of the house, that's when I noticed he didn't have shoes on.

2  Q.  And you noticed that and so now he's now away from the

3  threshold of the door, correct?

4  A.  In front of the door, yes.

5  Q.  About how far away from the threshold, you know, the side

6  door?

7  A.  Not far.  Within a foot, two feet.

8  Q.  And at that point in time are you the one that has taken, I

9  guess, control of Mr. McMillian?

10 A.  I have control of him.

11 Q.  And are there any other officers around him or is it mainly

12 you?

13 A.  No, there's members of the tac squad, tactical enforcement

14 unit.  My partner, I don't know where, which side he's on, but

15 he's also there.

16 Q.  So how many officers do you think, including yourself, were

17 around Mr. McMillian at this time?

18 A.  No more than three.

19 Q.  And the other officers have already gained entrance into the

20 residence to go and do the protective sweep?  Or not?

21 A.  I believe after I backed him up, noticed the shoes, that's

22 when the protective sweep was conducted.

23 Q.  And at the point in time that you backed him up and the

24 protective sweep begins, you have a conversation with him about

25 where he should get some shoes from; is that what you're telling

1   us?

2   A.  No.  I basically said, "Do you want some shoes?"

3   Q.  And he said, "Yes,--"

4   A.  Yes.

5   Q.  "--I want my Air Jordan flip flops"?

6   A.  Yes.

7   Q.  And the protective sweep is going on at this point in time,

8   correct?

9   A.  Yes.

10  Q.  And do you go in the house to look for the flip flops at

11  this point in time?

12  A.  No.

13  Q.  What do you do after he says I want my Air Jordan flip

14  flops?

15  A.  I just stand there and wait for the protective sweep to be

16  done.

17  Q.  Okay.  And where is Ms. Kneuppel at this point in time; do

18  you know?

19  A.  She's still there.

20  Q.  So within about 10 feet away?

21  A.  Yes.

22  Q.  And the protective sweep finishes up, correct?

23  A.  Yes.

24  Q.  And do you say any more about the flip flops to

25  Mr. McMillian?

1    A.   Just to -- when I noticed him by the door, I said, "Are

2    these them right there?" and him saying, "No, those are not

3    mine, those are hers; mine are in the back bedroom."

4    Q.   All right.  That takes place when?  While you're standing

5    there while the protective sweep is going on or at another point

6    in time?

7    A.   I would say simultaneously when the protective sweep's

8    being conducted.

9    Q.   And after this conversation takes place and the protective

10   sweep ends, that's where eventually you go in the house.  Am I

11   correct with that statement?

12   A.   Yes.  After everything was done, yes.

13   Q.   So give me an idea of just -- I don't know how long a

14   protective sweep lasts, but from the time that you put the

15   handcuffs on Mr. McMillian to the time that you re-entered the

16   residence with Ashley to get the flip flops, what timeframe are

17   we talking about?  Minutes?  15, 20?  Seconds?  I don't know how

18   long it takes.

19   A.   I'm gonna say at least 10 minutes.

20   Q.   So, a conversation takes place almost immediately after

21   handcuffs are on Mr. McMillian about the flip flops and about 10

22   minutes goes by and that's when you go back -- you go into the

23   residence with Ms. Kneuppel, correct?

24   A.   Roughly, yeah, give or take a couple minutes.  Yep.

25   Q.   Now, where -- when you go back into the residence with

28

1    Ms. Kneuppel -- and I shouldn't say back into the residence

2    because you weren't in the residence at all until you walked in

3    with Ms. Kneuppel, correct?

4    A.  Correct.

5    Q.  All right.  So, when you go in the residence and you walk in

6    there with Ms. Kneuppel, where is Mr. McMillian at this point in

7    time?  Had he been taken to the squad?

8    A.  He was placed into a squad.

9    Q.  And give me an idea, if you can, when that took place?  Was

10   that, again, while the protective sweep was going on, or after

11   it was done?  Do you have an idea?

12   A.  I don't recall if it was after the protective sweep was

13   done.  I recall that an officer had to go and get a car and

14   bring it up.  Because we had parked our cars like seven, eight

15   houses down the block.

16   Q.  Okay.

17   A.  So I don't know the exact timeframe of when he was placed

18   into a squad.  It could have been as soon as the sweep was done,

19   it could have been a couple minutes after that.  I'm not

20   positive on that.

21   Q.  Your best recollection of the words that Mr. McMillian used

22   in regards to going to the back bedroom to get his flip flops

23   were what, "Mine are in the back bedroom"?

24   A.  Those, when -- the exact words that I remember:  "Those are

25   not mine, those are hers; mine are in the back bedroom."

1  Q.  All right.  He never said to you, "Go in and get them for

2  me"?  He never said that to you.

3  A.  No.

4  Q.  He never said, "I'm giving you consent to go in and get my

5  flip flops in the back bedroom," did he?

6  A.  No.

7  Q.  You never asked him for consent to go into his residence,

8  did you?

9  A.  No.

10  Q.  Now, you eventually approach McMillian, let's say, 10

11  minutes after the placing of handcuffs of Mr. McMillian about

12  the flip flops; is that right?

13  A.  Yes.

14  Q.  Now, when you went up to her, what did you say to her as far

15  as you can best recall?

16  A.  The only thing that I can remember saying is, "He needs his

17  flip flops, do you know where they are?"

18  Q.  And her response to you was what?

19  A.  I don't recall the exact words.  I'm assuming it was

20  something to the effect of, "Yes, okay," because we wound up

21  walking toward the back to go get them.

22  Q.  All right.  Now, you say, "I'm assuming it was 'yes' or

23  'okay,'" you have absolutely no recollection of the words that

24  were used, correct?

25  A.  Not word for word, no.

1    Q.   And she never -- well, strike that.

2              Was there an officer standing there with her at that

3    point in time?

4    A.   There are officers standing everywhere still.

5    Q.   Now, you would agree that the fact that an individual such

6    as Tyrone McMillian being arrested, and you have another person

7    that was in the residence — Ashley Kneuppel — being outside,

8    that it would be good policy to have somebody standing with her

9    so that she doesn't cause any harm to any of the officers.  You

10   would agree with that.

11   A.   Correct.

12   Q.   So -- and also at this point in time while this protective

13   sweep is going on, you have no idea if there's somebody else in

14   the residence, right?

15   A.   Correct.

16   Q.   Now, at some point in time, though, after the sweep is over,

17   you came to learn that there was a gun case found?

18   A.   Yes.

19   Q.   And do you know who informed you of that?  Was that Officer

20   Witkowski?

21   A.   I believe he was one of them, but several tac members and

22   even their sergeant told me about the black gun case located in

23   the room.

24   Q.   And did anyone tell you that they opened up the black gun

25   case and they saw a gun in there?

1   A.   Not to me, no.

2   Q.   Now, Mr. Wall asked you some questions about policy and it's

3   good procedure that you don't have people walking around in a

4   house, right?

5   A.   Correct.

6   Q.   Unescorted, right?

7   A.   Yes.

8   Q.   And you indicated that, you know, you had knowledge of at

9   least one gun in the residence, right?

10  A.   Yes.

11  Q.   And that would be one of the main reasons, at least from

12  your recollection, that you weren't going to let somebody go and

13  roam the house alone, right?

14  A.   Yes.

15  Q.   Where was that gun?

16          MR. WALL:  Objection.  Rephrase the question.  It was

17  a gun case.

18          MR. BOYLE:  Well, no.  That wasn't what his testimony

19  was.

20  BY MR. BOYLE:

21  Q.   Your testimony on direct was that you did not want somebody

22  to walk around the house when there's a knowledge of at least

23  one gun in the residence.  Is that what you said on direct?

24  A.   Yes.

25  Q.   All right.  Tell me what knowledge you had.  Because you're

1   telling us here today that there was the knowledge of the one

2   gun which is why you didn't want Ms. Kneuppel walking around the

3   house.  Tell me what knowledge you had to not allow her to walk

4   around where there was one gun in the residence.

5   A.  I had no clue where the gun was in the residence.

6   Q.  Did somebody tell you after the protective sweep that there

7   was a gun in the residence?

8   A.  A long black gun case.

9   Q.  So there was no knowledge that you had of a gun being in the

10  residence, right?

11  A.  (No response.)

12  Q.  Or was there?  I'm trying to find out.

13  A.  I was informed of a long black gun case.

14  Q.  So when you approach Ms. Kneuppel and said, again, about the

15  shoes, and you have no recollection of the exact words but

16  you're assuming here today that she said "yes" or "okay" and

17  then walked into the residence, right?

18  A.  Yes.

19  Q.  Now, you never asked her for consent to go in the residence.

20  A.  No.

21  Q.  You never asked her whether or not she will allow you to

22  enter her home to obtain an item.  You never asked her

23  permission to enter the home, correct?

24  A.  No.

25  Q.  So when you walked in there you walked with her side by

1    side, basically, right, into the residence?

2    A.  (No response.)

3    Q.  Or --

4    A.  Well, she led the way.  She knew where she was going.

5    Q.  And were there other officers still in the home?

6    A.  At that time, no.

7    Q.  And you walked directly to the bedroom that was, in essence,

8    the master bedroom; is that right?

9    A.  Yes.

10   Q.  Now, you told us that when you walked in -- and I know the

11   exhibits, you still have them up there, correct?

12   A.  No.

13   Q.  Oh, you don't?  Oh, okay.  I'll get them back in a second.

14        You were able to observe the black gun case in the one

15   bedroom, right?

16   A.  Yes.

17   Q.  And, as we've identified -- I show you Exhibit Number 1,

18   which I have another copy.  It has been moved and pulled out

19   from underneath the bed; is that right?

20   A.  Yes.

21   Q.  Now, let's talk about when you went into the master bedroom.

22   You entered and Ms. Kneuppel, I think you said, went to the left

23   side of the bed; is that right?

24   A.  Yes.

25   Q.  And you went -- I'm going to show you what's been marked as

1  Exhibit 3 -- to the end of the bed.  Is that what I understand?

2  A.  Correct.

3  Q.  And you observed the pair of jeans that is currently on the

4  bed, right?  On the floor?

5  A.  Yes.

6  Q.  And that's where the black -- or the Nike flip flops were.

7  By the jeans; is that right?

8  A.  By the jeans, under the jeans, next to the jeans.  They were

9  relatively close to each other.

10  Q.  You're the one who physically went over and picked up the

11  flip flops.

12  A.  Yes.

13  Q.  And Ms. Kneuppel is where?  Still on the left side of the

14  bed?

15  A.  Yes.

16  Q.  Now, when you saw these gun cases, they're stacked on top of

17  each other, right?

18  A.  Uh-huh.

19  Q.  You gotta say "yes" or "no" for the record.

20  A.  Sorry.  Yes.

21  Q.  And do you say anything to Ms. Kneuppel like "What are

22  these?", "What's in those?", anything along that lines?

23  A.  No.

24  Q.  And you just make the observation and you leave.

25  A.  Yes.

1    Q.  You go, you bring the flip flops for Mr. McMillian who is

2    where, in the squad?

3    A.  At that time he's in the squad.

4    Q.  Where does Ms. Knueppel go after you leave the bedroom?

5    A.  I believe it was the kitchen area or the living room area.

6    Q.  And who did she go with?

7    A.  At that time my partner was still there and my sergeant,

8    Sergeant Burmeister, was still there.

9    Q.  Okay.  And so, she goes with your partner and Sergeant

10   Burmeister.

11   A.  Yes.

12   Q.  And she goes somewhere in the house with them, right?

13   A.  Yeah, either the -- the side door leads to the kitchen and

14   then it kind of wraps around into the living room.  So it was

15   either -- we stayed in the living room and the kitchen most of

16   the time.

17   Q.  Okay.  I gotta clarify that.  When you said we stayed in the

18   kitchen or the living room, that's -- who is the "we"?  You,

19   your partner, and --

20   A.  Myself, Ashley, Police Officer Walkowiak, and Sergeant

21   Burmeister.

22   Q.  Okay.  Just so I'm clear.  You go in the bedroom, you pick

23   up the flip flops, and you leave the bedroom, right?

24   A.  Yes.

25   Q.  You go and bring the flip flops out to Mr. McMillian, or

1  does somebody else do that?

2  A.  I passed them off to somebody, and that person gives them to

3  Mr. McMillian.

4  Q.  All right.  And Ms. Kneuppel is then still in your general

5  area, that being in the living room or the kitchen area.

6  A.  Yes.

7  Q.  And how long do you wait in the living room/kitchen area?  I

8  mean, are you there for like 15 minutes, 20 minutes at least?

9  A.  It's hard to say because I remember going outside.

10  Q.  And Sergeant Berman and your partner, though, are also in

11  that area, right?

12  A.  Yes.

13  Q.  So they were in the house at the same time that you were in

14  there getting the flip flops.

15  A.  No.

16  Q.  They came in after?

17  A.  After I passed off the flip flops Ashley remained in the

18  house.  They came in afterwards.

19  Q.  And did you inform them about the gun cases?

20  A.  Yes.  My sergeant and I did, yes.

21  Q.  Now, you said that one of the things that when you went down

22  to pick up the flip flops is you noticed "HK Arms" on one of the

23  cases.

24  A.  Yes.

25  Q.  And that would have been the gray case, correct?

1   A.   Yes.

2   Q.   Now, these gun cases were stacked between the nightstand and

3   the bed, correct?

4   A.   Bed headboard, yes.

5   Q.   I'm going to show you what's again been marked as Exhibit 2.

6        Are these -- can I ask, are these the actual exhibits

7   that I should have him mark up?  Or the ones --

8        THE COURT:  If you can mark the one that was

9   previously marked.

10       MR. BOYLE:  Oh, okay.  And I have to ask, does the

11  court have exhibit stickers?

12       THE CLERK:  We do.

13       MR. BOYLE:  Okay.  I'll need one in a second.

14  BY MR. BOYLE:

15  Q.   If I can ask you, with Exhibit Number 2, can you just make a

16  line as to where the gun cases were?  However you want to do it.

17       (Brief pause.)

18  Q.   Do you know what, I'm not going to ask you to mark it yet.

19  I just want to do this for at least a description.

20       You agree that where I'm pointing to on this — and I'm

21  just gonna make a little tiny X — is the corner of the bed, yes?

