UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WICONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                         11CR193

TYRONE MCMILLIAN,
          Defendant.

### DEFENDANT'S BRIEF

NOW COMES, the above-named defendant, Tyrone McMillian, upon all proceedings had herein and hereby requests that this Honorable Court find that the entry into 6333 West Darnell was without consent and in violation of the Fourth Amendment. That this is based upon the following memorandum of law.

### MEMORANDUM OF LAW

The first issue is whether or not there was consent to enter the home after Mr. McMillian was taken into custody. The facts that were testified to at the hearing indicate that after Mr. McMillian was arrested, Officer Shull noticed that he was not wearing any shoes. He stated the following:

Q. Before you did that did you notice whether he had shoes on or was barefoot?

A. I noticed he had no shoes on.

Q. And did you make a comment about that to him?

A. Yes, I asked him if he wanted any shoes.

Q. And what did he say?

A. He said, he requested he would like his black Air Jordan Nike flip flops.

Q. And at that time did he go with your partner Ken - - sorry.

A. He did. Before that I did notice a pair of black and white Air Jordan Nike flip flops at the door and I asked him were these them right here, he said, "No, those are hers, mine are in the back bedroom."

Q. So he was still standing right by the doorway.

A. Yes.

Q. And you were able to show him the Air Jordans that were - -

A. Yes.

Q. - - there. Okay. After he said that "mine are in the back bedroom," what did you do?

…….

Q. Okay. So going back now, Tyrone McMillian says that "those are hers." When he said "those are hers," who did you take him to be referring to?

A. The only female that was there, Ashley.

Q. Okay. He says, "Mine are in the back bedroom." Do you have any follow-up conversations with Ashley regarding the flip flops?

A. The only conversation I had with her is I asked her if she knew where they were at. She said, "Yes." I said, "Let's go get them." And we went to go get them.

Q. And where did she take you?

A. She took me to the - - I believe that would be the - - I'm not sure of the direction, but it's - - it's the bedroom opposite of where the black rifle case was. Tr. 10-11.

Therefore the first issue is whether Mr. McMillian or Ashley Knueppel consented either by expressly giving consent or implying consent. It is clear from the testimony at

the hearing that neither person verbally consented to the police reentering the home to obtain his shoes. In other words, based upon the testimony at the hearing, Officer Shull never asked for consent to enter the home to obtain the shoes. Therefore, the question is whether or not the actions and words of Tyrone McMillian and Ashley Knueppel implied consent to enter the home to obtain the shoes.

Prior to examining the issue identified above, it should be noted that the scene was frozen at the time that Officer Shull talked with Ashley Knueppel. As stated in the testimony, Officer Shull testified that the scene was frozen after the identification of the original black gun case. Tr. P. 50.. Therefore, the undersigned submits that Officer Shull did not ask for consent because the scene was frozen. He knew that there would be no way in which any occupant of the residence would be allowed to enter without a police officer since the scene was frozen. As a result, the undersigned submits that there was no need for him to ask for consent to enter the home. Based upon that, Officer Shull could have entered the home at any point in time without any implied or actual consent from the parties.

Turning again to the question at hand, one must look at case history in order to ascertain whether or not the exchange of words between Officer Shull and the parties was implied consent. The Defendant submits that there is no aspect of the exchange that would have amounted to implied consent to enter the home to obtain the shoes.

The Fourth Amendment stands for the basic principle that searches and seizures inside a home without a warrant are presumptively unreasonable. Welsh v. Wisconsin, 466 U.S. 740, 748-49, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). But it is also "well settled that one of the specifically established exceptions to the requirements of both a warrant

3

and probable cause is a search conducted pursuant to consent to search." Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.3d 854 (1973). In Schneckloth, the Supreme Court stated that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." Id at 227. There are some factors that are used to determine the totality of the circumstances. For instance, the defendant's age, education and apparent intelligence, whether the defendant was advised of his right to refuse consent, the present of physical or subtle coercion, the defendant's belief that no incriminating evidence would be ground and the extend and level of the defendant's cooperation with the police. United States v. Jenkins, 46 F.3d 447, 451 (5th Cir. 1995). Finally, it is the Government's burden of proving by a preponderance of the evidence, that the consent was voluntary. United States v. Lechuga, 925 F.2d 1035, 1041 (7th Cir. 1991)

