UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                    Case No. 11-CR-193

TYRONE McMILLIAN, a/k/a "HK,"

        Defendant.

## GOVERNMENT'S SECOND RESPONSE TO PRE-TRIAL MOTIONS

On November 29, 2011, an evidentiary hearing was held on the motion of Tyrone McMillian.[1] Two witnesses testified for the United States: Milwaukee Police Officer Brian Shull and Milwaukee Police Department Detective Rodolfo Gomez. McMillian's live-in girlfriend, Ashley Knueppel testified on his behalf. On December 12, McMillian filed his opening "Memorandum of Law." There are three issues in front of the Court in this second round of motions:

1)    Was Brian Shull's entry into McMillian's residence to obtain specific footwear requested by McMillian appropriate under the circumstances such that his observation of two handgun cases was lawful;

2)    In the event Shull's entry into the residence was unlawful, does the redacted search warrant and affidavit show probable cause for the subsequent judicially authorized search; and

3)    Did Milwaukee Police Officers rely on the warrant in good faith as set forth in *United States v. v. Leon*?

---

[1] References to the transcript of that hearing are indicated by (Tr. XX).

1

# I. __Factual Summary__

A.     __Arrest of McMillian and Entry Into Residence__

On July 6, 2011, Milwaukee Police Officer Brian Shull reviewed a "suspect card" detailing probable cause for the arrest of Tyrone McMillian for his involvement in a double homicide (Tr. 5-6). Shull was an officer with the Milwaukee Police Department (MPD) for more than 15 years (Tr. 5). He determined that McMillian lived at 6333 W. Darnell in Brown Deer, Wisconsin (Tr. 7). Because this was considered by MPD to be a "high felony arrest" or "dangerous arrest," the Tactical Enforcement Unit was called to assist with the arrest (Tr. 8). Shull knocked on the door of the house and McMillian's live-in girlfriend, Ashley Knueppel, answered and told him that McMillian was inside the house (Tr. 9). Two or three times, while remaining outside the doorway, Shull yelled for McMillian to come to the door (Tr. 9). Eventually McMillian came to the door and the officers handcuffed him in the frame of the doorway (Tr. 9-10).

While still at the doorway and before he handed McMillian off to another officer, Shull noticed that McMillian was barefoot (Tr. 11). He asked McMillian if he wanted a pair of shoes and McMillian stated that he wanted his black Air Jordan Nike flip flops (Tr. 11). Shull pointed to a pair by the door and McMillian stated, "those are hers, mine are in the back bedroom." (Tr. 11). After directing Shull to where his requested flip flops were located, McMillian gave Shull no indication that he could not go into the house to get them (Tr. 21). Based on McMillian's statement, Shull understood that he was to retrieve the requested footwear for McMillian (Tr. 21). At this time the Tact Squad was doing a protective sweep of the house (Tr. 12). When they finished, a member of that team told Shull that they had seen a long, black rifle case in one of the

2

bedrooms but that the house was clear (Tr. 12). Shull then asked Knueppel if she knew where the flip flops were and she said words to the effect, "yes, let's go get them." (Tr. 12, 54). Knueppel "led the way, she knew where she was going," (Tr. 35; 19, 118) and it was his understanding that he was to follow her to get that footwear (Tr. 53). At no time did Knueppel object to Shull following her or tell him that she alone would retrieve the flip flops (Tr. 19).

Knueppel led Shull to a back bedroom and she searched one side of the bed and he searched the other (Tr. 14). Shull found the flip flops on the floor next to the bed (Tr. 14). About two feet away he saw two handgun cases stacked on top of each other between the bed and a night stand (Tr. 14). He did not move or touch either gun case (Tr. 15). After retrieving the flip flops, Shull and Knueppel left the bedroom and Shull gave the shoes to another officer who gave them to McMillian (Tr. 38). No one else was in the house at that time (Tr. 38). Shull had no intent to search the bedroom or any other part of the house, nor did he (Tr. 13). Knueppel stated that at all times Shull treated her respectfully and with dignity (Tr. 116).

B.    **The Search Warrant For the Residence**

1.    **Preparation of the Affidavit and Warrant**

Later that afternoon, an MPD lieutenant told Detective Rodolfo Gomez to contact another detective, William Smith, and obtain information so as to prepare a homicide search warrant (Tr. 61). Gomez had been with MPD ten years, a detective for four years, and had been investigating homicides for two years (Tr. 60). Gomez understood that the suspect was Tyrone McMillian and the residence was located at 6333 W. Darnell (Tr. 62). Gomez began reading the file on the double homicide and discussed the case with Detective Eric Gulbrandson, who was familiar with the crime (Tr. 63). Gomez then began typing the affidavit for the homicide search warrant (Tr. 63; Exh. #4).

3

Gomez prepared the first four paragraphs of the affidavit relating to the homicide and then obtained additional information from Detective Smith who was at the residence (Tr. 65). The information in paragraphs five (the arrest of McMillian at his address) and six (the gun information) came from Smith (Tr. 65). Once he finished the affidavit he read it to Detective Smith who told him that it was accurate (Tr. 69). After he finalized the affidavit and search warrant an Assistant District Attorney reviewed the package and approved it (Tr. 69). His lieutenant also reviewed it, approved it, and notarized Gomez's signature (Tr. 69). Gomez then took the affidavit and search warrant to the circuit court judge who approved and signed it (Tr. 69). Gomez then went to the residence (Tr. 70).

2.    **The Showing of Probable Cause**

Gomez has investigated "well over 100" homicides (Tr. 67). He detailed for the Court why there was probable cause for the specific items that were listed as "Objects of the Search" on the face sheet of the warrant and in paragraph 8 of his affidavit. His testimony on these items is as follows:

¶ 8a.)   "Recording Equipment (taken in burglary days before the homicide)": This was included because he knew that there had been a previous burglary at the recording studio where the homicides occurred (Tr. 67).