22  A.   From that angle, yes.

23  Q.   Okay.  And then the other place where I'm gonna mark another

24  X is the back corner of the dresser.

25  A.   Yes.

38

1    Q.   Nightstand.   Right?

2    A.   Yes.

3    Q.   All right.   It appears from looking at this photograph that

4    there's a gap between the bed and the nightstand.   You agree

5    with that.

6    A.   Yes.

7    Q.   Is that gap where the gun cases were found?   In that air

8    space between those two items?

9    A.   Yes.

10   Q.   All right.   Now, you agree, and I know this is a tough

11   picture, but the nightstand has to be at least a foot, foot and

12   a half in depth.   You agree with that, at minimum?

13   A.   Yes.

14   Q.   All right.   So is it fair to say that, again, the air space

15   between the two furniture items is where these things were

16   stacked up?

17   A.   In-between the bed and the nightstand, yes, that space.

18   Q.   And --

19              Do you have -- okay.

20              You never touched the gun case when you were in there

21   on that time, correct?

22   A.   No.   Or, yes, you're correct.

23   Q.   And I'm gonna mark a picture as Exhibit Number 5.   I'm going

24   to show you this.   Do you know what this is?

25   A.   That's the gray gun case.

1  Q.  Okay.  And that says "HK USP" on the photograph that we're

2  looking at, correct?

3  A.  Yes.

4        MR. BOYLE:  And I'd move into evidence Exhibit

5  Number 5 as the gun case.

6        MR. WALL:  No objection.

7        THE COURT:  Received.

8        (Exhibit 5 offered and received.)

9  BY MR. BOYLE:

10 Q.  Now, where on the gun case does it say HK Arms?

11 A.  It doesn't.

12 Q.  Where on the gun case that you saw, on July 6, 2011, did you

13 see the words "HK Arms"?

14 A.  It appears I didn't.

15 Q.  Are you familiar with this gun case?  Are you familiar with

16 this gun case?

17 A.  Yes.

18 Q.  You agree with me that if a person examined the top side and

19 the bottom side of this gun case -- well, strike that.

20        This gun case that I'm showing in Exhibit 5, which was

21 the gun case that was found on July 6th in Mr. McMillian's home,

22 the only place on the entire gun case that it has the letters

23 "HK" is what we're looking at in this picture.  You would agree

24 with that statement.

25 A.  In the picture, yes.

1    Q.  You would agree with me that if this gun case was located

2    between the bed and the nightstand, that this lettering of "HK"

3    would have been obscured by the furniture.  You would agree with

4    that.

5    A.  All depends on how far the space was in-between the

6    nightstand and the bed frame.

7    Q.  Well, showing you Exhibit Number 2 again, you would agree

8    that the space between the bed and the nightstand is not a space

9    of any great significance.  In other words, that gun case

10   couldn't have been turned with the letters "HK" facing outward,

11   there's not that much space there.  You would agree with that?

12   A.  Yes.

13   Q.  And you would also agree to me that it appears from looking

14   at Exhibit Number 2, that the width between the bed and the

15   nightstand is not much greater -- maybe an inch or two at

16   most -- than the depth of what this gun case would be?  You

17   would agree with that?

18   A.  No.

19   Q.  Okay.  Well, how many inches was it?

20   A.  I don't know.

21   Q.  I'm sorry?

22   A.  I don't know.

23   Q.  I'm sorry?

24   A.  I don't know actual inches.

25   Q.  Okay.  You have told us here that you did not view the words

1    "HK Arms" on -- well, strike that.

2              You've told us here today on Exhibit Number 5 that it

3    does not say "HK Arms," correct?

4    A.   That full phrase, yes.

5    Q.   Okay.  You would agree with me that it does say, "HK.  "In a

6    world of compromise some don't--", and then big letters of

7    "USP."  You agree with that?

8    A.   Yes.

9    Q.   You would agree that you did not view the phrase and letters

10   I just read into the record.  You would agree with that.

11   A.   I would disagree with that.

12   Q.   Okay.  Did you see those letters when you went in there to

13   pick up the flip flops?

14   A.   The HK.

15   Q.   Okay.  How did you see that if the gun cases were stacked on

16   top of each other between two pieces of furniture, in the gap

17   area between the two pieces of furniture?

18   A.   The gap in-between the nightstand and the bed was not that

19   small as what you're portraying it to be.  As I bent down to

20   pick up the flip flops I was no more than two feet away from the

21   gun cases and I can easily see the HK.

22   Q.   I need to ask you --

23             I would like to mark this as Exhibit Number 6.  Is

24   that the same one?  Oh, do you know what, I'm going to mark this

25   as Exhibit Number 6 because mine is a little cleaner.

1    MR. WALL:  Nice.

2  BY MR. BOYLE:

3  Q.  I'm going to show you Exhibit Number 6, which is Exhibit

4  Number 3.  Do you agree with that or do you need to see Exhibit

5  Number 3?

6    MR. WALL:  Stipulate.

7    MR. BOYLE:  Okay.

8  BY MR. BOYLE:

9  Q.  Again, here is the -- at least what appears to be a cleaner

10  or more -- or more focused printing of the dresser and the bed.

11  You would agree with that?

12  A.  Yes.

13  Q.  And this is as it was, as far as you can recall, the way it

14  was, other than the jeans and the flip flops being in the room

15  and the gun cases being between the dresser and the bed?

16  A.  That's after search warrant.

17  Q.  Yes, I understand.  But this is -- for the rest of the

18  items -- other than the jeans, the flip flops, and the gun cases

19  that are now on top of the bed, this is as best as you can

20  remember the layout of the furniture and the dresser, correct?

21  A.  Roughly.

22  Q.  Well, what do you mean by "roughly"?  What got moved?

23  A.  In a search warrant everything gets moved.  I helped search

24  this room so I know exactly what was moved, what was opened,

25  what was closed.  So you're talking about moving mattresses,

1   moving furniture, lifting up furniture, see if anything is

2   underneath the furniture, mattresses, et cetera, et cetera.

3   Everything from one corner goes into the other corner and then

4   vice versa to make sure you don't miss anything.

5   Q.  Did you move the nightstand?

6   A.  Nightstand was moved, yes.

7   Q.  Who moved it?

8   A.  I don't know if it was me, but I did search the lower

9   drawer.  I missed this top drawer right here.  I didn't realize

10  that popped out.  It was lifted up and searched underneath.  The

11  safe was also moved.  This whole bed mattress was flipped up.

12  Behind this bed frame was pulled off against the wall.  So the

13  whole furniture, everything was moved.

14  Q.  I asked you, Officer, who moved the nightstand?

15  A.  There were several people in the room.  I was one of them.

16  I don't know who physically moved it, but I looked underneath

17  it.

18  Q.  Did you physically move the nightstand as far as you can

19  recall?

20  A.  No.

21  Q.  Okay.  You did not see anyone physically move that

22  nightstand, did you?  Observe it, in actuality, not assumptions.

23  A.  Somebody did because I looked underneath it.  I don't

24  remember --

25          MR. BOYLE:  Okay.  I move for the admission of -- oh,

44

1  it's stipulated to.

2  BY MR. BOYLE:

3  Q.  You never opened, prior to the execution of the search

4  warrant, the black gun case, did you?

5  A.  No.

6        MR. BOYLE:  All right, I'm going to mark this exhibit,

7  please, as Exhibit Number 7.

8  BY MR. BOYLE:

9  Q.  This is a picture of a dresser.  Nightstand, I'm sorry.

10  A.  Yes.

11  Q.  There is a safe next to it?

12  A.  Yes.

13  Q.  That would be on the right-hand side?

14  A.  Yes.

15  Q.  There is the bed frame on the left side of the picture?

16  A.  Yes.

17  Q.  There is -- it appears to be separated from the -- the frame

18  of the bed from the headboard; you would agree with that?

19  A.  Yes.

20  Q.  You would agree that from looking at this picture the safe

21  is pretty much right against the wall on Exhibit Number 7?

22  A.  Yes.

23  Q.  You would agree that it appears that the safe is also right

24  against the nightstand on its left-hand side?  You would agree

25  with that?

1    A.   From that angle, yes.

2    Q.   Yes.  You would agree that there appears to be maybe three

3    inches of space between the nightstand and the bed headboard

4    area in this picture, correct?

5    A.   It could be three inches.

6    Q.   Okay.

7    A.   It could be five inches, it could be six inches.  There is a

8    space in-between the headboard and the nightstand.

9    Q.   Sure.  So let's go with three to six inches, yes?

10   A.   Yes.

11   Q.   Okay.  So, just for the sake of the record, whatever

12   distance there is between the headboard and the nightstand is

13   contingent upon the safe being there.

14          In other words, with the safe being on the right side

15   of this picture abutting the wall, abutting the nightstand, the

16   nightstand cannot move to the right, it can only move to the

17   left, correct?

18   A.   That general direction left or right, yes.

19   Q.   Yes.

20          I move for the admission of Exhibit Number 7.

21          MR. WALL:  No objection.

22          THE COURT:  It's received.

23          (Exhibit 7 offered and received.)

24   BY MR. BOYLE:

25   Q.   After you see these gun cases you notify somebody, your

1   sergeant, at some point in time, and it is at that point in time

2   when you contact your dispatcher to do a SNEW check?  Or when do

3   you ask that this be run?

4   A.  I don't know the exact time.  It was probably 10 -- when I

5   had time to do it, 10, 15 minutes to do it.  After I saw those

6   two gun cases, knowing the other gun case was in the other room,

7   making sure he was already going downtown, letting my supervisor

8   know all the information that I obtained, having him call down

9   to the Detective Bureau and have the detectives respond to our

10  scene.  Within that timeframe is when I made the call to our

11  clerks who work at our station to have the FBI number ran.

12  Q.  Ultimately you find out he is a convicted felon.

13  A.  Yes.

14  Q.  And you then do what?

15  A.  I advised the detectives that were there that, "Hey, he's a

16  convicted felon."

17  Q.  Okay.  Ashley Kneuppel was a resident in the home when you

18  arrive, right?

19  A.  Yes.

20  Q.  You had knowledge that she was a resident, that meaning a

21  person who lived in the residence also prior to your arrival

22  that day, right?

23  A.  Yes.

24  Q.  So, you never -- well, strike that.

25          When Ashley was outside, after Tyrone was handcuffed,

1    while the protective sweep was going on, she would not have been

2    allowed to go back into her residence without an officer with

3    her.  You would agree with that.

4    A.  Yes.

5    Q.  You would also agree with me that if she wanted, after the

6    sweep was over, to go into the residence to get flip flops, that

7    you would not have allowed her to walk freely throughout her

8    home.

9    A.  That's correct.

10   Q.  You did not give her an option -- well, strike that.

11          You've told us you did not get consent from her to go

12   into that residence for the flip flops.

13   A.  Correct.

14   Q.  And when you walked into the residence you told us that

15   there were no other officers in there, right?

16   A.  That's correct.

17   Q.  When you come out of the bedroom, though, with the flip

18   flops, eventually some officers come into the residence.

19   A.  Yes.

20   Q.  And that -- the officers coming back into the residence,

21   though, was prior to you telling your sergeant about the gun

22   cases being seen in the bedroom.  Is that what I understand?

23   A.  My gun cases, yes.

24   Q.  Yes.

25   A.  Yes.

1  Q.  You then at some point in time after they come back into the

2  residence, and Ashley is in there and you're in the kitchen area

3  or the living room area, you inform your sergeant, "Hey, there's

4  a couple gun cases in that bedroom," right?

5  A.  Yes.

6  Q.  And then you check and he is a convicted felon, right?

7  A.  Yes.

8  Q.  Now, you knew, though, that there was a gun case at least in

9  that other bedroom prior to reentering the residence with

10 Ashley; is that what I understand?  Yes?

11 A.  Yes.

12 Q.  And you would agree with me that when you learned that there

13 was a gun case in the child's bedroom, prior to your re-entry

14 or -- not re-entry -- prior to your entry into the home, that

15 that home could not be accessed by Ms. Kneuppel.

16 A.  Yes.

17 Q.  So, is it fair to say that until you sort out -- after the

18 officers find the black gun case in the child's bedroom, until

19 you're able to sort out whether or not he's a convicted felon or

20 if it's a -- I guess a stolen gun case or whatever, that home

21 was not able to be accessed by the resident who was the rightful

22 owner, that being Ms. Kneuppel.

23 A.  Correct.  It was -- we pretty much froze the house.  The

24 scene was freezed.

25 Q.  The scene was frozen after the identification of that

49

1   original -- or the observation of that original gun case, that

2   being the black one, yes?

3   A.  Yes.

4           MR. BOYLE:  I have nothing further.

5           THE COURT:  Mr. Wall, do you have anything else?

6           MR. WALL:  Yes.  I'd like to see the Exhibits 5, 6 and

7   7 for just a bit.

8                   REDIRECT EXAMINATION

9   BY MR. WALL:

10  Q.  Okay.  Exhibit 5, the gray gun case.  Is that -- based to

11  the best of your memory, is that the side of the gun case that

12  you saw through the nightstand?

13  A.  Yes.

14  Q.  You did not see -- and it's not shown in here -- you did not

15  see something written on the side.

16  A.  No.

17  Q.  Okay.  And it says, in block letters, "HK USP."  You had it

18  wrong when you recalled "HK Arms."

19  A.  No explanation where the "Arms" came from.

20  Q.  Okay.  Somewhere in your memory.

21  A.  Well, what I saw it's HK.

22  Q.  And did HK mean something to you?

23  A.  Just HK alone, no.  Not to myself, no.

24  Q.  Did you recognize it as a gun case?

25  A.  Yes.

1   Q.  You said in your -- during cross-examination here that you

2   know that after you saw the two gun cases stacked between the

3   nightstand and the bed that the search warrant was conducted.

4           The search warrant happened after you were in the

5   bedroom to get the flip flops and saw the two gun cases.

6   A.  That happened well after.

7   Q.  Well after.

8   A.  Yes.

9   Q.  And you were part of that search warrant.

10  A.  Yes.

11  Q.  And you were in the -- this particular bedroom later on.

12  A.  Yes.

13  Q.  And in this particular bedroom you were moving furniture?

14  A.  Yes.

15  Q.  Is that pretty standard?

16  A.  Like I said, on the search warrant everything gets moved.

17  Q.  Everything gets moved.

18  A.  Everything gets moved.  Everything gets rifled through.

19  Socks, drawers, you name it.  We go through it.

20  Q.  Okay.  And you were shown -- it's essentially Exhibit

21  Number 2 and 3 which are pretty similar.  Exhibit Number 3, this

22  is post search warrant, correct?