In examining the facts presented at the hearing, there was a large police presence on scene. Tr. P. 7. Mr. McMillian was arrested immediately. Police entered the home immediately after the arrest of Mr. McMillian. Ashley Knueppel was displaced from her home and was required to remain outside while the home was searched. Finally Ms. Knueppel was required to stay with a police officer while the search was taking place which was prior to the conversation with Officer Shull. Lastly, it is absolutely clear that Officer Shull did not advise either Mr. McMillian or Ashley Knueppel of their right to refuse entry into the home. Officer Shull also never asked for consent to enter the home.

The testimony from Officer Shull is that Mr. McMillian stated that "mine are in the back bedroom." Tr. P. 10. The Defendant asserts that under no circumstances can

4

this be implied or inferred consent. The law is crystal clear that a statement explaining the location of an object does not in itself indicate consent for police to search an object beyond the scope of the police' lawful authority. United States v. Zertuche-Tobias, 953 F.Supp. 803, 826-827.

In examining what Officer Shull indicated was the exchange with Ms. Knueppel, the same rule applies. Officer Shull indicated that the only conversation he had with her is that he asked her if she knew where they were at. She said, "yes." I said, "Let's go get them." And we went to go get them." Tr. 11.

The above exchange between Officer Shull and McMillian and Knueppel does not imply consent to enter the home. The Defendant asserts that the statements by Officer Shull are statements that can be construed as an imperative statement and not a question requesting consent. Officer Shull states "let's go get them." This is a prime example of an imperative statement which is a commanding statement. A statement being made from an uniformed police officer who has just arrested Tyrone McMillian and who was in the presence of a number of other law enforcement officers that were conducting a sweep of the residence. As reference in 3 Wayne R. LaFave, Search and Seizure – A Treatise on the Fourth Amendment, 8.2(a0 at 642 (1996), when the police state that they "want" to undertake some activity, this is often an imperative statement and not a question requesting consent. Ashley Knueppel complied with the imperative statement of Shull and as the holding in Bumper v. North Carolina 391 U.S. 543, 548-49, 88S.Ct. 1788, 20 L.Ed.2d 797 (1969) indicates that the defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent. That is exactly what we have here – Ashley Knueppel following the commands of a law enforcement officer.

5

The police in this matter did not have the consent of either party to enter the home to obtain the shoes of Mr. McMillian. In this matter there was a significant police presence on scene and in the home. Ashley Knueppel was being watched by police and when Officer Shull approached her and asked where the shoes were located her, his response of "let's go get them" was a directive and not a question. The fact that she went with Officer Shull does not show anything other than a person complying to an Officer's demands. It does not show consent. As a result, Officer Shull's observations of the gun cases in the bedroom were in violation of Mr. McMillian's Fourth Amendments Rights.

If the Court believes that Officer Shull did not have the necessary consent to enter the home then the issue that needs to be addressed is whether or not there is enough information to support probable cause in the search warrant. The Defendant asserts that there is not enough information to support probable cause.

At the outset it should be noted that this was a double homicide investigation in which two individuals were killed in 2005. The search warrant and affidavit are wrought with problems. As noted in previous filings we have an affidavit and application that have the wrong address. There are changes made in a couple of places in addition to the changes to the address. Furthermore, the application signed by the judge only requests the premises be searched for the crime of felon in possession and not a double homicide. The undersigned would submit that the search warrant and affidavit are sloppy in its preparation and confusing.