¶ 8b.)   "Cell phones": He included these because everybody uses them now; they text, make calls, take photos, and keep their "contacts" in their phones. Cell phones take pictures and at times perpetrators take pictures of their proceeds, their acts, their weapons, and themselves posing with their weapons (Tr. 67).

¶ 8c.)   "Clothing": He included clothing because if it was worn during a crime, especially a homicide, the police would be looking for biological evidence such as DNA on the clothes such as "splash back" from blood of the victim (Tr. 68).

8d.)   "Personal Papers": Included because they could contain such things as insurance documents and threatening or intimidating letters (Tr. 68).

4

8e) "Monies *in large quantities which [may] constitute drug contraband"* [2] (emphasis added): He included money because people who commit murders or robberies sometimes get paid or keep the proceeds, sometimes they keep the money for long periods or sometimes they spend it right away (Tr. 68).

8f.) "Firearms, ammunition, gun cases, etc.": This was included because the victims were shot with a firearm (Tr. 68).

8g.) "Computers and / or electronic storage devices": He included these because he knows that phones can be backed up onto a computer (Tr. 68).

The search warrant and affidavit were "dual purpose," that is, for two crimes: felon in possession of a firearm, in violation of Wisconsin Statute § 941.29, and homicide, in violation of Wisconsin Statute § 940.01 (Tr. 94). Although Gomez neglected to include the homicide statute on the face sheet of the warrant, which he candidly (and embarrassingly) admitted, he did include the homicide and its statutory cite in the affidavit at paragraph 9 (Tr. 93).

[Todd Carter provided the information about McMillian's involvement in the homicides contained in paragraph 4 of the affidavit to MPD during two separate interviews on April 30, 2009 and May 27, 2009.] [3]

---

[2] The italicized part appears to be a mistake in that there was no insinuation then that McMillian was involved in the drug trade. Also, the word "may" was a handwritten addition to the face sheet but not the affidavit.

[3] McMillian's attorney, Ms. Boyle, attempted to elicit this information from Detective Gomez at the evidentiary hearing and I objected on the basis of relevance, hearsay, and Gomez's lack of personal knowledge (Tr. 72, 96-98). That objection was sustained. I made that objection in good faith but was incorrect at the time as the relevance of the information. Although Gomez did not have personal knowledge of the date or dates on which Carter provided that information to MPD, and therefore could not answer that question anyway, in my subsequent research I have found that the date is relevant and it is therefore included here for the Court's consideration on McMillian's probable cause "staleness" argument. *See, e.g., United States v. Lopez*, 649 F.3d 1222, 1246 (11th Cir. 2011).

5

### 3.    The Typographical Error

Gomez stated that Detective Smith provided him with the address and description of the premises to be searched (Tr.  68).  He stated that the one-digit typographical error as to McMillian's address was his fault and was accidental (Tr. 73). [4]   When he arrived at the house he noticed that he had a typo on the address – the warrant stated 6633 instead of 6333 (Tr.  70).  Gomez notified his lieutenant who told him to call the judge (Tr.  70).   He called Judge Kevin Martens, who signed the warrant, and explained the typographical error (Tr.  70).   Judge Martens told him that it was not a problem and told him to go through the entire affidavit and search warrant, line through the incorrect number 6, put in the correct number 3, and initial every correction (Tr.  70).  The judge then authorized him to continue with the search (Tr.  70).   Gomez made all the changes the judge noted and made an entry on page 5 of 6 of the affidavit that on "7-6-11, 10:08pm, authorized corrections of 6633 to 6333.  Judge Martens."(Tr.  70).

## II.   Shull's  Entry Into Defendant's Bedroom to Retrieve Requested Footwear Was Lawful

## A.    Consent: General Principles

The Fourth Amendment prohibits only searches and seizures that are unreasonable.  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).  Warrantless searches are *per se* unreasonable unless the search falls within one of "a few specifically established and well-delineated exceptions."  *Katz v. United States*, 389 U.S. 347, 357 (1967).  In the absence of a warrant, it is the burden of the government to prove that the search was reasonable under a particular exception.  *Schneckloth v. Bustamonte*, 412

---

[4]  The other errors in paragraphs 5 and 6 of the affidavit – that McMillian was arrested on a warrant and in the residence as opposed to in the doorway to the residence, and that an AK-47 was observed in the residence – came from information that Detective Smith provided to Gomez (Tr.  65) and is the basis of an issue previously briefed by the parties.

6

U.S. 218, 219 (1973). "Thus, we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Jimeno*, 500 U.S. at 250-51. The government must show that the consent was freely and voluntarily given – a factual question to be determined by the totality of the circumstances. *Schneckloth*, 412 U.S. at 227. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251. *See also United States v. Lemmons*, 282 F.3d 920, 924 (7th Cir. 2002). "Consent may be express or implied." *United States v. Risner*, 593 F.3d 692, 694 (7th Cir. 2010). "The consent may be in the form of words, gestures, or conduct." *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976). *See also United States v. Walls*, 225 F.3d 858, 863 (7th Cir. 2000) ("consent may be manifested in a non-verbal as well as a verbal manner . . . ."); *United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir. 1996) ("A person can, however, consent to the entry of their homes or hotel by officers, and consent need be neither express nor verbal"). Whether or not a suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual. *Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990).

The extent of the intrusion, and its purpose, are key considerations in the "reasonableness" equation. Under the Fourth Amendment, "the reasonableness of a search turns upon the particular search as balanced against the level of intrusiveness." *Kraushaar v. Flanigan*, 45 F.3d 1040, 1054 (7th Cir. 1995). *See also Belcher v. Norton*, 497 F.3d 742, 748 (7th Cir. 2007) ("To determine whether a particular search is reasonable, we must balance the extent of the intrusion against the need for it."). The Seventh Circuit evaluates "the constitutionality of a given search by 'balancing

7

. . . the need for the particular search against the invasion of personal rights that the search entails.' In doing so, we consider 'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" *Campbell v. Miller*, 499 F.3d 711, 716 (7th Cir. 2007) (citing and quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). *See also Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985) (reasonableness determined "by balancing the extent of the intrusion against the need for it").