23  A.  Correct.

24  Q.  And post search warrant we see that the nightstand, from

25  this angle, looks pretty close to the bed frame, correct?

1    A.   Yes.

2    Q.   Is it your testimony that the nightstand and the bed frame

3    were moved during the search warrant?

4    A.   At one point in time they were moved.

5    Q.   Such that at the end of the search warrant this picture,

6    number 3 and number 2, would be accurate pictures.

7    A.   Yes.

8    Q.   After you talked to Ashley about the flip flops and she said

9    she knew where they were, did you understand that you -- in your

10   mind, did you understand that you were to go with her and get

11   them?

12        MR. BOYLE:  I'm going to object.  Well, forget it.  He

13   can answer.

14        THE WITNESS:  Yes.

15   BY MR. WALL:

16   Q.   Was there any other interpretation in your mind, at that

17   time or now, as to what --

18   A.   She never said no.

19   Q.   And you were going to go get them.

20   A.   Yes.

21   Q.   And she -- it was your understanding that she wanted to get

22   them.

23   A.   Yes.

24        MR. WALL:  Okay.  I have nothing else.

25   /

1                          RECROSS-EXAMINATION

2    BY MR. BOYLE:

3    Q.  Officer Shull, you know based upon your knowledge and

4    experience as a Milwaukee police officer, that in order to enter

5    a person's home you have to gain consent from that individual to

6    enter the home, correct?

7    A.  Normal circumstances, yes.

8    Q.  You never asked Ashley Kneuppel, "Can I have consent to go

9    in your house and get a pair of flip flops in the bedroom?", did

10   you?

11   A.  In those exact words, no.

12   Q.  What words did you use as a Milwaukee police officer to gain

13   consent to go and enter a resident of a lawful owner of a

14   residence, that being Ashley Kneuppel?

15   A.  I don't recall what I said earlier, but I believe it was to

16   the point of, "Do you know where the flip flops are?", with her

17   saying, "Yes, let's go get them," and we both walked to the

18   back.

19   Q.  And you're telling us in this courtroom that that was

20   enough, quote-unquote, consent for you as a Milwaukee police

21   officer to enter the residence of a human being, specifically

22   6333 West Darnell?

23   A.  That was enough to tell me that she was going to go get

24   them, and with my knowledge of a firearm in one of the rooms

25   that she wasn't going to go alone.

1   Q.  All right.  And when you say knowledge of a firearm in one

2   of the rooms, what knowledge did you have of a firearm?

3   A.  Just of the long black gun case, but 99 percent of the time

4   if there's a gun case somewhere there's going to be a gun.

5   Q.  Okay.  So you're assuming that there was a firearm in the

6   residence, correct, because of a gun case?

7   A.  Yes.

8   Q.  So when you said that the knowledge of a firearm in a

9   residence, you meant the assumption that there was a firearm in

10  the residence because of a black gun case, right?

11  A.  Yes.

12  Q.  Now, you -- when she said, "Okay let's go and get it," which

13  is what you just said now, right?  "Let's go and get them."

14  A.  Something to that effect.

15  Q.  Right.  Because you don't remember the exact words that she

16  used, as you sit here today.

17  A.  Correct.

18  Q.  All right.  And in your report that you wrote, it indicates

19  that, and I'll read it:

20          "I observed that he was not wearing any shoes.

21  McMillian stated that he wanted his Air Jordan flip flops.  I

22  asked Ashley where they were located, to which she stated, 'They

23  are in our bedroom.'  I walked with Ashley to the bedroom and

24  bent over to pick up the flip flops."  Et cetera and so forth.

25          Do you remember that in your report?

1  A.  Yes.

2  Q.  Okay.  There's nothing in here that says Ashley responded

3  with any words when you stated to her that you wanted to know

4  where they were located.  You agree that in your report she

5  never responded as far as what you wrote down.

6  A.  Yes.

7  Q.  All right.  So, when you wrote your report and put that she

8  responded with, "Okay, let's go and get them," right?  You agree

9  with that.

10  A.  Correct.

11  Q.  But you remember those words, as you sit here today, that

12  she said something along that lines.

13  A.  Something along the lines of the positive, because if she

14  would have said no, he would never have got his Air Jordan flip

15  flops, he would have went barefoot.

16  Q.  Right.  Because she had a right to say, "I'm not getting his

17  flip flops," right?

18  A.  Correct.

19  Q.  She had a right to say, "I'm not walking with you to our

20  bedroom," right?

21  A.  Correct.

22  Q.  The scene, though, was already frozen at this point in time,

23  right?

24  A.  Yes.

25  Q.  So you never got consent from her, directly.  In other

1    words, "Can I have consent to go into your residence?"  Do you

2    agree?  Right?

3    A.  Yes.

4    Q.  But it was really, would you not say, would you agree with

5    me, that it was really irrelevant at that point to gain consent

6    from her because the scene was already frozen, she couldn't walk

7    in there?

8             MR. WALL:  Objection, calls for a legal conclusion.

9             MR. BOYLE:  Well, I'll ask it a different way.

10   BY MR. BOYLE:

11   Q.  The scene was frozen when you had this conversation with

12   her, right?

13   A.  Yes.

14   Q.  Because of the black gun case being found on the protective

15   sweep, correct?

16   A.  Yes.

17            MR. BOYLE:  All right.  I have nothing further.

18            MR. WALL:  Nothing else, Your Honor.

19                            EXAMINATION

20   BY THE COURT:

21   Q.  Officer Shull, I just have a couple of picture framing

22   questions.

23   A.  Yes.

24   Q.  You testified that when you arrive at the house you went to

25   a side door?

1    A.   Yes.

2    Q.   Is the side door the main entrance to this residence?

3    A.   There is -- from what I remember there is a -- I wanna say

4    there's a front door, but the side door led out to the driveway

5    and I -- I would say that's a secondary door.  And I believe

6    there was a front door.  We never used the front door, though.

7    We used always the side door.

8    Q.   Is this a single-family residence, a duplex?

9    A.   It's a single-family residence.  Ranch.  Had a basement.

10   Q.   And when you -- when you approach the side door do you have

11   to climb steps to get to where the door is, to get to the

12   threshold?  I could not visualize what you were describing.

13   A.   I believe there was one stoop or one step to the door.  I

14   don't recall a screen door.  I just recall the main door.

15   Q.   And when you testified that Ms. Kneuppel -- she came out of

16   the residence and was about 10 to 15 feet away from you.

17   A.   Yes.

18   Q.   Is this the sidewalk?  Is this the yard of the residence?

19   Can you just kind of lay out the picture for us a little bit

20   more?

21   A.   That's the driveway.  The driveway is on the east side of

22   the house.  You have the north side of the house.  The east side

23   of the house is where the one door is.  All three cars are

24   parked in the driveway.  There was a garage, I believe.  I don't

25   know what else you would need to know.

57

1  Q.  Okay.  And now as to the bedroom in question, the subject of

2  Exhibits, I think, 2, 3.  You testified that the furniture was

3  moved during the course of the execution of the search warrant;

4  is that correct?

5  A.  Yes.

6  Q.  And these pictures were taken after the execution of the

7  search warrant?

8  A.  I believe so, yes.

9  Q.  And was the furniture put back where you first saw them?

10  A.  Towards the end of the search warrant I left.  It was going

11  on 3:00 in the morning, 4:00 in the morning, and I was over.  My

12  shift ended at 4:00.  So I don't know what was physically moved

13  back into place.  But those pictures look a lot nicer than what

14  the room was when I left.

15  Q.  Okay.  Do the pictures look like the room looked when you

16  first arrived looking for the flip flops?

17  A.  Yes.

18          THE COURT:  I don't have anything else.  Any

19  questions?

20          MR. WALL:  No, Your Honor.

21          MR. BOYLE:  No.

22          THE COURT:  Thank you, Officer Shull, you may step

23  down.

24          (Witness excused at 2:53 p.m.)

25          THE COURT:  Any other witnesses?

1    MR. WALL:  Yes, Your Honor.  Detective Rodolfo Gomez
2  as to the search warrant.  I'll go get him.
3        RODOLFO GOMEZ, GOVERNMENT WITNESS, DULY SWORN
4    THE CLERK:  Please be seated.  Please state your full
5  name and spell your last name for the record.
6    THE WITNESS:  Rodolfo Gomez.  R O D O L F O.
7  G O M E Z.
8                    DIRECT EXAMINATION
9  BY MR. WALL:
10 Q.  Mr. Gomez, for whom do you work?
11 A.  I am a detective for the city of Milwaukee's police
12 department.
13 Q.  How long have you been employed with the City of Milwaukee
14 Police Department?
15 A.  10 years.
16 Q.  How long have you been a detective?
17 A.  Four years.
18 Q.  What's your current assignment?
19 A.  I am assigned to the Homicide Division.
20 Q.  And how long have you been with the Homicide Division?
21 A.  Two years, sir.
22 Q.  Direct your attention to July 6th of this year, 2011, what
23 shift were you working?
24 A.  I worked early shift, which is from 4:00 p.m. to 12:00 a.m.
25 Q.  Okay.  And during that shift is there some type of briefing

1  of the detectives?

2  A.  Yes, sir.

3  Q.  And what does that consist of and who does that?

4  A.  We do a rollcall every day from 3:48 to 4:00 p.m.  The

5  lieutenants normally conduct the rollcall.  And it basically

6  comprises of updating officers of any changes in the department,

7  any personnel orders.

8  Q.  Okay.  Did you have a conversation with a Lieutenant Jeff

9  Point that day?

10  A.  Yes, sir.

11  Q.  Who was the nature of that conversation?

12  A.  Well, the first conversation he instructed me to make

13  contact with Detective William Smith regarding a homicide search

14  warrant.

15  Q.  And what was your understanding of what your duties would be

16  regarding that search warrant?

17  A.  Yes.  He wanted me to type up an affidavit based on

18  information that was gleaned from Detective Smith.

19  Q.  Okay.  And did you have occasion to call Detective Smith or

20  did he call you?

21  A.  Yes, sir, we made telephonic contact.

22  Q.  Now, we're talking a little bit after 4:00?

23  A.  Yes, sir.

24  Q.  Do you know where he was at the time you first contacted

25  him?

1    A.  No, I did not.

2    Q.  Did you come to find out where he was located during the

3    course of other conversations?

4    A.  Yes.

5    Q.  And where was that?

6    A.  I knew that he was at 6333 -- my brain just slipped here.

7    Q.  West Darnell?

8    A.  West Darnell, there you go, yes.  And it was not in the city

9    of Milwaukee, though.

10   Q.  And what was the substance of those early phone calls?

11   A.  Well, basically Detective Smith --

12          MR. BOYLE:  Well, Judge, I'm going to object because I

13   think it calls for hearsay.

14          MR. WALL:  It goes for what he did in preparing the

15   warrant.

16          THE COURT:  I will allow it because generally the

17   rules of evidence, as you know, do not apply in evidentiary

18   hearing, and plus it goes as to what steps he took next in

19   preparing the warrant.

20          THE WITNESS:  Detective Smith informed me that they

21   were currently at that location, 6333 Darnell, regarding the

22   arrest of a homicide suspect which is Tyrone McMillian.

23   BY MR. WALL:

24   Q.  Okay.  And, again, you understood your assignment was to

25   type up an affidavit for a search warrant?

1    A.   Yes, sir.

2    Q.   For that residence.

3    A.   Correct.

4    Q.   Okay.  So you're talking to Detective Smith, correct?

5    A.   Yes, sir.

6    Q.   And what else are you doing to inform yourself as to, I

7    guess, probable cause?

8    A.   Well, I started reading the M file for that particular

9    double homicide.

10   Q.   What's an M file?

11   A.   That is a homicide file.  And it's an accordion file where

12   we keep all evidence such as discovery, police reports, photos.

13   Anything that has taken place, been written or taken in as

14   evidence for that particular homicide.

15   Q.   Was anybody with you when you were reviewing the homicide

16   file and the reports?

17   A.   Yes, sir.  There was another detective named Eric

18   Gulbrandson, G U L B R A N D S O N.

19   Q.   And do you know whether or not he had knowledge of this

20   particular homicide?

21   A.   Yes, sir, he did.

22   Q.   And this is actually a double homicide, correct?

23   A.   That is correct.

24   Q.   As a result of your conversation with Detective Smith, did

25   you start typing up a face sheet for the search warrant and then

1    the affidavit?

2    A.  Yes, sir, I did.

3    Q.  Okay.  I show you what's been marked as Exhibit Number 4

4    which --

5            This was in the record about three or four different

6    times in various pleadings but we'll put it back in.

7            Do you recognize that?

8    A.  Yes, sir.

9    Q.  And what is Exhibit 4?

10   A.  That is the search warrant and affidavit that I drew up

11   regarding the residence of 6333 West Darnell Avenue.

12   Q.  Who gave you the -- in looking at page 1, and we'll call it

13   page 1 of 6, who gave you the description of the residence?

14   A.  Detective Smith.

15   Q.  There's a typo in -- looks like -- described premises here,

16   it's -- you start to have a typo.  What happened there?

17   A.  Well, you basically said it.  It was a type error.

18   Q.  Whose fault was that?

19   A.  That was mine.  And I had it corrected.

20   Q.  He actually gave you 6333 but you had a typo?

21           MR. BOYLE:  Well, I'm going to object to the form of

22   the question.  Calls for leading.

23           THE COURT:  Sustained.

24   BY MR. WALL:

25   Q.  Where did you get 66 -- how did it go from 63 to 66?

63

1    A.   Well, Detective Smith had originally given me 6333, and I

2    inadvertently typed in 6633.

3    Q.   Now, turning to the affidavit, page 3 of 6 on the bottom

4    there.

5    A.   Yes.

6    Q.   Paragraphs 1 through 4.  Where did you get that information?

7    Paragraph 1 is about you, but paragraphs 2 through 4, where did

8    you get all that?

9    A.   That information was gleaned from the file.  Some of the

10   information of which I read from the M file and from Detective

11   Gulbrandson.

12   Q.   And you typed that up.

13   A.   Yes, sir.

14   Q.   Along with the header there, "I, Detective Gomez"?

15   A.   Yes.

16   Q.   Okay.  And where did you -- well, was that -- were

17   paragraphs 1 through 4 completed before a period of time in

18   which you typed up paragraph 5?