Having stated the above, if information is excised out of the document, the question becomes is whether or not there is enough information to support probable cause to issue a search warrant. As previously stated and agreed upon, the information

regarding the black gun case in the child's bedroom is stricken as being observed in an unlawful protective sweep. Therefore, the only other information in the document regarding observations in the home is the information that Officer Shull provided regarding the gun cases in the bedroom. As argued above, the undersigned believes that this was done without consent of the residents. Therefore, this information should be stricken from the document as well. Therefore, the only other information was information that was provided by Todd Carter as to statements that Tyrone McMillian allegedly made to him.

As to this information, we do not have a date. We do not have a timeframe. We do not have context. We do not have where it was made. We do not have how it was made. We only have two very brief and short statements. The undersigned would also submit that the statements of Todd Carter do not indicate that Tyrone McMillian "confessed" to the killing of these two people. It only indicates that Tyrone McMillian "confessed that it was over a failed lease contract." It does not state that Tyrone McMillian "confessed that he killed the victims." Therefore, the use of creative writing is not enough for probable cause to support a request for a search warrant.

In the request for the search warrant, there was a request to seize certain items. During the hearing Detective Gomez went through each and every item to explain why these items would be necessary in a homicide investigation. However, the affidavit does not support any of this information and the reason that they wanted to seize said items. Tr. 65-67. For instance, Detective Gomez testified that he wanted to look for biological evidence such as DNA or back-splash from blood of the victim. Tr. P. 67. The problem is that this homicide was years old and there is little chance that DNA evidence in back-

splash form would still exist.  There is absolutely no information to support that there was any evidence of the victims' DNA being splashed.  There is not even minimal information on how the victims were killed or any facts of the evidence in the affidavit.

More importantly there is no information that any item that is identified in the document had any connection to Tyrone McMillian.  For instance, there is no information that Tyrone McMillian was seen with the recording equipment.  If that information existed, the Milwaukee Police Department may have had a leg to stand on.

The information in the affidavit is stale and without any reliability.  Detective Gomez did not put forth any facts whatsoever to indicate whether or not he was reliable.  He did not identify any facts to support that the information that Todd Carter provided was verified in any way, shape or form.  In State v. Romero, 317 Wis.2d 12, 265 N.W.2d 756, 2009 WI 32, the issue of reliability and to an extent, staleness was discussed.  In that matter the Court indicated that the task of the warrant issuing commissioner is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit …"  Id. at 28.  Romero further states that to demonstrate a declarant's veracity, facts must be brought to the warrant-issuing officer's attention to enable that person to be able to evaluate either the credibility of the declarant or the reliability of the particular information being provided.  The reliability of the information may be shown by corroboration of details and this corroboration may be sufficient to support a search warrant.  Id at 30.  Finally, Romero indicates that in order to demonstrate the basis of a declarant's knowledge, there must be facts revealed to the warrant-issuing officer to permit the officer to reach a judgment whether the declarant had a basis for his or her allegations that evidence of a crime would be found at a certain place.  Id. at 31.

8

In this matter we have nothing to support the declarant's statements. We only have a simply statement from Todd Carter that says Tyrone McMillian was going to "pop" the victims. He also provided that Tyrone McMillian had "confessed" that this was over a failed lease contract. The undersigned submits does not support anything. The undersigned believes that based upon the written words on the affidavit that Todd Carter provided information that Tyrone McMillian had indicated that he was going to do something in the future, to wit: pop them. It does not indicate that Tyrone McMillian had indicated that he "popped" the victims.

The undersigned submits that in order to have obtained proper probable cause to support the search warrant in this matter, the Milwaukee Police needed to provide more information in order to have obtained a search warrant to search a premise for a crime that occurred years before. As a result, the undersigned would submit that this affidavit fails to support probable cause.

         BOYLE, BOYLE & BOYLE, S.C.


        By: /s/ Bridget E. Boyle
          BRIDGET E. BOYLE
          Attorney for Defendant

          State Bar ID No. 1024879
          Boyle, Boyle & Boyle, S.C.
          2051 West Wisconsin Avenue
          Milwaukee, WI 53233
          bboyle@boylelaw.com
          Telephone: (414) 343-3300
          Facsimile: (414) 343-3310