## B.  Shull Did Not Enter McMillian's Residence to Conduct a Search

While Shull's entry into McMillian's residence trigger's the protections of the Fourth Amendment, the first, and most important, point to be made in framing this issue is that Officer Shull did not enter McMillian's bedroom in order to *search* the bedroom, but, rather, to retrieve the black Nike Air Jordan flip-flops that McMillian requested.[5]  McMillian requested the flip flops and told Shull that they were in the bedroom.  Knueppel led Shull there to locate and retrieve them. Shull did not intend to conduct a search of any part of the residence, including the bedroom, nor did he.  His intent was simply to retrieve McMillian's requested footwear.  He did not enter any other room, open any drawers, or disturb any items in McMillian's bedroom.  This was not a "search," as that word is ordinarily used in the context of the Fourth Amendment.

Furthermore, Shull did not *seize* or even touch anything, including the two gun cases that he observed while bending down to retrieve McMillian's requested flip flops.  He merely noted their existence, as any responsible law enforcement officer (or observant civilian) would do in such a situation.  Under these circumstances, Shull's actions are neither a search nor a seizure.

---

[5]  There has been no claim that Shull's retrieval of the flip flops was pretextual such to allow him to search the bedroom.  This is another relevant consideration, as some of the below-discussed cases point out.

8

**C.** **Shull's Entry Into McMillian's Bedroom at McMillian's Request Was "Reasonable"**

McMillian told Shull that he wanted his Nike Air Jordan flip flops and told Shull that the shoes were in his bedroom. That alone should end the inquiry as to whether McMillian consented to Shull retrieving the shoes. Knueppel told Shull that she knew where the shoes were and led him into the bedroom. Shull found the shoes and gave them to McMillian to wear during his transportation to MPD headquarters. His actions are not only reasonable, but exactly what McMillian asked him to do.

The threshold Fourth Amendment test of any governmental intrusion is whether it is "reasonable" under the circumstances. In *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990) the United States Supreme Court stated: "It is apparent that in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable."

"Reasonableness," not rigid principles, guide the analysis of Shull's actions. As the Seventh Circuit has said, "the constitutionality against which we must measure this search is the norm of reasonableness. Ordinarily, a determination of reasonableness involves such considerations as the justification for the search and circumstances in which the search is performed." *McGann v. Northeast Il Regional Commuter Rail*, 8 F.3d 1174, 1179 (7th Cir. 1993). "[T]he 'reasonableness inquiry . . . is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ." *Graham v. M.S. Connor*, 490 U.S. 386, 397 (1989). *See also Terry v. Ohio*, 392 U.S. at 21 ("objective standard" used to determine reasonableness). "[R]easonableness . . . must be judged from the perspective of a

9

reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Furthermore, Shull reasonably believed that both McMillian and Knueppel had given him consent to enter the house and retrieve the flip flops from the master bedroom. In his testimony, Shull stated that after talking to McMillian he believed that he was to get the flip flops (Tr. 21). That's the thought that was in his head (Tr. 21). He also testified that after talking to Knueppel it was his understanding that he was to go with her to get the flip flops – that that is what Knueppel wanted (Tr. 53). His belief was reasonable under the circumstances – any other belief or opinion would have been absurd. Thus, his entry into the house and bedroom was lawful. *See Illinois v. Rodriguez, 497 U.S. 177, 185-86 (1990). See also United States v. Risner*, 593 F.3d 692, 694 (7th Cir. 2010) (implied consent received from battered girlfriend: "Any reasonable person would infer from Dean's communications that she consented to the police entry into her home to arrest Risner. In fact, we have trouble imagining why Dean would have provided [the officer] such information if she was not actually requesting that the police enter her home and arrest Risner.").

Finally, in determining the reasonableness of Shull's conduct, this Court must balance the extent of the intrusion against the need for the intrusion and how it was carried out. The extent of the intrusion is almost *de minimis*. Shull walked directly to the back bedroom, touched nothing but the flip flops, disturbed nothing else in the house, and searched no other area of the house – including McMillian's bedroom. The need was created by the barefoot McMillian: he requested those specific flip flops and both he and Knueppel directed Shull to the bedroom. Shull was responsible, careful, and conscientious in his movements through the house. His task was to get the footwear that McMillian requested. He did that and nothing more. His entry into the house and bedroom was reasonable and lawful. *See Campbell v. Miller*, 499 F.3d 711, 716 (7th Cir. 2007).

10

### D. Shull Had Consent to Enter McMillian's Bedroom

#### 1. McMillian Requested His Black Air Jordan Nike Flip Flops

Shull's entry into McMillian's bedroom and observation of the gun cases presents a factual scenario almost identical to that found lawful by the ninth circuit in *United States v. Gilbert*, 774 F.2d 962 (9th Cir. 1985). There, federal marshals arrested the defendant in her car. She was wearing only shorts and a blouse. *Id.* at 963. She asked the marshals to bring her some clothes from her home several miles away because she did not want to go to jail dressed as she was. She told them that the clothes were on the bed in her bedroom. *Id.* While several officers drove her to jail, three others went to her home to get her clothes. Once in her home, the officers first did a protective sweep of the residence, and then retrieved her clothes from the bedroom. *Id.* at 964. During the sweep, the officers found a triple beam scale and a cutting agent for cocaine, both of which they seized. *Id.* at 963. The district court denied the defendant's motion to suppress that evidence stating "what [the officers] did wasn't a search at all [but] was a granting of a request which was reasonable under the circumstances." *Id.* at 963-64. The district court found that the evidence was lawfully observed in plain view during the sweep. *Id.* at 964. The Ninth Circuit Court of Appeals agreed stating the defendant's "request that the officers obtain her clothing necessarily implied consent to enter the bedroom in which she said the clothing was located." *Id.*

Shull's entry was much more innocuous than that found appropriate in *Gilbert*. As did the defendant in *Gilbert*, McMillian requested his footwear and told Shull where they were located. Unlike *Gilbert*, Shull did not go to the room alone but followed Ms. Knueppel. Also unlike *Gilbert*, Shull did not conduct a search of the residence or even the bedroom. Nor did he seize anything. *Gilbert*, while from another district and not controlling, is a good common-sense decision that is quite persuasive.