19   A.   Yes.

20   Q.   And where did you get the information in paragraph 5?

21   A.   That information was gleaned from Detective Smith who was on

22   scene.

23   Q.   Okay, next page.  It says 4 of 6.  Paragraph 6.  Where did

24   you get that information from?

25   A.   That information was also obtained from Detective Smith.

1  Q.  Paragraph 5 -- um, sorry, to go back.  Second sentence there
2  it says, "Executed an arrest warrant at the residence."  Where
3  did you get that information from?
4  A.  That specific wording I just wrote down when Detective Smith
5  told me that Mr. McMillian was arrested on an arrest warrant.
6  Q.  Okay.  So he said "an arrest warrant"?
7  A.  Yes.
8  Q.  And paragraph 7, where did you get that information?
9  A.  That's from information that was relayed to me by Detective
10  Smith, and also information that I found via the MPD databases.
11  Q.  Okay.  So would it be correct to say that at the beginning
12  of this search warrant, really, paragraphs 1 through 4 are
13  probable cause and then 5, showing the address, were for the
14  homicide?
15  A.  Pretty much, yes.  Yes, sir.
16  Q.  Now, there was -- was there one phone call or were there a
17  series of phone calls back and forth between you and Smith?
18  A.  There were at least four to five phone calls, sir.
19  Q.  Okay.  Was -- were you getting additional information
20  through the consecutive phone calls?
21  A.  Yes.
22  Q.  Okay.  Paragraph 8 is your probable cause paragraph.  Why is
23  paragraph A in there?  Or, I'm sorry, subsection A, 8A.
24  A.  8A, where it says "recording equipment"?
25  Q.  Yes.

1   A.   That was included based on the homicide information I had

2   received.   We had knowledge that there had been a burglary that

3   was committed before the homicide.

4   Q.   And the rest of these paragraphs, can you go through -- how

5   long have you been doing homicides, two years?

6   A.   Two years, sir.

7   Q.   How many have you investigated, approximately?

8   A.   Well over 100.

9   Q.   Okay.   What is the relevance of the rest of the

10  subparagraphs here?   If you can just kind of narrate that.

11  A.   Okay.   I'll start at B, cell phones.   Everybody uses cell

12  phones.   I think that's pretty self-explanatory.   They either

13  text, use photos, or make phone calls.   They have contacts in

14  there.

15         Clothing --

16  Q.   Any relevance to cell phones taking pictures?

17  A.   Absolutely.   People take pictures -- most of the phones

18  nowadays have cameras and video recorders.

19  Q.   And how would that be relevant to a homicide investigation?

20  A.   It's been my experience that, not only homicides but other

21  crimes, people take pictures sometimes of the proceeds,

22  sometimes of their acts, their weapons.   They include firearms,

23  body armor, pictures of themselves posing with their weapons.

24  Q.   Go on.   C?

25  A.   C, clothing.   You know, if somebody used it in a crime,

1    especially in a homicide, we would be looking for any biological

2    evidence such as DNA or back-splash from blood from the victim.

3          D, personal papers, documents.  You know, you may find

4    insurance papers, threatening letters, intimidating letters or

5    contracts.

6          E, monies.  Well, people who commit robberies or

7    murders, sometimes they get paid or they keep the proceeds.

8    Sometimes they hide them, keep them for some time, sometimes

9    they spend them right away.

10          As far as F, for firearms and ammunition.  Obviously,

11   I was investigating a homicide, so I was definitely looking for

12   any firearms or ammunition, any gun cleaning supplies which is

13   indicative of a person who has a firearm.

14   Q.  And these victims were shot.

15   A.  Yes, sir.  They were killed with a firearm.

16          And G, the computers and/or electronic devices.

17   Again, most phones such as my iPhone is considered a computer.

18   I know on personal experience that when I back up my phone it

19   saves it to the hard drive of my laptop or a storage device, and

20   most of that evidence that is normally or typically on a phone

21   could be saved on a computer.

22   Q.  Okay.  Paragraph 9 is -- where did you receive that

23   information?

24   A.  That was part of the description that Detective Smith had

25   given me regarding the description of the house.  As with 10.

1  Q.  After you typed up your search warrant and your affidavit,
2  did you take it to anybody for review?
3  A.  Yes.  I had my lieutenant, Jeffery Point, review it.  He
4  notarized it.  I then took it to the assistant district attorney
5  Grant Huebner, who also reviewed it and told me that it was
6  good, I could now forward it to the judge, the duty judge.
7  Q.  Did you talk to Detective Smith at all about the search
8  warrant?
9  A.  Yes, sir.  Basically, the last phone call I had with him I
10 read back some of the items -- or the affidavit explaining what
11 I had written up.  I asked him if I had missed anything.
12 Detective Smith stated it sounded like it was good, nothing that
13 he could think of at the time.  And then we moved forward with
14 the executing or the signing of the search warrant.
15 Q.  And how did you do that?
16 A.  I had made contact with the duty judge who on this
17 particular day was going to be Judge Martens, Kevin Martins.
18 M A R T E N S.
19 Q.  You presented everything to him at his house, right?
20 A.  Yes, sir.
21 Q.  And what happened?
22 A.  He reviewed it and he signed it and approved it on that
23 particular day at approximately 9:10 p.m.
24 Q.  Okay.  What did you do after Judge Martens approved the
25 search warrant?

1  A.  I contacted my lieutenant, advised him that we had received

2  the okay to execute the search warrant.  We then proceeded to

3  6333 West Darnell Avenue where we executed the search warrant.

4  Q.  Okay.  And you when you got there did you notice that

5  something was wrong?

6  A.  Yes, sir.  As I was approaching the residence I normally

7  validate and verify the numbers of the address to the search

8  warrant and I noticed that there was a type error.  The address

9  was 6333, and I had on the search warrant 6633.

10  Q.  Okay.  What did you do about that error?

11  A.  I stopped, I notified my lieutenant, who then recommended we

12  call the judge which was Judge Martens.  I called Judge Martens

13  and explained the typographical error.  He instructed me to go

14  throughout the entire affidavit and search warrant, line through

15  the incorrect number 6, put the correct number of 3, and to

16  initial every correction.  And I contacted the judge at 10:08

17  p.m., and he told me that was not a problem and he authorized me

18  to continue.

19  Q.  Okay.  And did you go through it and make those changes and

20  initial the changes?

21  A.  Yes, sir.

22  Q.  And is there a notation somewhere on your affidavit that you

23  talked to the judge and received his approval?

24  A.  Yes, sir.  On page 5 of 6, the last handwritten entry I

25  wrote in:  "7-6-11, 10:08 p.m., authorized corrections of 6633

1    to 6333, Judge Martens."

2              MR. WALL:  Okay.  I have nothing else of this witness.

3              THE COURT:  Ms. Boyle?

4              MR. BOYLE:  Thank you.

5                          CROSS-EXAMINATION

6    BY MR. BOYLE:

7    Q.  Detective Gomez, your involvement in this case, did it start

8    on July 6th, or had you previously had some knowledge of this

9    matter?

10   A.  I had some previous knowledge of this matter, yes.

11   Q.  You are aware that there was a homicide of two people in --

12   somewhere between the dates of October 15th, 2007 and October

13   19th, 2007, correct?

14   A.  Yes.

15   Q.  So at the time that this was being -- I'm just stating the

16   obvious, it's about four years later when this search warrant is

17   being applied for and executed.  You would agree with that.

18   A.  Yes.

19   Q.  Now, you're aware based upon your knowledge of the file and

20   the fact that on page -- on the affidavit in paragraph 4, you're

21   aware that there's an individual by the name of Todd Carter who

22   supplied information to law enforcement.  Specifically, that

23   "Tyrone McMillian had to 'pop' the victims over an argument.

24   Todd Carter further related McMillian confessed the argument was

25   over a failed lease contract which involved a recording studio

1  at 5514 West Lisbon Avenue."  Correct?

2  A.  Yes, ma'am.

3  Q.  Now, you're aware that the information from Todd Carter was

4  probably about a year old?  Is that about right?

5  A.  I was not aware of exactly when he had provided that info.

6  Q.  Okay.  Did you come to learn at any point in time that Todd

7  Carter's information was -- the interview that he supplied this

8  information was approximately a year old?

9  A.  I could not truthfully answer that.

10  Q.  All right.  When you put the information from Todd Carter in

11  this affidavit, how did you acquire that information?

12  A.  I acquired that from Detective Gulbrandson and other

13  detectives that were providing the information regarding this

14  particular informant.

15  Q.  All right.  You typed up the application which is the first

16  page of Exhibit Number 4, correct?

17  A.  Yes.

18  Q.  All right.  In it, under paragraph 1, it says, "describe

19  premise," and there are -- it's a description of a residence,

20  and when you originally typed it you typed 6633 West Darnell

21  Avenue, correct?

22  A.  Yes, ma'am.

23  Q.  And he talks about it's a single-family located on the south

24  side, et cetera, and so forth, right?

25  A.  Yes.

1    Q.  Who gave you that information?

2    A.  Detective Smith.

3    Q.  All right.  Did he also give you the address West Darnell?

4    A.  Yes.

5    Q.  Did you go and search -- you said that you did a little

6    review of the file.  Did you search as to Mr. McMillian's

7    address at all?  Or did you just rely on your memory of what

8    Detective Smith gave you?

9    A.  I relied on the information Detective Smith gave me.

10   Q.  All right.  So did Detective Smith inadvertently give you

11   6633, or not?  Or do you not know?

12   A.  I would assume he gave me the correct address since he was

13   on scene, and I took the responsibility of the error upon

14   myself.

15   Q.  Okay.  And I understand that.  But when you say you assume

16   that he gave you the right address, a potential exists that he

17   could have said 6633 and just misspoke and you wrote down what

18   he gave you.  I mean, that exists as a possibility.

19   A.  Sure.

20   Q.  Sure.  And it also exists as a possibility that you

21   inadvertently wrote down 6633 instead of what Detective Smith

22   gave you of 6333, correct?

23   A.  Well, I know that more likely than not the error was my part

24   because when I reviewed the memos, those little memo Post-It

25   notes, I had the correct address on there.

1    Q.   Where are the memo Post-It notes?

2    A.   I threw them away when I finished the affidavit.

3    Q.   Well, you reviewed some memo Post-It notes, right?

4    A.   That I wrote that day, yes.

5    Q.   Sure.  And when did you review those?

6    A.   The next morning.

7    Q.   And did you at all make a copy of that to be able to put in

8    the report or into evidence to say this was just an inadvertent

9    mistake?

10   A.   No.

11   Q.   You went in the next morning, saw these Post-It notes and

12   said, oh, I guess I did have the right address, I just

13   inadvertently typographically transcribed it incorrectly.

14   A.   Yes.

15   Q.   So as you sit here, it's absolutely not possible that

16   Detective Smith gave you the wrong information, correct?

17   A.   I didn't say that.

18   Q.   Oh, so it is a possibility that he gave you the wrong

19   information.

20   A.   It could have been.

21   Q.   Okay.  All right.  So let's go on here.  You make three

22   corrections on the front of this page to the correct address and

23   initial it, right?

24   A.   Yes, ma'am.

25   Q.   And that is done after -- well, strike that.

1           That is done when you are back on scene or when you

2    are on scene going to execute the search warrant.  Right?

3    A.  That is correct.

4    Q.  All right.  Now, let's look at Exhibit -- or, I'm sorry,

5    describe articles of search.  It says, "E, Monies in large

6    quantities which constitute drug contraband" and "may" is

7    written there.  Do you see that?

8    A.  Yes.

9    Q.  Who wrote that?

10   A.  That was probably me.

11   Q.  Well, "probably" doesn't help me out.

12   A.  Then I'll say it was me.

13   Q.  Okay.  Do you remember writing that?

14   A.  I believe I did write it, yes.

15   Q.  Okay.  So you do remember writing it.

16   A.  Yes.

17   Q.  When did you write that?

18   A.  I couldn't tell you, ma'am.

19   Q.  So you don't know if that "may" was written when you were at

20   Judge Martens' house or it was written after you got on scene?

21   Do you know?

22   A.  It would not have been written after Judge Martens.

23   Q.  So it was written sometime before.

24   A.  Yes.

25   Q.  Was it after Grant Huebner reviewed it, that being the DA?

1   A.  I honestly couldn't tell you.  I couldn't tell you that.

2   Q.  All right.  Now, you agree that also on page 1 of that

3   Exhibit Number 4, it says, "Describe crime or crimes," right?

4   A.  Yes.

5   Q.  And listed there is possession of a firearm by a felon

6   committed in violation of Section 941.29 subsection (1) and

7   subsection (b), correct?

8   A.  Yes.

9   Q.  That's the information you put in there, correct?

10  A.  Yes.

11  Q.  And you put that in there because Detective Smith gave you

12  information about the crime?

13  A.  Yes.

14  Q.  All right.  Now, you know that possession of a firearm by a

15  felon means that a person has been convicted of a felony

16  somewhere in the United States that remains unreversed and is in

17  possession of a firearm, correct?

18  A.  Yes.

19  Q.  It's very simple language, you agree.

20          When you're typing this out, you, based upon your

21  affidavit, from what you learned from Detective Smith, know that

22  there was a gun found in that residence, correct?

23  A.  Yes.

24  Q.  Okay.  So that's why when you typed up this affidavit and

25  the application for the search warrant, you put down "possession

Case 2:11-cr-00193-CNC   Filed 12/06/11   Page 75 of 127   Document 41

1   of a firearm by a felon," because you had come to learn somehow

2   that Mr. McMillian was a felon, right?

3   A.  Yes.

4   Q.  And you had come to learn from Detective Smith that there

5   was a firearm in the residence.

6   A.  Correct.

7   Q.  Okay.  Going on.  We know on page 2 that Judge Martens

8   signed it about 10:10, and that's a p.m., right, on July 6?

9   A.  9:10 p.m.

10  Q.  Oh, I'm sorry.  9:10 p.m.  Correct?

11  A.  Yes.

12  Q.  Now let's talk about your affidavit.  Paragraph 1 is your

13  background information which is accurate, correct?

14  A.  Yes.

15  Q.  All right.  Now, number 2 says, "As a part of my duties I

16  have reviewed reports prepared in the normal ordinary course of

17  business of the City of Milwaukee Police Department related to

18  the homicide of the two victims," right?

19  A.  Yes, ma'am.

20  Q.  And you say, "I base this affidavit upon a review of said

21  reports/personal knowledge as a result of that investigation,"

22  yes?