## 2.     __The Clothing and Accessories "Exception" – Further Analysis__

*Gilbert* is one of numerous federal and state cases that have found reasonable, appropriate, and necessary law enforcement's entry into a suspect's residence to retrieve clothing, footwear, keys, or other accessories, whether on their own initiative or, as with McMillian, at the suspect's request. Indeed, in his treatise focusing on this issue, Professor LaFave writes:

> If the defendant is placed under arrest at a particular place in the premises, even at the front door, the circumstances may be such that he will be allowed to move about the premises prior to departure to the police station. Although this may occur for other reasons as well, it occurs with greatest frequency when the defendant needs to change his clothes or put on additional clothing before departing. Often the defendant will ask that he be allowed to do this, although on some occasions it appears that the police have been the motivating force in causing the defendant to seek out other clothing. In either event, the courts have had little hesitancy in holding admissible evidence discovered by the police as a consequence. . . . *Given the propriety of accompanying the defendant and searching these areas, it has been assumed to be of no legal significance that the police made essentially the same intrusion by undertaking to secure clothing for the defendant.* Often the courts have intimated that the aforementioned practices could be upheld upon the independent ground that the arrestee consented to the officer's actions.

3 W. LaFave, Search and Seizure § 6.4(a) p. 365 (4th ed. 2004) (emphasis added). [6]

An analysis of relevant cases in this area shows that courts have used a common-sense approach in determining the reasonableness of an officer's actions.

In *United States v. v. Butler*, 980 F.2d 619, 620 (10th Cir. 1992) an officer arrested the barefoot defendant outside of his trailer. The officer noticed that the defendant was not wearing shoes and asked the defendant if he had shoes. The defendant replied that they were in his trailer.

---

[6] See also cases cited in footnotes 3 through 16 and accompanying text of that section of LaFave's treatise.

*Butler*, 980 F.2d at 620. The officer told the defendant, "well, let's go on in and get them." While escorting the defendant, a convicted felon, back into the trailer, the officer observed firearms in the trailer and in the defendant's bedroom. The tenth circuit rejected the defendant's motion to suppress that evidence finding that the officers actions were done for the defendant's benefit and "there is no evidence that the police action was done in bad faith." *Id.* at 621. Like in *Butler*, Shull's request of McMillian was for McMillian's benefit and there is no evidence his conduct was in bad faith or a pretext for searching the house. *See Butler*, 980 F.2d at 622 (no evidence that conduct was "pretextual"). Unlike in *Butler*, Shull did not walk the defendant or Ms. Knueppel to the bedroom but responded to McMillian's request and followed Ms. Knueppel to the bedroom. Shull's response was more reasonable than that at issue in *Butler*, and the only obvious thing to do.

In *United States v. Di Stefano*, 555 F.2d 1094, 1101 (2nd Cir. 1977) the court stated that once the officers arrested the defendant, they "had a duty to find clothing for [her] to wear or permit her to do so. . . . Having permitted [the defendant] to retire to her bedroom to dress, Officer Christie was clearly justified in accompanying her to maintain a 'watchful eye' on her and to assure that she did not destroy evidence or procure a weapon." *Id.* That supervision is crucial, or as Shull stated in his testimony, "I would like to go home at night." (Tr. 20). Shull's concern for his life is exactly what the district court in *United States v. Rudaj*, 390 F. Supp.2d 395, 402 (S.D. N.Y. 2005) meant in finding that the officers were entitled to go to a defendant's bedroom to obtain his clothing:

> The agents were under a duty to provide Rudaj with clothing, but they were under no duty to let him or his family go upstairs unaccompanied to get the clothing. Moreover, they would have been constitutionally permitted to, and indeed foolish not to, accompany *whoever went upstairs* to ensure that she did not destroy evidence while there or return downstairs with a weapon.

13

*Rudaj*, 390 F.Supp.2d at 402 (emphasis added). There, the defendant unsuccessfully argued in his motion to suppress evidence found in the house that the agents should not have entered his house at all and that they should have stayed outside while his wife retrieved his clothing. *Id.* Looking at established case law, the judge found that the officers were entitled to accompany the defendant to obtain clothing or "may choose to keep the arrestee in a secure location and send one of their own to get the clothing." *Id.* at 401.

Another district court judge, in *United States v. Jackson*, 414 F.Supp.2d 495, 507 (D. New Jersey 2006), and again in the interest of officer safety, found it unnecessary to let the defendant or another retrieve the shoes that he requested following his arrest: "Indeed, to require [the officer] to have awkwardly led Defendant into the bedroom to accompany him to retrieve his shoes would impose an unnecessary burden on a law enforcement officer attempting to balance the competing interests between ensuring his own safety, and ensuring the safety of a criminal rendered vulnerable by a lack of footwear." *Id.* at 507. *See also United States v. Berkowitz*, 927 F.2d 1376, 1389 (7th Cir. 1991) (after requesting his keys, officer's followed arrestee to another room: "The officer's authority to monitor a suspect does not depend on the suspect's consent; a suspect under arrest has no right to wander off on his own."); *United States v. Harness*, 453 F.3d 752, 754-756 (6th Cir. 2006) (officers were authorized to accompany arrestee into his house following his request to retrieve his keys and a wallet – it is of no consequence that it was the officers who asked him whether he needed anything in the house).