23  A.  Correct.

24  Q.  All right.  You identified in number 3 the homicides which,

25  again, had been about four years before this affidavit, right?

1    A.   Correct.

2    Q.   And then you talk about that Todd Carter information, yes?

3    A.   Yes, ma'am.

4    Q.   And that information that you put in there about Todd Carter

5    and what he said, you can't tell us, as you sit here today, when

6    that statement was given, right?

7    A.   Correct.

8    Q.   Detective Gulbrandson didn't say anything like "Todd Carter

9    just told us this," did he?

10   A.   I couldn't tell you exactly what words were used, no.

11   Q.   And you never reviewed the report of Todd Carter and his

12   interview, did you?

13   A.   No.

14   Q.   Okay.  So, when you say that you reviewed said reports and

15   personal knowledge as a result of the investigation, that's

16   personal knowledge of Eric Gulbrandson or other detectives,

17   right?

18   A.   That's personal knowledge based on the information they are

19   giving me.

20   Q.   Sure.  Now, let's go on to paragraph 5.  You never talked to

21   Kenneth Walkowiak or Brian Shull, did you?  In focusing your

22   attention just in the affidavit preparation.

23   A.   Okay.

24   Q.   So you never talked to them prior or when you were typing up

25   this affidavit, right?

1   A.   No.   I don't believe I did, no.

2   Q.   Because, and correct me if I'm wrong, all of the information

3   that you learned in support of this affidavit from another human

4   being that was on scene was only from Detective Smith; is that

5   what I understand?

6   A.   Well, some of the information he had received was from

7   Police Officers Ken Walkowiak and Brian Shull.

8   Q.   Okay.   So what you understood is Detective Smith was

9   relating information either from his own personal knowledge or

10  observations, or information that he received from Walkowiak or

11  Shull; is that what I understand?

12  A.   Yes.

13  Q.   Okay.   So -- and for the record, you would agree that the

14  address is incorrect one, two -- three times in the affidavit;

15  is that right?

16  A.   Yes.

17  Q.   Okay.   Now, we know it wasn't an arrest warrant, right?

18  A.   Correct.

19  Q.   You know it's a suspect card.   At least you know that now.

20  A.   Yeah.

21  Q.   All right.   Did Detective Smith tell you and use the words

22  "arrest warrant"?

23  A.   Yes, ma'am.

24  Q.   All right.   You know based upon your knowledge and

25  experience that an arrest warrant is different than a suspect

78

1    card.

2    A.  Correct.

3    Q.  An arrest warrant is a warrant that may have been issued by

4    a judge to go and arrest a certain individual, right?

5    A.  Yes.

6    Q.  Or it could be -- I believe the DA's office might be able to

7    issue an arrest warrant if they issue a case, yes?

8    A.  That's correct.

9    Q.  A suspect card is not usually a card -- well, strike that.

10            A suspect card gets issued sometimes and, for the most

11   part, internally by the Milwaukee Police Department, hey, we

12   want to go and pick this person up for questioning?

13   A.  Correct.

14   Q.  And in this case you would agree that the words "arrest

15   warrant" were, at least as you sit here now, you know are

16   inaccurate because it was only a suspect card, correct?

17   A.  Yes.

18   Q.  All right.  All right.  Now, let's go on to paragraph 6.

19            Paragraph 6 says that, "The tactical unit gained entry

20   into the residence and arrested Mr. McMillian."  That's the way

21   it starts out, do you agree?  Not exactly the words.

22   A.  Yes.

23   Q.  That information was given to you -- that specific concept

24   was given to you by Detective Smith?

25   A.  Yes, ma'am.

79

1  Q.  All right.  And he told you that the tac unit gained entry

2  into the residence and arrested Mr. McMillian in the residence,

3  correct?

4  A.  Yes.

5  Q.  You were also told that that was a residence occupied by

6  another individual.

7  A.  I was told there was another, a person in there, later

8  identified as Ashley.

9  Q.  You were informed that a protective sweep of the home was

10  done for other subjects, parentheses, confederates hiding in the

11  residence, correct?

12  A.  Yes.

13  Q.  And that came from Detective Smith?

14  A.  Yes, ma'am.

15  Q.  All right.  And you were told by Detective Smith that an

16  Officer Jonathan Witkowski observed "a black in color AK-47

17  assault rifle underneath an air mattress."  Did I read that

18  correctly?

19  A.  It was not -- I put in air mattress but it was actually a

20  mattress, and if you notice, there's a correction there, a line

21  through there.

22  Q.  Yes, I was going to get to that.  Do you know when you made

23  that correction?

24  A.  That would have been after I read the affidavit.

25  Q.  Okay.  So, do you know when you made the correction -- you

1   made it sometime before going to Judge Martens's house, right?

2   A.  Yes, ma'am.

3   Q.  Now, as far as you knew from what Detective Smith told you,

4   is that Officer Witkowski observed an AK-47 assault rifle in the

5   residence, yes?

6   A.  Yes, ma'am.

7   Q.  And your understanding from Detective Smith is that this was

8   something found underneath a mattress.

9   A.  Correct.

10  Q.  Did you come to learn that in fact there was an AK-47 found

11  in the residence?

12  A.  Yes.

13  Q.  Did you come to learn that the AK-47 was found in a black

14  gun case?

15  A.  Yes.

16  Q.  Did you come to learn that underneath the mattress was a

17  small handgun?

18  A.  Yes.

19  Q.  All right.  Now, you know, do you not, because of what we

20  just went through, that the gun case that held the AK-47 --

21  well, strike that.

22          From your knowledge and experience of this case, if an

23  AK-47 assault rifle was found in the residence in a gun case,

24  and you were told that there was an AK-47 rifle found in the

25  residence, you would agree that somebody had to look in that gun

1    case in order to view the AK-47.

2            MR. WALL:  Objection, speculation.

3            THE COURT:  I will allow it.  Just based on your

4    experience whether it would be true or not.  And if you don't

5    know, you don't know.

6            THE WITNESS:  Not necessarily, no.  Based on my

7    experience.  I have seen firearms in gun cases when they are

8    broken or ajar.

9    BY MR. BOYLE:

10   Q.  Okay.  Well, I'm going to show you what's been marked as

11   Exhibit Number 1.  Have you ever seen this picture before?

12   A.  Yes, ma'am.

13   Q.  What is that?

14   A.  That is the gun case we are currently talking about.

15   Q.  Correct.  That gun case, at least how it appears in the

16   paragraph, is not ajar, correct?

17   A.  No, ma'am.

18   Q.  Let's talk based upon your knowledge and experience.  If an

19   officer writes a report that says they observed a black gun case

20   in a bedroom of a residence, and that officer does not say I

21   looked in it, I examined what was in it, I saw what was in it,

22   correct?  I'm asking you to accept that.

23   A.  Well, I'm kind of -- you said -- an officer said I looked in

24   it --

25   Q.  Well, I'll strike the question.  I'm going to ask it this

1   way.

2           You were told, were you not, by Detective Smith that

3   there was an AK-47 assault rifle found in that residence which

4   is what you put in your affidavit, correct?

5   A.  Yes, ma'am.

6   Q.  Based upon your knowledge and experience of what you learned

7   from Detective Smith, did you form a belief as to whether or not

8   an officer from the City of Milwaukee Police Department viewed

9   an AK-47 assault rifle in that residence?

10          MR. WALL:  Judge, I'm going to object on relevance.

11  It has to do with the protective sweep and we've conceded the

12  protective sweep was illegal.  So I'm not sure what it goes to.

13  The Court has already ruled on the Franks issue.  So, maybe

14  Ms. Boyle can just proffer the relevance?

15          MR. BOYLE:  I'm sorry, did Mr. Wall say the Court's

16  ruled on the Franks issue?

17          THE COURT:  Yes.

18          MR. BOYLE:  When did we get that ruling?

19          MR. WALL:  Wednesday.

20          MR. BOYLE:  Last week Wednesday?

21          MR. WALL:  Yes.

22          MR. BOYLE:  Oh, I have to be honest, I did not see

23  that ruling.  I'm going to guess the Court denied the Franks

24  issue.

25          THE COURT:  That is correct.  But, Ms. Boyle, as to

1   your question, the relevance to the question to answer

2   Mr. Wall's objection?

3           MR. BOYLE:  Well, I think it goes to the validity of

4   what is told to this officer, what he writes down in the

5   affidavit, what he goes to get a judge to sign, and the changes

6   that are made.  If the Court denied the request for a Franks

7   hearing then I think it is probably an irrelevant question.

8   But --

9           THE COURT:  It is correct.  That request was denied,

10  Ms. Boyle.  But Detective Gomez has already testified that the

11  information about the AK-47 he did receive from Officer Smith.

12          MR. BOYLE:  I'll move on.

13  BY MR. BOYLE:

14  Q.  The other information contained in there with the HK

15  displayed, you, again, got that from Detective Smith, correct?

16  A.  I'm sorry, ma'am, what was the question?

17  Q.  The HK displayed on the front of the gun case, that came

18  from Detective Smith.

19  A.  Yes.

20  Q.  All right.  Now, in paragraph 8, you have stated, "I have

21  probable cause to believe McMillian is in violation of Wisconsin

22  state statute," and you've identified, again, the felon in

23  possession of a firearm statute.

24  A.  Yes.

25  Q.  You would agree that does not say 940.01.

1   A.   Unfortunately, yes, I'll agree.

2   Q.   And 940.01 is?

3   A.   The state statute for homicide.

4   Q.   First degree intentional, right?

5   A.   Yes, ma'am.

6   Q.   Now, Mr. Wall asked you about recording equipment taken in

7   the burglary days before the homicide, right?

8   A.   Yes, ma'am.

9   Q.   That has nothing to do with felon in possession of a

10  firearm.

11  A.   No.

12  Q.   The cell phones, you talked about pictures of the homicide

13  investigation.  Or pictures that might have been taken on a cell

14  phone, correct?

15  A.   Yes.

16  Q.   That has nothing to do with felon in possession, right?

17  A.   It could.

18  Q.   Okay.  Well, did you write it down for the purpose of felon

19  in possession of a firearm or did you write it down for purposes

20  of the homicide investigation?

21  A.   Well, my primary intent was for the homicide.

22  Q.   Right.  And that's why you were involved was -- the primary

23  intent was to focus on the homicide, not the felon in possession

24  of a firearm case.  I mean, that was the primary intent as to

25  why you were involved.

1  A.  Correct.

2  Q.  And that would be the same for all A through G.  All deals

3  basically -- with the exception of firearms, ammunition, gun

4  case, basically deals with the focus of the homicide, yes?

5  A.  Well, not necessarily, ma'am.  I think the omitting of the

6  940.01, first degree intentional homicide charge, was obviously

7  a gross error on my part.  When I'm playing with these computers

8  and they're filling in the spaces, I didn't catch that it didn't

9  include the homicide charge.

10        MR. BOYLE:  Mr. Reporter, can I have my question read

11  back for the detective?

12        (Record read.)

13        THE WITNESS:  Then I'll answer yes.

14  BY MR. BOYLE:

15  Q.  You would also agree -- if you, again, reference the first

16  page of Exhibit 4, describe crime or crimes, is possession of a

17  firearm by a felon and not anything about the homicide.  You

18  would agree with that, would you not?

19  A.  Yes, ma'am.

20  Q.  All right.  Now, I want to ask you, after you typed this up,

21  you told us at least you recall making one correction, "air

22  mattress," you changed that, yes?

23  A.  Yes, ma'am.

24  Q.  And then I thought you said you showed it to your lieutenant

25  and he notarized it?

1    A.   Yes.

2    Q.   All right.  So when -- just so I know, when do you sign off

3    on it?

4    A.   When he swears me in.

5    Q.   Okay.  And that's done -- that was done at the police

6    station?

7    A.   Yes.

8    Q.   When does Grant Huebner review it?

9    A.   He reviews it after the lieutenant notarized it.

10   Q.   All right.  So you swear -- he puts you under oath, correct?

11   A.   Yes.

12   Q.   As a notary he's required to ensure by affirmation that you

13   are swearing to the truth of the contents of the affidavit.

14   A.   Correct.

15   Q.   So in paragraph 11, where it says this affiant -- or the

16   affidavit was reviewed by Assistant District Attorney Grant

17   Huebner on July 6, 2011, that occurs after you swear to it?

18   A.   No.  We supply Grant Huebner -- in fact, I believe he came

19   in that day, he says it's all good.  Then the lieutenant signs

20   it.  I stand corrected.

21   Q.   Okay.

22   A.   Then he notarizes it.  That's what it is.

23   Q.   Then what you do is you travel to Kevin Martens' home,

24   correct?

25   A.   Yes.

87

1  Q.  And he -- what does he do?  Tell us what he does.  Does he

2  take it, does he review it?  What does he do?

3  A.  He sits there, reviews the entire document.  If he has any

4  questions he asks.  Normally he'll review it.  If he's got any

5  problems with it he'll tell us to fix it.  Then I'll have to

6  return.  Unfortunately we don't have laptops.  And if it gets

7  too late he may ask us to e-mail it.  But this was not the case.

8  He looked it over and he said it was good to go, and we went

9  from there.  He signed it.

10  Q.  Do you have any knowledge of whether or not any other member

11  of the police department attempted to get a search warrant for

12  this residence prior to your getting it?

13  A.  No.

14  Q.  And this was the only document -- this affidavit and

15  application were the only documents that went to a judge by you.

16  In other words, there wasn't another copy or a draft that went

17  somewhere?

18  A.  Not to my knowledge, no.

19  Q.  Now, you have told us that when you signed before your

20  lieutenant, the affidavit that you were signing to, signing

21  under oath, you believed was accurate and correct.  Correct?

22  A.  Correct.

23  Q.  You reviewed the document to ensure that it was accurate as

24  far as what you knew?

25  A.  Yes.

1   Q.  You verified -- Strike that.

2           When you signed under oath you had a belief, based

3   upon your affidavit and upon the review of the affidavit, that

4   the address you ultimately would be going to would be 6633 West

5   Darnell, did you not?

6   A.  No.

7   Q.  Okay.  Why not?

8   A.  I knew it to be 6333 West Darnell.

9   Q.  So when you signed off on the affidavit you swore under oath

10  that the information that was contained in the affidavit was

11  true and correct.  You would agree with that statement.