Several courts have used an "exigency" theory to uphold the admissibility of evidence seized by law enforcement while retrieving clothing for the defendant. In *United States v. Clay*, 408 F.3d

Case 2:11-cr-00193-CNC   Filed 12/22/11   Page 14 of 28   Document 43

214, 217 (5th Cir. 2005) [7] the officers arrested the defendant and noticed that he was barefoot. One officer asked him where his shoes were, and the defendant stated that they were in his bedroom. The officer went to the bedroom to get the shoes and saw a bag of marijuana. In upholding this, and a subsequent search of another room, the court stated: "In considering Fourth Amendment claims, both this court and other circuit courts routinely distinguish between the arrest itself and subsequent procurement of clothing for the arrestee, requiring independent entry or reentry into a room or dwelling after the arrest itself has been completed." *Clay*, 408 F.3d at 218. Similarly, in *United States v. Nascimento*, 491 F.3d 25, 50 (1st Cir. 2007) the officers encountered the partially-clothed defendant in the front of his apartment and escorted him to his bedroom to retrieve the rest of his clothing. The first circuit found that evidence the officers found in the defendant's closet was legally seized: "When police encounter and arrest a partially clothed individual in his home, the need to dress him may constitute an exigency justifying the officers in entering another room in order to obtain needed clothing." *Id.* at 50. The court found relevant that the officers "neither manipulated the situation nor used Nascimento's dishabille as a pretext to carry out an otherwise impermissible search." *Id.*

In *United States v. Gwinn*, 219 F.3d 326, 333 (4th Cir. 2000), the court found that the arrestee's lack of shoes and a shirt created an exigency that along with the "limited degree of intrusion represented by the reentry" into his trailer lawfully placed an officer in an area where he observed contraband. In finding the officer's conduct reasonable the fourth circuit set forth a number of factors that are also relevant when reviewing Shull's entry into McMillian' bedroom to retrieve

_____

[7] Clay was a parolee with a diminished expectation of privacy but that did not influence the court's analysis or rationale.

15

his requested footwear:

> In applying a clothing exigency exception to the warrant requirement in this case, we rely on numerous factors that were present. *First*, Trooper Thomas was presented with an objective need to protect Gwinn against the substantial risk of injury to his feet [8] and of chill in the absence of a shirt. *Second*, there was no evidence or even a claim that Trooper Thomas' reasons for reentering the trailer were pretextual. *Third*, the intrusion into Gwinn's trailer was slight and temporary . . . *Fourth*, the intrusion was strictly limited to the purpose of retrieving shoes and clothing. *Fifth*, the purpose of the reentry and seizure of the boots was not to serve a governmental interest, but to ensure Gwinn's reasonable safety while he was in the government's custody.

*Gwinn*, 319 F.3d at 333-34. The court's analysis in *Gwinn* provides a common-sense structure for the analysis here. First, Shull noticed that McMillian was barefoot and asked him about his need for footwear – for McMillian's comfort and protection. Second, as in *Gwinn*, there was no pretext to Shull's question to McMillian nor to his retrieval of the footwear that McMillian specifically asked for. Third, as in *Gwinn*, Shull's entry into McMillian's residence, following Knueppel, was slight and temporary. Fourth, Shull's entry into the house and into McMillian's bedroom was strictly limited to retrieving McMillian's requested flip flops. While he did observe the gun cases, he neither moved nor touched them nor anything else in the bedroom, nor did he go into any other room in the house. Fifth, and also as in *Gwinn*, Shull went into the house to retrieve the flip flops that McMillian requested, because *McMillian requested them*, and needed them for his own comfort and safety, not to serve some government purpose. *Gwinn* can be distinguished in one way from the present case: there the defendant did not request his footwear and clothing. Here, McMillian described to Shull

---

[8] Outside of the common sense of not making an arrestee walk and remain barefoot during his arrest, detention, booking, interview, and detention, there were no facts in *Gwinn* that indicated that there was any specific danger on the ground around the defendant where the defendant was standing or would be required to walk to.

16

the specific footwear he wanted and where they were located. Like in *Gwinn*, Shull's actions were reasonable, even more reasonable than the facts in *Gwinn*.

### 3. Knueppel's Conduct In Leading Shull to the Bedroom Is Consent

Courts have found consent in circumstances much less clear and direct than here. There is a line of cases in the Seventh Circuit, among the others, that have found voluntary consent to enter a home through an individual's conduct in opening a door to law enforcement and merely stepping aside. Concepts and words such as "common sense," "inescapable conclusion," and "totality of the circumstances" guide these courts. *See, e.g., United States v. Villegas*, 388 F.3d 317, 325-26 (7th Cir. 2004); *United States v. Walls*, 225 F.3d 858, 862-63 (7th Cir. 2000); *United States v. Griffin*, 530 F.2d 739, 743 (7th Cir. 1976). The reasoning of these courts in finding valid consent is relevant to Shull's entry into the residence because the only conclusion he, or a reasonable person, could draw from McMillian's request, and Knueppel's statement and conduct, was that both wanted him to get McMillian's specific flip flops from a specific room of the house. He could understand nothing less.

### 4. McMillian's and Knueppel's Consent Was Voluntary

The United States has the burden to prove, by a preponderance of the evidence, "that someone who consents to a search does so freely and voluntarily." *United States v. Saadeh*, 61 F.3d 510, 518 (7th Cir. 1995). "We look at the totality of the circumstances to determine whether consent arose from coercion and duress, or from voluntariness." *Id.*

In *United States v. Raibley*, 243 F.3d 1069, 1075-76 (7th Cir. 2001) the Seventh Circuit set forth some of the main factors that must be considered:

> (1) the person's age, intelligence, and education, (2) whether he was advised of his constitutional rights, (3) how long he was detained before he gave his consent, (4) whether his consent was immediate,

17

> or was prompted by repeated requests by the authorities, (5) whether
> any physical coercion was used, and (6) whether the individual was
> in police custody when he gave his consent.

Under the totality of the circumstances, both McMillian's and Knueppel's consent was voluntary.