12  A.  Absolutely.

13  Q.  You indicate that you have reviewed the document, yes?

14  A.  Yes.

15          MR. WALL:  Judge, again, I object.  It's all been

16  asked and answered.  And I don't see the relevance in light of

17  the court's ruling as well as the concession from the government

18  on the protective sweep.

19          MR. BOYLE:  I forgot that you already ruled on that.

20  I'll withdraw the question.

21  BY MR. BOYLE:

22  Q.  You would agree, Officer, that paragraph 6 is the only

23  paragraph in regards to information learned about the inside of

24  that residence on July 6, 2011.  In other words, that's the only

25  information dealing with the inside of the residence.  You agree

1    with that.

2    A.  As far as evidence or --

3    Q.  Yes.

4    A.  Yes.

5    Q.  Evidence.  The only other information that is in there is

6    the -- regarding the homicides -- and I'm not talking about the

7    date of the homicide or the actual homicide and the names of the

8    victims -- but is from the informant Todd Carter which is

9    contained in paragraph 4, correct?

10   A.  I don't understand your question.

11   Q.  Well, tell me the paragraphs that deal with the homicide.

12   A.  Well, you'd have paragraph 2.

13   Q.  Yup.

14   A.  Which lists the victims.

15   Q.  Yes.

16   A.  You have paragraph 3.

17   Q.  Yup.

18   A.  Which is the date and location.  Venue.

19   Q.  Correct.

20   A.  You have paragraph 4, like you mentioned, the informant.

21   And he annotates that your client, or Tyrone McMillian,

22   confessed that he had basically taken part in killing the

23   victims.

24   Q.  Well, you would agree that it says that McMillian -- this is

25   what Todd Carter is relating -- related he had to pop the

1  victims, meaning a future event?  Do you agree with that as to

2  the language that's written in the affidavit?

3  A.  Popped, yes.

4  Q.  In a future statement.  "I'm going to pop them in the

5  future."

6        MR. WALL:  Objection.

7        MR. BOYLE:  Well, it's his words.

8  BY MR. BOYLE:

9  Q.  What does it mean?  Why did you write "who related he had to

10  pop the victims"?

11        THE COURT:  I'm sorry, could you repeat the question?

12        MR. BOYLE:  Sure.

13  BY MR. BOYLE:

14  Q.  It says, "HK, who related he had to pop the victims over and

15  argument."  Did I read that correctly?

16  A.  Yes.

17  Q.  It does not say he had already popped the victims.  Meaning

18  he had done it already and was explaining to Mr. Carter.

19  A.  I would assume that "had to" meant he had.

20  Q.  Had what?

21  A.  Had popped the victims.

22  Q.  Okay.  And then it says, "Carter further related McMillian

23  confessed the argument over a failed lease contract."  Yes?

24  A.  Yes.

25  Q.  Now, that is the only paragraph that has any tie to

1  Mr. McMillian with these homicides, correct?

2  A.  Yes.

3  Q.  Oh, so after -- oh, wait, I think that's getting into the

4  Franks issue, isn't it.

5      I don't think I have anything further.  And I

6  apologize, Judge.  I did not see the decision come through.  I

7  don't have any idea why I didn't.  So --

8      THE COURT:  Anything further, Mr. Wall?

9      MR. WALL:  Yes, just one question, area.

10                 REDIRECT EXAMINATION

11  BY MR. WALL:

12  Q.  Detective Gomez, Ms. Boyle had you go through paragraph 8

13  and read through the statutory section there, felon in

14  possession of a firearm.  You stated that "I made a gross error

15  in failing to include the homicide statute."  Could you just

16  quietly read to yourself paragraph 9?

17      (Witness peruses document.)

18  A.  Yes, sir.

19  BY MR. WALL:

20  Q.  Did you include the homicide as part of the probable cause

21  of the affidavit?

22  A.  Yes, in paragraph 9.

23  Q.  Do you take it back that you made a gross error?

24      MR. BOYLE:  Well, I'm going to object to the form of

25  that question.  That's extremely leading.

1          MR. WALL:  He can say yes or no.  It's not leading.

2     I'll ask a different question anyway.

3     BY MR. WALL:

4     Q.  Is this a dual-purpose affidavit?

5     A.  Yes, sir.

6     Q.  For which crimes?

7     A.  For felon in possession of a firearm, 941.29, and for

8     homicide, 940.01.

9          MR. WALL:  Thank you.  Nothing else.

10                         RECROSS-EXAMINATION

11    BY MR. BOYLE:

12    Q.  But you would agree that the only reference to the homicide

13    is found at the last listing of numbers in paragraph 9, correct?

14    A.  That is correct.

15    Q.  And in paragraph 8 it's, "I want to search for these

16    proceeds for the crime of felon in possession of firearm,"

17    correct?

18    A.  Yes, ma'am.

19    Q.  And you would also agree on the first page that it doesn't

20    list describe -- under "describe crime or crimes" possession of

21    a firearm by a felon and two counts of first degree intentional

22    homicide.  You would agree with that.

23    A.  Yes.

24         MR. BOYLE:  Nothing further.

25         MR. WALL:  Nothing else.

1        THE COURT:  Mr. Wall?

2        MR. WALL:  Nothing else.

3                              EXAMINATION

4    BY THE COURT:

5    Q.  Detective Gomez, I have a question.  I am now confused

6    regarding paragraph 4 in the affidavit.  The source of that

7    information.  Did you testify that it was from your review of

8    the file or from what was conveyed to you by Officer Smith?

9    A.   It was information which I reviewed from the suspect card

10   are probable cause and information that Detective Gulbrandson

11   had provided to me, ma'am.  Not Detective Smith.

12        THE COURT:  Any follow-ups from that question?

13                   FURTHER REDIRECT EXAMINATION

14   BY MR. WALL:

15   Q.  This may be in the record, but Gulbrandson was personally

16   involved in the investigation of the homicide?

17   A.  Yes, sir.

18                   FURTHER RECROSS-EXAMINATION

19   BY MR. BOYLE:

20   Q.  Did you have a chance to review the probable cause statement

21   and judicial determination regarding Mr. McMillian and the two

22   counts of homicide and two counts of felon in possession of a

23   firearm that was written by Detective Marco Salaam, S A L A A M?

24   Did you have a chance ever to review that probable cause

25   determination?

1          MR. WALL:  Question on the form.  Question, what's the

2    date of that?  Was that after the affidavit or before?

3          MR. BOYLE:  It was --  I'm sorry?

4          MR. WALL:  Was that report by Detective Salaam -- I

5    think it's S A L A A M -- written after or before the date of

6    this affidavit?

7          MR. BOYLE:  It was after.  It's the --

8          MR. WALL:  Object to relevance.

9          MR. BOYLE:  Well, because I want to ask him if it

10   helps refresh his recollection as to when Todd Carter gave his

11   statement based upon his review of the file.

12         MR. WALL:  Something written after wouldn't do that.

13         THE COURT:  Well, the relevant time here is what

14   information he had or knew at the time of writing of the

15   affidavit.  So if your question relates to that.

16         MR. BOYLE:  It does.

17         THE COURT:  At the time of writing the affidavit?

18         MR. BOYLE:  Well, here's what I want to know.

19   BY MR. BOYLE:

20   Q.  Did you review the statement -- you told us, because the

21   judge just asked you, the information in paragraph 4 came from

22   where?  The review of the file, is that right?  And information

23   you learned from Detective Gulbrandson.

24   A.  Correct.

25   Q.  All right.  When you reviewed the file, do you recall that

1    April 30th, 2009, Todd Carter supplied the information that is

2    in paragraph 4 of the affidavit that you submitted to Judge

3    Martens?

4         MR. WALL:  Objection.  We don't know the date.  I

5    don't know what she's reading.  She's reading hearsay.  I don't

6    know where it's coming from.  I don't know when it was written.

7    None of us know that.

8         MR. BOYLE:  All right.  I'm going to ask that this be

9    marked.

10         MR. WALL:  If it was written after -- can I see it?

11         MR. BOYLE:  Sure.

12         (Counsel peruses document.)

13         MR. WALL:  I would object.  This was written on July

14   7th of 2011 by a different police officer.  It would not have

15   been in the file that Detective Gomez reviewed on July 6th.  It

16   was drafted the day after.

17         MR. BOYLE:  I'm aware of that.  I am only asking if

18   this officer has ever reviewed it while it's been in the file to

19   help refresh his recollection of the date of when Todd Carter

20   supplied the information to law enforcement.

21         And the reason that I want the date into the record of

22   when Todd Carter supplied the information is as an offer of

23   proof.  Todd Carter supplied that information about a year

24   before the search warrant was executed.  And if Milwaukee police

25   is going to a residence to search for information -- if we

1    assume that the gun cases -- I don't know how the court is going

2    to rule -- but if we get rid of paragraph 5 of the affidavit, we

3    now have to examine whether or not there was enough to get into

4    the residence under the search warrant.

5         MR. WALL:  First of all, the report is rank hearsay.

6    She can't get the report in.  You can't get any of the

7    information into evidence because it's all hearsay.

8         Second of all, she can't refresh anybody's memory of

9    what they did on July 6th with a report that was written on July

10   7th.  She's trying to get into evidence through two or three

11   different backdoors something that's inadmissible and could not

12   have been reviewed by this witness.  Either this witness knows

13   the date or doesn't know the date and she's stuck with that.

14        THE COURT:  Well, if I may here.  Well, as we already

15   established, both counsel, that the rules of evidence do not

16   apply, but we must still have some reliable information.

17        So, Ms. Boyle, the relevant time is of the writing of

18   the affidavit.  So if you could backtrack with some foundational

19   questions regarding the timeframe of the information that's in

20   paragraph 4.

21        MR. BOYLE:  Sure.

22   BY MR. BOYLE:

23   Q.  As you sit here today, you have a recollection that prior to

24   typing up the affidavit you reviewed the M file regarding the

25   homicides, correct?

1    A.  I reviewed pieces of the M file, yes, sir.

2    Q.  You are aware, based upon your review of the M file and

3    based upon what you put in the affidavit, that Todd Carter was

4    the lynchpin connecting Mr. McMillian to these homicides at the

5    time of the writing of the affidavit, correct?

6    A.  Yes.

7    Q.  All right.  So that is why the only information connecting

8    Mr. McMillian -- the only information connecting Mr. McMillian

9    to the homicides is contained in paragraph 4 which is

10   information that Todd Carter supplied to law enforcement,

11   correct?

12   A.  That I am aware of, yes.

13   Q.  Yes.  Now, you did review Todd Carter's statement prior to

14   doing the affidavit.

15   A.  No.

16   Q.  You never looked at Todd Carter's statement.

17   A.  I did not have that statement.

18   Q.  Did you ask when Todd Carter gave that information?

19   A.  No.  The information that I had was from Detective

20   Gulbrandson who was relaying that information to me based on his

21   knowledge and his reading the reports that he had in hand.

22   Q.  So the information that's contained in paragraph 4, you have

23   no idea if it was supplied to law enforcement on July 5th, 2011?

24   A.  No, I do not.

25   Q.  You have no idea if it was supplied on April 30th, 2009.

1    A.  No, I do not.

2    Q.  And, as you sit here today, do you know the answers to

3    whether or not it was supplied on July 5th, 2011 or April 30th,

4    2009?

5    A.  No, I do not.

6    Q.  And did it come to at all your mind that you needed or

7    should or would like to put a date of when Mr. Carter put that

8    information to law enforcement?

9    A.  Sitting here now, yeah, I would say yes.

10   Q.  You agree, do you not, that evidence in a homicide --

11   certainly, you know, you mentioned as an example that clothing

12   in a homicide, sometimes there's biological DNA that could be

13   obtained if you're able to seize clothes, correct?

14   A.  Yes.

15   Q.  So you would agree that over the course of time from 2007 to

16   2011 that evidence can disappear?  Yes?

17   A.  It could.

18   Q.  Okay.

19              I have nothing further.

20              MR. WALL:  Nothing else, Your Honor.

21              THE COURT:  Thank you, Detective Gomez.  You may step

22   down.

23              THE WITNESS:  Thank you.

24              (Witness excused at 3:52 p.m.)

25              THE COURT:  Mr. Wall, any other witnesses?

1        MR. WALL:  No, Your Honor, not on the issues that were

2  presented to the court.  Now there appears to be attack on the

3  probable cause of the search warrant which was not raised in the

4  opening briefs and was not presented to this court in our issues

5  for the court.  Maybe that's -- maybe it's not an issue and

6  maybe it goes more to the overall accuracy of the warrant, I'm

7  not sure.  But I'm a little confused now if we've, through this

8  questioning, expanded the issues that are going to have to be

9  briefed.  Maybe Ms. Boyle can talk about that.

10        The issues that I think are open to the court are the

11  two -- hang on one second.

12        (Brief pause.)

13        MR. WALL:  Just to clarify.

14        THE COURT:  Take your time.

15        MR. WALL:  Protective sweep is off the table.  We've

16  conceded that and stated it needs to be stricken from the

17  affidavit.

18        Questions for the court for this hearing are whether

19  the two gun cases were appropriately observed.  And that's

20  relevant only because it finds its way into the search warrant.

21        And then we have questions of whether -- if those gun

22  cases were inappropriately observed, whether the remainder of

23  the affidavit and search warrant provides probable cause for the

24  homicide aspect of the search.

25        And then if, in any event, one or two, we go back to

100

1    the original motions Ms. Boyle filed which has to do -- and

2    she's gone over that today well -- just the judicial correction

3    of the address, the three mistakes in the affidavit which we've

4    covered with testimony here today, and, as I say, the Court's

5    ruled on the Franks hearing.  So really we have just those four

6    issues, as I understand it, for the Court's consideration.  And

7    I understood that was the purpose of the hearing.

8            MR. BOYLE:  I'm sorry, Mr. Wall, I missed, what did

9    you say I'm doing now that --

10           MR. WALL:  I was going to ask if you could clarify

11   whether you are adding a new issue, and that is whether there is

12   probable cause in the search warrant affidavit to search for

13   evidence of the homicide.  Because that issue was not raised in

14   any formal way but -- questions.

15           MR. BOYLE:  I will tell you, just so the Court knows,

16   that this has been somewhat of a frustrating case for me because

17   there is such limited information in the police reports.  There

18   were a number of different divisions of the Milwaukee Police

19   Department that were involved in it.  And so, to cross-reference

20   all of this and to try to guess what might come out of the

21   mouths of witnesses on the witness stand is always a difficult

22   process.