McMillian was 29 years old at his arrest and seems of average intelligence. There is nothing in the

record as to whether he was advised of his rights before he asked for his shoes,[9] but it seems clear

that he was asked about his shoes very quickly after his arrest because it was while the Tact Squad

was doing their sweep and he was still at the doorway (Tr. 10-11). Shull retrieved the footwear

less than ten minutes after McMillian's arrest (Tr. 29). McMillian's consent was immediate – Shull

asked him once about his footwear. No officer physically, verbally, or psychologically coerced

McMillian into asking for his flip flops or identifying the room where Shull could find them. Under

the totality of the circumstances, there is no evidence that McMillian's request for his shoes was not

genuine or voluntary.

The factors are the same for Knueppel who, independent of McMillian, had authority to lead

Shull to the bedroom to get McMillian's requested flip flops. Applying these same factors, and

looking at all the surrounding circumstances, Knueppel freely and voluntarily led Shull to the

bedroom to retrieve McMillian's footwear.

### 5. There Was No Objection To Shull's Entry Into Residence To Obtain Footwear

Also relevant here is that neither McMillian nor Knueppel objected to Shull's entry into the

residence (in light of McMillian's specific request, his objection would have been absurd).

---

[9] According to his August 19, 2011 bond study, McMillian had been arrested at least four times prior to July 6, 2011. On April 20, 2000, for resisting / obstructing an officer; on March 5, 2003, for Aggravated Robbery – 1st Degree (56 months imprisonment); on May 3, 2007, for disorderly conduct; and on November 5, 2009, for failure to report to jail. It should be clear from this history that McMillian understood his constitutional rights.

Knueppel did not tell Shull, "Stay, here, I'll go get them," or any other words to that effect. Instead, she told Shull that she knew where the shoes were and said "let's go get them." [10] Once in the bedroom, Ms. Knueppel and Shull looked for the footwear together – she on one side of the bed, he on the other. She did not object to this. Clearly, in her own mind, they were together both looking for her boyfriend's requested footwear.

If McMillian did not want Shull to retrieve the flip flops he asked for in directing him to the bedroom, he could have said so. Apparently there were shoes at the doorway that McMillian could have instead requested and worn. If Knueppel thought that Shull was mistaken in his belief that he should follow her to the back bedroom to get the footwear, she could have told him to wait at the doorway (she did not know he would not let her go into the house unaccompanied) while she went to get the shoes. Instead, she told him to follow her.

A person is entitled to not consent to a search, withdraw consent to a search, or limit the scope of a search. This is an important consideration in a long line of Seventh Circuit decisions ruling on this issue. In *United States v. Wesela*, 223 F.3d 656, 659 (7th Cir. 2000), officers went to a residence in response to a call from a woman who stated her husband had a gun and was threatening to kill her. After arriving at the residence, one officer began searching the house and collecting evidence. *Id.* at 59. Although he did not ask the woman for consent to search the house,

_____

[10] There is a conflict on this point between the testimony of Knueppel and Shull and this Court will need to make a credibility determination. Knueppel, McMillian's girlfriend who is carrying his child, testified that she was taken into the house (Tr. 110) and that she walked behind Shull thereby following him to the bedroom (Tr. 112). This is objectively implausible; it is clear that Shull had never been in the house and had no idea where the bedroom was located. In addition to her inherent bias favoring McMillian, Knueppel's testimony in this regard casts a negative shadow on her overall credibility. Shull is more believable, especially considering what *he did not say* to bolster and solidify the consent he received.

she "did not object to what he was doing." *Id.* The defendant husband contested the search and resulting seizure of evidence stating that his wife did not give consent to enter the home, or, alternatively, did not give express or implied consent for the search of the gun. *Id.* at 660. The Seventh Circuit found that the wife, through all the circumstances, gave implied consent for the officers to search the house and "[h]ad she wished to do so, she could have objected to Detective Corbett's search." *Id*. at 661. In another case, *Gerald M. v. Conneely*, 858 F.2d 378, 384 (7th Cir. 1988) an officer entered a woman's home and walked around in the belief that she had given him consent to do so. The court found the officer's belief to be reasonable despite the woman's express verbal reservation:

> The fact that Mrs. Macek said 'wait here' or something similar gives us pause but only for a moment. The material facts are undisputed. Her subsequent silence and apparent acquiescence persuades us that [the officer] Conneely's presence in the home was not against Mrs. Macek's apparent wishes. . . . She did not act astonished nor did she physically respond in any way that might relay the message she disapproved of his movement.

*Conneely*, 858 F.2d at 384-85. *See also United States v. Villegas*, 388 F.3d 317, 325 (7th Cir. 2004) ("There is 'nothing in the sequence of events that evidences coercion or duress' or any objection by Mr. Villegas to the officers' entry."); *United States v. Stribling*, 94 F.3d 321, 324 (7th Cir. 1996) ("Stribling was present during the search; she could (and should) have protested at the time if believed [the officer] exceeded the scope of her consent, as it was her burden to limit that scope." (citing other seventh circuit decisions)).

Here, McMillian could have objected, declined to wear any of his footwear, or directed the officers to shoes not in his bedroom. Instead he very clearly asked for a specific pair of shoes and told Shull where to get them. Knueppel, too, could have said or done something to tell Shull that

20

he was not to enter the house. She did quite the opposite, inviting him to follow her to the bedroom that she shared with McMillian to look for the flip flops he requested.

The Court should find lawful Shull's entry into McMillian's residence and his subsequent observation of the two handgun cases. If the Court so finds, then the search warrant affidavit contained probable cause to search McMillian's residence.

## III. The Search Warrant Established Probable Cause to Search McMillian's Residence

The Fourth Amendment provides that warrants may be issued upon a showing of probable cause and particularly describing the place to be searched and the things to be seized. U.S. Const. amend. IV. "Probable cause exists when 'known facts and circumstances' allow a reasonable belief that a search will turn up evidence of criminal activity." *United States v. Hicks*, 650 F.3d 1058, 1065 (7th Cir. 2011) (quoting *United States v. Brack.*, 188 F.3d 748, 755 (7th Cir. 1999)). Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). The question is whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

This Court's review of the issuing judge's finding of probable cause is a deferential one. "[W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of a *de novo* review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). *See also United States v. Dismuke*, 593 F.3d 582, 586 (7th Cir. 2010) ("we must afford great deference to the issuing judge's conclusion.").