23           I believed that when Detective Gomez came into this

24   courtroom that he was not going to say this was a dual

25   affidavit.  I really thought that he was going to say, you know,

101

1   this is kind of standard language that we put in here regarding

2   the homicide -- or, I'm sorry, you know, in paragraph 8.  And

3   that's what I kind of expected him to say.  And now I find out

4   that it really was a dual purpose search warrant, to wit, we

5   were asking for a search warrant for the homicide, we believe we

6   had enough probable cause to do that, and we believe we had

7   enough probable cause based upon our observations for the gun

8   cases.

9           So, I guess, to answer Mr. Wall's question, based upon

10  the testimony I think there probably is another issue; however,

11  I think that the first issue goes to the gun cases in the

12  bedroom.  Because if the gun cases in the bedroom remain, I

13  guess, in the affidavit, I don't know if the issues on the

14  probable cause and the dual purpose are really anything major.

15  If the gun cases then are excluded out of the affidavit, then I

16  think we got an issue properly identified by Mr. Wall and what

17  I've stated based upon the testimony.

18          MR. WALL:  But, again, my response would be paragraph

19  9 tells you specifically it's dual purpose that there's probable

20  cause to believe there's evidence of felon in possession and

21  there's belief that these same items are evidence of a crime of

22  homicide.  I mean, it couldn't be any clearer, paragraphs 8 and

23  9, as well as Gomez's testimony, that paragraphs 1 through 5

24  were specifically and only relating to the homicide, and he

25  added 6 and 7 for the gun.  But, I mean, by its very wording

102

1    it's looking for evidence of both.

2            MR. BOYLE:  Well, by its wording that may be, but when

3    you apply and have a judge sign off on saying we're looking for

4    the crime of felon in possession of a firearm, and I will also

5    state for the record that any person reviewing this affidavit

6    and application for a search warrant with all of the mistakes,

7    cross-outs, inserts in this affidavit, it would not cause a

8    person to make the leap of it's just a sloppy search warrant and

9    application that was done.

10           So, that's why I indicate that it was a little

11   surprising when the main focus seems to be felon in possession,

12   and the information in paragraphs 1 through 4 only appear to be

13   in there as kind of background information, not, oh, we're now

14   gonna ask a court to issue a warrant, search warrant for a

15   residence based upon our homicide.

16           There is no date in here.  We certainly know in this

17   business and based upon case law is that you can't get a search

18   warrant for a homicide that occurred four years before without

19   something more than just the guy told me he had to pop the

20   victims over an argument.  There has to be some greater causal

21   connection to go into somebody's residence on very dated

22   information.  Unless there's an exception I'm missing.

23           THE COURT:  Ms. Boyle and Mr. Wall, I take it neither

24   of you want me to rule here this afternoon based on your oral

25   presentations; that you want an opportunity to submit something

1    in writing as to what you identify as the appropriate issues

2    based on the pleadings and also from the testimony this

3    afternoon; is that correct?

4            MR. BOYLE:  Yes.

5            THE COURT:  And how do you wish to proceed?  Do you

6    want to do simultaneous briefings or do you want to proceed in

7    the usual course where the government -- well, the movant goes

8    first and the government gets to reply?

9            MR. WALL:  The second way.  The way we did it the

10   first round before new issues were discovered.

11           Bridget might have a witness.

12           THE COURT:  I'm sorry.

13           MR. BOYLE:  I might.

14           THE COURT:  The government has rested.  Ms. Boyle, do

15   you have a witness?

16           MR. BOYLE:  I want to talk to my client briefly, if I

17   can, to see whether or not we need her.

18           THE COURT:  Why don't we take a quick recess and you

19   let us know when you're ready.

20           MR. BOYLE:  Okay.

21           (Recess taken at 5:00 p.m., until 5:05 p.m.)

22           THE COURT:  Please be seated.

23           We are back on the record in this matter.

24           Ms. Boyle?

25           MR. BOYLE:  I'm going to call Ashley Kneuppel to the

1    witness stand.

2            THE COURT:  You may proceed.

3            THE CLERK:  Please raise your right hand.

4        ASHLEY KNEUPPEL, DEFENSE WITNESS, DULY SWORN

5            THE CLERK:  Okay, please be seated.  Please state your

6    full name and spell your last name for the record.

7            THE WITNESS:  Yes, Ashley Kneuppel.  Last name is

8    K N U E P P E L.

9            THE COURT:  And before you begin, Ms. Boyle, there's

10   another individual in the courtroom; do you intend to call her

11   as a witness?

12           MR. BOYLE:  I do not.

13           THE COURT:  Okay.  You may proceed.

14                         DIRECT EXAMINATION

15   BY MR. BOYLE:

16   Q.  Do you know Tyrone McMillian?

17   A.  Yes.

18   Q.  And how do you know him?

19   A.  He's my boyfriend.

20   Q.  And how long have the two of you been dating?

21   A.  About 2 1/2 years.

22   Q.  And on July 6, 2011, where did you reside?

23   A.  6333 West Darnell Avenue.

24   Q.  And who did you reside with?

25   A.  Tyrone.

105

1  Q.  On that date did anything happen?

2  A.  Yes.

3  Q.  And tell me what happened sometime in the afternoon on that

4  date.

5  A.  Him and I were in the bedroom.  I get a knock at the door.

6  I go to the door.  I realize it was Milwaukee police.  Told me

7  to step outside.  They asked if anybody else was in the house.

8  I said yes.  They asked who.  I said my boyfriend Tyrone.  And

9  then that's when I was -- I stepped outside.

10 Q.  Okay.  Now, you stepped outside.  Where do you generally go?

11 A.  The driveway.

12 Q.  And is anyone with you when you go to the driveway?  In

13 other words, you're not handcuffed, correct?

14 A.  Correct.

15 Q.  And you get -- does somebody escort you there?

16 A.  Yes.

17 Q.  Okay.  And who is that?

18 A.  I don't know his name but I remember his face.

19 Q.  Was it a police officer?

20 A.  Yes.

21 Q.  Uniformed?

22 A.  Yes.

23 Q.  Okay.  Now, at some point in time does Tyrone come out of

24 the house?

25 A.  Yes.

106

1    Q.  All right.  Tell us just briefly how that occurred.

2    A.  When I came to the door they had the screen door open, they

3    told me to step outside.  That's when they asked me who was in

4    the house.  I said Tyrone.  Couple seconds later he came

5    outside.  And then he was arrested and taken I don't know where.

6    Q.  He went somewhere and you don't know.

7    A.  Right.

8    Q.  Okay.  Now, do you -- how many officers are there, if you

9    can guess, when you open the door?

10   A.  Roughly between 10 and 12.

11   Q.  Okay.  After you see Tyrone come out, do you see him get

12   handcuffed?

13   A.  Yes.

14   Q.  And then he's taken somewhere that you don't know.

15   A.  Correct.

16   Q.  Do you see while this is going on -- what are the officers

17   doing?  Are they standing around, are they going in the house?

18   What are they doing?

19   A.  After I'm in the driveway somebody's holding my arm, a

20   police officer, and then I see a bunch of people go inside the

21   house.

22   Q.  And how many did you see go inside the house?

23   A.  I don't know.  Five, six, seven maybe.  Somewhere around

24   there.

25   Q.  And at some point in time do you see them all come out, or

107

1  no?

2  A.  I see people come out.  I don't know if there was people

3  still in the house.  I see people come out.

4  Q.  Do you know an Officer Brian Shull?

5  A.  Yes.

6  Q.  And you saw him in the hallway here today.

7  A.  Correct.

8  Q.  At any point in time did you have contact with him while you

9  were on the driveway?

10  A.  Yes.

11  Q.  Okay.  Tell me -- now, just so I'm clear, Tyrone gets

12  arrested or handcuffed and taken away, right?

13  A.  Right.

14  Q.  You're still on the driveway and you saw Officers go into

15  your residence, correct?

16  A.  Correct.

17  Q.  And at any point in time do you go into the residence?

18  A.  No.

19  Q.  And we're talking about the protective sweep, right?

20  A.  Yes.

21  Q.  At any point in time after the sweep do you go into the

22  residence?

23  A.  No.

24  Q.  Do you go into the residence with Officer Brian Shull?

25  A.  Yes, I do.

108

1   Q.  So you do go in the residence.

2   A.  Oh, yes.  Yes.  It was about 15 minutes -- I had been

3   standing outside for maybe about 15 minutes before I went back

4   inside the house.

5   Q.  So during that 15 minutes you don't go in the house.

6   A.  I do not.

7   Q.  What causes you to go in the house with Officer Brian Shull?

8   A.  He comes up to me while I'm in the driveway and tells me

9   that he needs to get Tyrone's flip flops from inside the house.

10  Q.  Okay.

11  A.  So then I'm taken into the house.

12  Q.  Okay.  Do you say, okay, I'll take you and we'll go in

13  together?

14  A.  No.

15  Q.  Do you -- does Officer Brian Shull say I need your

16  permission to go in the house?

17  A.  Absolutely not.

18  Q.  Do you say you can just go in there and look around for

19  yourself?

20  A.  No, I do not say that.

21  Q.  And so he comes up, he says we need to get his flip flops,

22  and you -- did you respond by saying sure, I'll show you around?

23  A.  No.

24  Q.  You made no verbal response to him.

25  A.  No.

109

1  Q.  Like okay, go ahead?

2  A.  No.

3  Q.  Did you make any shaking your head up and down, yes, go

4  ahead?

5  A.  No.

6  Q.  Did you at all consent to allowing Brian Shull in the house?

7  A.  No.  I was never even asked for consent.

8  Q.  Okay.  When you went with him into the house was there

9  anyone in the house when you arrived?

10 A.  There was somebody else inside the house and he was walking

11 from one of the bedrooms.  He was coming down the hallway.

12 Q.  And you took -- Strike that.

13          When you entered the house with Officer Shull where

14 did you go?

15 A.  We walked to my bedroom.

16 Q.  And when you were in the bedroom what happened?

17 A.  I walked him to the side of the bed to get his flip flops.

18 Q.  And was anything said?

19 A.  He was bending down to pick up the flip flops and he pointed

20 to some cases and said, "What are these?"  I said, "I don't

21 know."  And he said, "They look like gun cases to me."

22 Q.  And what happened after that?

23 A.  He told me to sit down in our front living room and I had to

24 sit there.

25 Q.  Did you stay in the living room for a period of time?

110

1    A.   Yes.

2    Q.   Did you think that you could get up and walk around your

3    house?

4    A.   No.

5            MR. BOYLE:   I don't think I have anything else.

6                       CROSS-EXAMINATION

7    BY MR. WALL:

8    Q.   Ms. Kneuppel, do you recall Officer Shull asking you do you

9    know where Tyrone's Air Jordan flip flops are that he wants?

10   A.   I know he came up to me and said, "We need to get his flip

11   flops."

12   Q.   Do you recall him asking you do you know where they are?

13   A.   He either --  probably.  He said -- probably he said that.

14   And then I was either like they're by right -- right by the door

15   or they're in our room.

16   Q.   Okay.  And then on your own, after he asked that, you

17   started walking into the house?

18           MR. BOYLE:   Well, I'm going to object to the form of

19   the question.

20   BY MR. WALL:

21   Q.   After he asked that question did you then start walking into

22   the house?

23   A.   I started walking to the house after him.  I was following

24   him.

25   Q.   And where was he going?

1   A.  We were by the door where all the shoes are.  And then I

2   said, "No, they're not here."  So then that's when we walked to

3   the bedroom.

4   Q.  You walked him to the bedroom.

5   A.  I didn't walk him to the bedroom.

6   Q.  Did he walk to the bedroom by himself?

7   A.  No.  I was behind him.  We walked to the master bedroom.

8   Q.  But you told him they were in the bedroom.

9   A.  Right.  I said, "If they're not here they're in the

10  bedroom."

11  Q.  If they're not where?

12  A.  If they're not by the door.

13  Q.  You love Tyrone McMillian, don't you?

14          MR. BOYLE:  I'm going object.

15          MR. WALL:  Bias.  It's always admissible.

16  BY MR. WALL:

17  Q.  You love Tyrone McMillian --

18          THE COURT:  That's admissible, go ahead.

19  BY MR. WALL:

20  Q.  -- very much, don't you?

21  A.  Yes.

22  Q.  You're pregnant with his child.

23  A.  Yes.

24          MR. WALL:  Judge, I ask -- ask a series of questions

25  under 608(b).

112

1  BY MR. WALL:

2  Q.  After retrieving the Air Jordan flip flops, did you have an

3  interview with a Detective Gomez in the house?

4  A.  No, he wasn't there.

5  Q.  He never interviewed you in the house?

6  A.  No.  He didn't come until the actual copy of the search

7  warrant came which was about 9:30, 10:00 o'clock.

8  Q.  So you did have an interview with him in the house.

9  A.  He didn't sit me down and interview me and ask me all kinds

10 of questions.

11 Q.  Okay.  Did you have an interview with him in the house?

12 A.  (No response.)

13 Q.  I'm not asking if he asked you all kinds of questions, I'm

14 asking did he ask you any questions while you --

15 A.  Yes, he did ask me questions.

16 Q.  Okay.  And did you tell him that you had no knowledge of any

17 firearms in the residence and you had not touched, seen or

18 purchased any firearms?

19 A.  Yes.

20 Q.  Was that true when you told him that?

21 A.  Yes.

22 Q.  That you had never seen any firearms in the house?

23 A.  Yes.

24 Q.  And that you had never touched any firearms in the house?

25 A.  Yes.

113

1  Q.  Do you recall him asking you to provide a DNA sample?

2  A.  I do.

3  Q.  And you said that you would?

4  A.  Yes.

5  Q.  Did you then apologize to him and say that you, in fact, had

6  seen and touched a black semiautomatic handgun?

7  A.  I didn't apologize.  I had said I remember seeing a black

8  gun, but I was referring to guns that Tyrone's son plays with.

9  I never apologized and said I'm sorry, you know, I remember

10 seeing -- I never described a semiautomatic gun.  I didn't say

11 anything like that.

12 Q.  And was that the gun that you told the officer that

13 Mr. McMillian was cleaning in your bedroom two months previous?

14 A.  I don't remember -- I mean, he didn't describe a gun to me.

15 I said what I seen.  I don't --

16 Q.  Okay.  Well, let's take a step back and I'll ask that

17 question again.  Did you tell him that Tyrone was cleaning a gun

18 in your bedroom and that you then touched the gun?