Here, McMillian attacks three parts of the search warrant and supporting affidavit: the showing of probable cause that he committed a crime; the description of the place to be searched; and the relevance of the listed "objects of search" to the homicide. The property description is the subject matter of pending motions and will not be revisited here.

The probable cause showing of McMillian's involvement in the homicides as set forth in Rodolfo Gomez's affidavit is short but right to the point. The affidavit states that two people were shot to death between October 15, 2007, and October 19, 2007,[11] at 5514 W. Lisbon Avenue in Milwaukee. It goes on to state that the informant, Todd Carter, was a friend of Tyrone McMillian. Because he is named and further identified by birth, Carter's veracity sits between that of a citizen witness and an unnamed "informant," further enhancing his credibility. *See* 2 W. LaFave, Search and Seizure § 3.3 p. 98 (4th ed. 2004) ("One who qualifies as . . . a 'citizen-informer' is more deserving of a presumption of reliability than the informant from the criminal milieu.").

Further, the affidavit states that McMillian told Carter that he had to "pop" – a known street term for kill – the victims as a result of an argument over a failed lease contract for a recording studio at 5514 W. Lisbon Avenue. The probable cause comes directly from the words of Tyrone McMillian to his friend. This is tantamount – or even better because it is a statement against McMillian's interest – to personal observation, again giving enhanced reliability to the statement. *See Illinois v. Gates*, 462 U.S. 213, 234 (1983) ("Conversely, even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case."). The internal corroboration of Carter is the known fact of the double

---

[11] McMillian's motion incorrectly sets the year as 2005.

homicide, a reference to the victims' identities, and the correct address of the homicides. This is sufficient to establish a "probability" that McMillian killed those two people, or was otherwise involved in their murder.

McMillian's attack on the "objects of search" section is actually two-pronged: he alleges that there is an insufficient tie of the items to the homicides (relevance) and that the probable cause connecting these items to McMillian's residence is stale.

In his testimony, Gomez detailed the relevance of each and every listed item to the homicide investigation of McMillian (Tr. 67-68). McMillian's complaint that the affidavit does not include this same detail presupposes that, without the same detailed explanation, a judge would not understand the relevance of these items to a homicide investigation. That is not accurate. Obviously, Gomez, his lieutenant, Detective Smith, an Assistant District Attorney who reviewed and approved the search warrant and affidavit (¶ 11 Aff.), and the judge who signed the warrant,[12] understood the relevance. Gomez, a ten-year MPD veteran, stated that he had investigated "well over 100" homicides in the two years he had been on the homicide unit. "Experienced officers may draw reasonable inferences from the facts based on their training and experience. . . . A magistrate reviewing [the officer's] factual basis for probable cause would have been entitled to rely on [the officer's] experience and any reasonable inferences drawn from that experience." *United States v. Hicks*, 650 F.3d 1058, 1067 (7th Cir. 2011) (citations and quotation marks omitted). Based on his

---

[12] While it is outside the record, it is of public record, and McMillian's counsel will not disagree, that the judge who signed the search warrant was Milwaukee County Circuit Court Judge Kevin Martens, who on July 6, 2011, was one of three circuit court judges assigned to the homicide / sexual assault courts and who had been in that specific assignment since August 1, 2010, a total of more than 11 months. This was a judge well seasoned in homicide cases and the types of evidence used in investigating and prosecuting them.

23

background and experience in investigating homicides for MPD, and the detail he provided in his testimony about each of the seven categories of "objects of the search," this Court should find those items relevant to the homicide investigation of McMillian and properly included in the search warrant.

McMillian's second challenge (but very closely related to the first because it still challenges probable cause) is that any tie between his residence and the "objects of search" is stale because of the three-plus years since the homicides. There is some facial attraction to this argument but it misses the point and fails on a number of different levels. First, and although this conduct was within the five-year statute of most other crimes, homicide does not have a statute of limitations. Also, "[w]hile the recency of information contained in a search warrant application is one factor bearing on the question of probable cause, *United States v. Watzman*, 486 F.3d 1004, 1008 (7th Cir. 2007), there is no bright line for when information is stale." *United States v. Pappas*, 592 F.3d 799, 803 (7th Cir. 2010).

Here again, the expertise of Detective Gomez, as demonstrated by his testimony, shows the tie between McMillian's residence and the "objects of search" despite the extended time frame. Clothes can contain DNA of the victims in a homicide such as this; cell phones can contain a record of calls or texts between McMillian, the victims, or others involved in the homicides and are at times used by perpetrators to take photos of their weapons or of them posing with their weapons; a perpetrator could still maintain a firearm or the ammunition, or both, used in the homicides; and computers and electronic devices are often used to back up cell phones (as well as preserve an email trail that could be relevant). Again, in this analysis, the Court must look to the expertise of the affiant and give great deference to the judgment of the circuit court judge who signed the warrant.

24

The items that Gomez included in the "object of search" section are not capable of evaporating or disappearing on their own, they have inherent longevity, and, as in other homicides, were more probable than not still maintained by McMillian in his residence – just as found by the sitting homicide judge who signed the warrant. There is no staleness issue as to these items.

### IV.    The Officers Relied On the Search Warrant in Good Faith

The good-faith exception of *United States v. Leon*, 468 U.S. 897 (1984) applies here. "[S]uppression of evidence seized pursuant to a search warrant that is later declared to be invalid is inappropriate if the officers who executed the warrant relied in good faith on the issuing judge's finding of probable cause." *United States v. Watts*, 535 F.3d 650, 656-57 (7th Cir. 2008). McMillian does not allege that the officers lacked good faith in the validity of the search warrant or the probable cause showing in the affidavit. Nor could he – not one fact in the record, express or implied, could support such a claim. Furthermore, this Court had the opportunity to see the affiant, Detective Gomez, testify and is thus able to assess his credibility and his good faith belief in the legitimacy of his affidavit and the warrant.