19 A.  I said I remember him cleaning a gun and I touched it, but

20 it wasn't real.

21 Q.  So he was cleaning a BB gun is your testimony.

22 A.  Whatever gun.  There's all kinds of guns in the house that

23 are play guns.

24 Q.  All kinds of guns in the house that were play guns.

25 A.  Yeah.

114

1    Q.  And were all those guns in the house at the time of the

2    search warrant?

3    A.  The play guns.

4             MR. WALL:  Okay.  I have nothing else.

5                      REDIRECT EXAMINATION

6    BY MR. BOYLE:

7    Q.  For the record, Detective Gomez's report indicates that when

8    you told him -- at least this is what his report says -- that

9    you "touched the gun when Tyrone was cleaning the gun in her

10   bedroom.  Ashley stated the incident occurred about two months

11   ago."  That's what his report reads.

12   A.  Right.  I said roughly.  I don't remember --

13   Q.  Now, you do love Mr. McMillian, correct?

14   A.  Yes.

15   Q.  Can you tell me -- out of all the police officers that were

16   there on that day, can you tell me who was the police officer

17   that treated you the nicest?

18   A.  Officer Shull.

19   Q.  And Officer Shull is the one that you walked behind going to

20   the bedroom?

21   A.  Correct.

22   Q.  Officer Shull, did he treat you with dignity and respect?

23   A.  Yes.

24   Q.  Kind to you?

25   A.  Yes.

115

1  Q.  And what you told us here is your recollection of your

2  contact with the officer that treated you the nicest and with

3  the most dignity and respect, correct?

4  A.  Correct.

5          MR. BOYLE:  I have nothing further.

6          MR. WALL:  Nothing else.

7          THE COURT:  Thank you, Ms. Kneuppel.  You may step

8  down.

9          (Witness excused at 4:18 p.m.)

10          MR. WALL:  Call Officer Shull for two, three minutes.

11          THE CLERK:  Please raise your right hand.

12      BRIAN SHULL, GOVERNMENT REBUTTAL WITNESS, DULY SWORN

13          THE CLERK:  Thank you.  Please be seated.

14                      DIRECT EXAMINATION

15  BY MR. WALL:

16  Q.  Officer, after you asked Ms. Kneuppel, "Do you know where

17  Tyrone's Air Jordan flip flops are that he wants?", did she

18  indicate that she knew where they were?

19          MR. BOYLE:  Well, Judge, I'm going to object as, first

20  of all, leading question.  Well, maybe not, but --

21          MR. WALL:  It's impeachment.

22          MR. BOYLE:  I believe that he's already testified to

23  this on direct when he was originally called.  In other words, I

24  don't know think this is proper rebuttal.

25          THE COURT:  Mr. Wall, would you please get to the

116

1    rebuttal question?

2              MR. WALL:  Okay.

3    BY MR. WALL:

4    Q.  When you went into the house with Ashley to get the flip

5    flops, were you in front of her leading the way or was she in

6    front of you leading the way?

7    A.  I think we started off side to side and then I let her lead

8    the way.

9              MR. WALL:  Okay.  Nothing else.

10             MR. BOYLE:  I have nothing further because I think

11   that's what he said on original testimony.  So I have nothing

12   further.

13             THE COURT:  Thank you, Officer Shull.  You may step

14   down.

15             (Witness excused at 4:20 p.m.)

16             MR. WALL:  I think that's it, Your Honor.

17             THE COURT:  Ms. Boyle, do you have any other

18   witnesses?

19             MR. BOYLE:  No.

20             MR. WALL:  If I can just make a -- not an evidentiary

21   proffer, but I've been trying to hit a moving target here.  We

22   had initial briefing by Ms. Boyle on October 21st, where the

23   issues were framed in her consolidated motion.  I responded on

24   October 31st.  And then she filed a reply, and I think in the

25   reply she raised a couple other issues which yesterday we agreed

117

1    to frame for the Court, and they're in yesterday's submission.

2            There may be two other issues in front of the Court,

3    one might be relevant and one is not.  And I'm maybe

4    extrapolating a bit from Ms. Boyle's questions.  One is -- has

5    to do when Todd Carter provided his information to the Milwaukee

6    Police Department.  And I don't know that that's relevant.

7            THE COURT:  Is that the staleness issue?

8            MR. WALL:  Well, that would be the second issue.  The

9    first issue is when he provided it and whether or not they

10   should have acted on it earlier or not.  That I don't think is

11   relevant.

12           I think what would be relevant is the fact that four

13   years past, almost four years, from the date of the homicide

14   until the date of the search.  And, you know, that certainly

15   could be relevant and say, well, evidence is stale and guns are

16   not kept in a house after four years and DNA disappears, cash

17   disappears, recording equipment might disappear.  I think those

18   are all relevant arguments.

19           But it seems that issue has been raised and I was not

20   prepared to respond to that.  I would need to -- if that's an

21   issue, that the search warrant is stale -- first of all, there's

22   no statute of limitations on homicide, we know that.  Whether

23   it's a cold case from 20 years ago or three and a half years

24   ago, there's no statute of limitations.

25           So, what they're looking for here, I guess there's a

                                                              118

1    question of staleness.  And, again, I was not prepared for that

2    issue to be argued in order to, let's say, put in testimony that

3    DNA can remain on clothes.  Well, actually I don't think I need

4    that testimony.  I think we know that DNA evidence can last 20,

5    30 years because they're solving those type of crimes 20 or 30

6    years later.

7         But maybe, Ms. Boyle, if there's a new issue, maybe

8    Ms. Boyle can frame it and maybe we can, I don't know, just deal

9    with it.

10        THE COURT:  Ms. Boyle?

11        MR. BOYLE:  Well, I think -- I mean, there potentially

12   is a new issue.  But I think it really comes down to what

13   portions of the affidavit are, quote-unquote, valid.  Because we

14   know that the protective sweep, that being the AK-47, is out by

15   agreement of the parties.  So the question then becomes is the

16   issue on the two other gun cases, the consent of going in the

17   home -- and, again, as I stated I believe in my reply brief, I

18   didn't know that the government was going to take the position

19   that the protective sweep was bad which is why I thought it was

20   going to be a different framed issue.

21        So, if the gun cases in the bedroom remain in the

22   affidavit, I do not believe under any circumstance that I can

23   argue that that is not enough probable cause to go in the house.

24   I mean, at least that's what I'm thinking what the case law is

25   going to tell me.

119

1    If the gun cases in the bedroom are not allowed to

2 remain in the affidavit and are stricken depending on how the

3 Court rules, then the question becomes is whether or not there's

4 enough information in the remaining portion of the search

5 warrant to support the search warrant --

6    THE COURT:  In the remaining affidavit.

7    MR. BOYLE:  In the remaining affidavit.  The search

8 warrant being I guess, quote-unquote, valid for lack of a better

9 word right now.  Which obviously now deals with that whole

10 staleness issue.

11    I don't think the staleness issue comes into play

12 right now because there's enough with the gun cases on the face

13 of the affidavit.  But if the gun cases go away, then I have

14 this entire argument about going in and, you know, there's a

15 minimal statement from Todd Carter that's not dated, there's no

16 idea of when that statement was given to law enforcement,

17 looking for evidence of DNA, money, contraband, in a residence

18 that there's no connection whatsoever in the affidavit to

19 suggest that it had anything to do with the homicide.

20    So I think the issue of staleness becomes relevant

21 depending on whether or not the two gun cases in the bedroom

22 stay or go.

23    THE COURT:  Okay.  Let's set a briefing schedule.  As

24 I understand the issues from the parties, the first question is

25 whether or not the first observation was valid; that is, was

1  there legal authority to enter the bedroom and make those

2  observations.  So the parties agree that they will address that

3  issue.

4         And then the second issue is, if that observation was

5  not valid, whether the remainder of the affidavit supports

6  probable cause to issue a warrant.  And I understand then that's

7  where the possible issue of staleness may come up.

8         Is that a correct statement of the issues, Mr. Wall

9  and Ms. Boyle?

10         MR. WALL:  Yes, Your Honor.

11         MR. BOYLE:  Yes, Your Honor.  And I will indicate

12  this.  If -- and I don't know the briefing schedule that the

13  Court is going to issue.  I will make a very quick determination

14  that my assumption regarding the mere observation of the two gun

15  cases would be enough to support the affidavit.

16         In other words, I just want a day or maybe a couple

17  days to inform the Court if I'm changing my position that

18  there's enough to get an affidavit and search warrant based upon

19  the observation of the two gun cases alone.

20         I've been in this building all day long.  It's been a

21  very --

22         In other words, because I had stated before, that if

23  the court rules that the two gun cases are validly -- were

24  lawfully observed in the residence, then there's no issue on the

25  staleness and the dual -- because that's enough probable cause

121

1  right there.  I just want to ensure that I'm correct that that's

2  how the case law is going to read, that the mere presence of the

3  observation of gun cases, if a person is lawfully in the

4  residence, is enough to get an affidavit.  That's all I'm

5  saying.  Does that make sense?

6          MR. WALL:  It just goes to the measure of probable

7  cause, but maybe there is some case law on it.  It's really a

8  probable cause issue that is --

9          MR. BOYLE:  Right.

10          MR. WALL:  Yeah.

11          MS. BOYLE:  I think it's enough probable cause to get

12  an affidavit.  Which I'm stating for the record that I think the

13  case law is going to state that if an officer sees -- if they're

14  lawfully in the residence and they see a gun case, that that's

15  enough probable cause to get, especially when they have

16  knowledge that the person's a felon.  I believe that's what the

17  case law is going to support.  Which, obviously, if I am correct

18  that that's what the case law is going to support, you have

19  properly identified the issues.  If I learn, though, in the next

20  couple days that I am incorrect, I will immediately notify the

21  Court that there might be another issue to address other than

22  the two that you've identified.

23          MR. WALL:  That's fine.

24          MR. BOYLE:  Okay.

25          THE COURT:  And there's also outstanding the issue

122

1    that the parties have already briefed upon, that is, the issue

2    of the legal effect of the officer correcting the address not

3    under oath.

4              MR. WALL:  Right.

5              THE COURT:  And that has already been briefed.

6              Now, as far as the briefing schedule, Ms. Boyle, do

7    you want to wait for a transcript or not?

8              MR. BOYLE:  Oh, I think I have to wait for a

9    transcript.  Do you have an opinion about that, Mr. Wall?

10             MR. WALL:  Well, I think -- yeah, I think you need a

11   transcript.

12             MR. BOYLE:  Yeah, I think we need a transcript in this

13   one.

14             THE COURT:  Mr. Schindhelm, when do you anticipate a

15   transcript being ready?

16             THE REPORTER:  Whichever service option counsel wants

17   is acceptable.

18             THE COURT:  And what the court reporter means by that,

19   Ms. Boyle, whether or not you want an expedited, 14-day

20   transcript, which is more expensive, or whether you want the

21   usual course which is approximately 30 days?

22             MR. BOYLE:  We can go ahead and expedite it.

23             Expedited, my client would request.

24             THE COURT:  With that, Mr. Schindhelm, when do you

25   think the transcript would be ready?

123

1          THE REPORTER:  7 or 14 days from today, whichever

2   service counsel requests.

3          MS. BOYLE:  Hold on for a second.

4          (Ms. Boyle and Defendant confer off the record.)

5          MS. BOYLE:  My client has indicated he'll take the

6   7-day option.

7          THE COURT:  So the transcript will be ready a week

8   from today which will be December 6.  And, Ms. Boyle, can you

9   have your brief in Monday, December 12th?

10          MR. BOYLE:  Sure.

11          THE COURT:  And, Mr. Wall, is that 10 days or 14 days

12   for your response?

13          MR. WALL:  10 days will be fine, Your Honor.

14          THE COURT:  So that will be December 22nd.

15          And, Ms. Boyle, we have a -- holiday, Christmas

16   Holiday in-between here, so can you get your reply in by

17   December 29th?

18          MR. BOYLE:  Yes.

19          THE COURT:  So the briefing schedule will be as

20   follows:  The defense to file their brief by December 12th;

21   response by December 22nd; and any replies by December 29th.

22          Is there anything else we need to take up this

23   afternoon, Mr. Wall?

24          MR. WALL:  No, Your Honor.

25          THE COURT:  Ms. Boyle?

124

1          MR. BOYLE:  No, Your Honor.

2          THE COURT:  Okay.  I thank you both and wish you,

3     Mr. McMillian, a good afternoon.

4          MS. BOYLE:  Thank you, Judge.

5          (Proceedings concluded at 4:34 p.m.)

6                              *    *    *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

125

```
1                          I N D E X

2    WITNESS   EXAMINATION                                PAGE

3    BRIAN SHULL, GOVERNMENT WITNESS

4         DIRECT EXAMINATION BY MR. WALL...................    4

5         CROSS-EXAMINATION BY MR. BOYLE..................   21

6         REDIRECT EXAMINATION BY MR. WALL................   50

7         RECROSS-EXAMINATION BY MR. BOYLE...............   53

8         EXAMINATION BY THE COURT........................   56

9    RODOLFO GOMEZ, GOVERNMENT WITNESS

10        DIRECT EXAMINATION BY MR. WALL..................   59

11        CROSS-EXAMINATION BY MR. BOYLE..................   70

12        REDIRECT EXAMINATION BY MR. WALL................   92

13        RECROSS-EXAMINATION BY MR. BOYLE...............   93

14        EXAMINATION BY THE COURT........................   94

15        FURTHER REDIRECT EXAMINATION BY MR. WALL.........   94

16        FURTHER RECROSS-EXAMINATION BY MR. BOYLE.........   94

17   ASHLEY KNEUPPEL, DEFENSE WITNESS

18        DIRECT EXAMINATION BY MR. BOYLE.................  105

19        CROSS-EXAMINATION BY MR. WALL...................  111

20        REDIRECT EXAMINATION BY MR. BOYLE...............  115

21   BRIAN SHULL, GOVERNMENT REBUTTAL WITNESS

22        DIRECT EXAMINATION BY MR. WALL..................  116

23

24                         * * * * *

25
```

1                        E X H I B I T S

2    NUMBER              DESCRIPTION              OFFERED  ADMITTED

3        1       Photo of gun case.........................13       13

4        2       Photo - right side of bed.................16       16

5        3       Photo - bedroom scene, gun cases, etc......17       17

6        5       Photo - gray gun case.....................40       40

7        7       Photo of bedroom scene - nightstand........46       46

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

127