The Supreme Court's decision in *Leon* created an exception to the exclusionary rule for situations in which the law enforcement officer relied in good faith on the issuance of a warrant by a judge. *Leon*,  468 U.S. at 922.  Even if probable cause for a warrant is lacking, the search can be saved by *Leon*'s good faith exception. *United States v. Olson*, 408 F.3d 366, 372 (7th Cir. 2005). An officer's decision to obtain a warrant is prima facie evidence that he was acting in good faith. *Olson*, 408 F.3d at 372 (citing *United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002)).

The Supreme court in *Leon* emphasized that "suppression of evidence obtained pursuant to a warrant should be ordered only . . . in those unusual cases in which exclusion will further the

Case 2:11-cr-00193-CNC   Filed 12/22/11   Page 25 of 28   Document 43

purposes of the exclusionary rule." 468 U.S. 918. This means that, "[j]ust as reviewing courts give 'great deference' to the decisions of judicial officers who make probable cause determinations, [law enforcement] officers should be entitled to rely upon the probable-cause determination of a neutral magistrate when defending an attack on their good faith for either seeking or executing a search warrant." *United States v. Soderstrand*, 412 F.3d 1146, 1153-1154 (10th Cir. 2005) (quotation omitted). As the *Leon* Court explained:

> In most cases [where an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope], there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.

*Leon*, 468 U.S. at 920-21 (citation and internal punctuation omitted).

In considering the issue of objective good-faith reliance, the Seventh Circuit asks whether "a reasonably well-trained officer would have known that the search was illegal despite the [judge]'s authorization." *Leon*, 468 U.S. at 922 n. 23. This standard does not require "studied examination" of legal precedents. *United States v. Malin*, 908 F.2d 163, 166-167 (7th Cir. 1990). And, especially in areas where such examination fails to yield clear guidance, the court has recognized that an officer can be wrong about probable cause without acting unreasonably for purposes of *Leon*. *Id*. *See also United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir.1985) ("[I]t must ... be remembered that the knowledge and understanding of law enforcement officers and their appreciation for constitutional intricacies are not to be judged by the standards applicable to lawyers.").

26

An additional factor that weighs in favor of a finding of objective reasonableness and good faith is that Detective Gomez consulted with a prosecutor about the affidavit and face sheet. The Assistant District Attorney reviewed it and approved it before Gomez applied for the search warrant. *See United States v. Pappas,* 592 F.3d 799, 802 (7th Cir. 2010) ("Consulting with the prosecutor prior to applying for [a] search warrant provides additional evidence of [that officer's] objective good faith."); *United States v. Merritt*, 361 F.3d 1005, 1013 (7th Cir. 2004), vacated on other grounds, 543 U.S. 1099 (2005) ("consultation with a prosecutor weighs in favor of a finding of objective reasonableness"); *United States v. Bynum*, 293 F.3d 192, 198 (4th Cir. 2002) (same); *United States v. Frangenberg*, 15 F.3d 100, 103 (8th Cir. 1994) (same); *United States v. Brown*, 951 F.2d 999, 1005 (9th Cir. 1991) (same); *United States v. Taxacher*, 902 F.2d 867, 872 (11th Cir. 1990) (same). [13]

Here, despite some mistakes and typographical errors in the affidavit and the inadvertent omission of the homicide statute citation on the search warrant face sheet,[14] the circuit court judge found probable cause and signed the search warrant authorizing the search of McMillian's residence. Gomez and the officers executing the search relied on the judicially authorized search warrant in good faith, as they should have. Their seizure of the evidence listed in the "objects of search"

---

[13] It should also be remembered that Detective Gomez consulted with the issuing judge from the scene regarding the typographical error on the address, further demonstrating again his good faith belief in the warrant and his intention to act within Constitutional requirements. Suppression is not justified when there is no police illegality to deter.

[14] Again, in addition to the homicide probable cause paragraphs in the affidavit, the crime and its statutory citation are alleged in paragraph 9 of the affidavit. Since the warrant specifically incorporated the affidavit ("by attached affidavit"), they are one for purposes of this analysis. *See, e.g., United States v. SDI Future Health Ins.* 568 F.3d 684, 699-700 (9th Cir. 2009); *United States v. Waker*, 534 F.3d 168, 172-73 (2nd Cir. 2008).

27

section of the warrant was lawful and valid under *United States v. Leon*, and the fruits of that search are admissible against McMillian in any future legal proceedings.

### V. Conclusion

Milwaukee Police Officer Brian Shull's entry into McMillian house to retrieve the footwear that McMillian requested was reasonable under the circumstances. McMillian and Knueppel, by their words and actions, voluntarily gave Shull consent to enter the residence and get the flip flops. Shull's observation of the two gun cases, and their subsequent inclusion in the search warrant affidavit, was lawful and appropriate. Moreover, even omitting the affidavit paragraphs concerning the observation of guns or gun cases in McMillian's residence, the remaining paragraphs of the affidavit established probable cause that the officers would find in the residence the specified items listed in the search warrant and affidavit. Finally, Detective Rodolfo Gomez and his fellow officers relied in good faith on the legitimacy of the judicially authorized and signed search warrant. All evidence taken by MPD on July 6, 2011 in the search of the residence is admissible against McMillian in any further judicial proceedings.

Dated at Milwaukee, Wisconsin this 22nd day of December 2011.

Respectfully submitted,

JAMES L. SANTELLE
United States Attorney

By:   s/ JOSEPH R. WALL
    Bar # 1009796
    Assistant United States Attorney
    United States Courthouse
    517 E. Wisconsin Ave., Room 530
    Milwaukee, WI 53202
    (414) 297-1721
    (414) 297-1738 (Fax)
    E-mail: joseph.wall@usdoj.gov

28