UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WICONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                          11CR193

TYRONE MCMILLIAN,
Defendant.

## RESPONSE TO GOVERNMENTS BRIEF

NOW COMES the defendant and submits the following response to the Government's Response to the pretrial motions in this matter.

At the outset of the undersigned's response she must note a couple of things that stand out in the Government's Response that are extremely distressing in this matter. First off, after the testimony in this matter, the Court indicated that the evidence was closed. It appears on a number of occasions that there is additional information that is put forth that has no basis in the record.

The first example is found in Footnote 9. The undersigned was present at the hearing in this matter and does not recall the bond study being admitted into evidence. The undersigned recognizes that the bond study is contained in the court file. However, there was no testimony at the hearing that McMillian had been arrested four times prior to July 6, 2011. There was no testimony in the record that Mr. McMillan was given his Miranda Rights in any of those cases. There is no evidence in the record that Mr.

McMillian made statements to law enforcement officers in those matters. If for some reason the Court believes that something that is contained in the court file somehow becomes relevant and a part of the record in an evidentiary hearing without any further explanation, examination of the facts or testimony the undersigned would request that the testimony in this matter be reopened so that the undersigned has an opportunity to produce evidence in regards to this issue.

The second place is found in Footnote 12. The undersigned does not disagree with the statement that Judge Martens was in the homicide/sexual assault court for 11 months. However, the undersigned in no way, shape or form agrees that he was well seasoned in homicide cases and the types of evidence used in investigating and prosecuting them. Just because a specific judge is assigned to a specific type of court this does not somehow translate into them being well seasoned in the law and those types of cases. There is no information that is present to support how many trials Judge Martens conducted during those 11 months. There is no information that he performed one or ten trials. Furthermore, there is no information to support that he heard motions in regards to search warrants. Finally and most importantly to this matter, there is absolutely no evidence that Judge Martens signed one or 100 search warrants. Therefore, the undersigned strongly suggests that this footnote cannot be relied upon in any manner especially to somehow bolster a judge's conduct in a case.[1]

---

[1] There is also a reference on page 2 of the Government's Brief that Ashley Knueppel was McMillian's live-in girlfriend. The undersigned has examined the transcript and does not believe that there was any testimony that Ashley Knueppel was his "live-in" girlfriend. Of course this would also cause problems with whether or not she was a person that could give consent to enter the home. In addition the Government indicated that Tyrone McMillian appears to be of average intelligence. Again there was no information in the testimony about this fact.

The undersigned has operated under the assumption that when the testimony is closed in a case that meant that facts that were not made a part of the evidence and testimony at the hearing that random facts cannot be inserted and used to support the position of the parties. Having stated the above, the undersigned will proceed to her argument in response to the Government's brief that was filed in this matter.

## SHULL'S ENTRY INTO THE HOME
## TO RETRIEVE THE FLIP FLOPS

The testimony is not in dispute as it relates to what occurred at the outset of the contact between McMillian and Shull. After McMillian was placed into handcuffs Officer Shull noticed that McMillian was not wearing shoes. Shull asked "Do you want some shoes?" (Tr. 10). McMillian answers "yes I want my Air Jordan flip flops." (Tr. 10). Shull shortly after states asks if the shoes by the door are them. (Tr. 10). McMillian states "No, those are not mine, those are hers; mine are in the back bedroom." (Tr. 10). McMillian never said that he wanted police to go and get him the shoes. Tr. p. 30. At the time that this was occurring, a protective sweep of the home is taking place in which a number of officers entered the home to search it. (Tr. 11).

Approximately ten minutes transpires before Shull has a conversation with Knueppel about the shoes. Officer Shull's testimony of what transpires when he talks with Knueppel is all over the map. For the purposes of the record it is necessary to recite each and every statement he made in regards to this issue.

Page 11 he indicates the following:

> Q: Okay. He says, "mine are in the back bedroom." Do you have any follow-up conversation with Ashley regarding the flip flops?
>
> A: The only conversation I had with her is I asked her if she knew where they were at. She said, "Yes." I said, "Let's go get them." And we went to go get them.

Page 30 he indicates the following:

> Q: Now, when you went up to her, what did you say to her as far as you can best recall?
>
> A: The only thing that I can remember saying is, "He needs his flip flops, do you know where they are?"
>
> Q: And her response to you was what?
>
> A: I don't recall the exact words. I'm assuming it was something to the effect of, "yes, okay," because we wound up walking toward the back to go get them.
>
> Q: All right. Now, you say, "I'm assuming it was 'yes' or 'okay,'" you have absolutely no recollection of the words that were used, correct?
>
> A: Not word for word, no.

Page 33 he indicates the following:

> Q: So when you approach Ms. Knueppel and said, again, about the shoes, and you have no recollection of the exact words but you're assuming here today that she said "yes" or "okay" and then walked in the residence, right?
>
> A: yes.

Page 53 he indicates the following:

4

Q:      You never asked Ashley Knueppel, "Can I have consent to go in your house and get a pair of flip flops in the bedroom?' did you?

A:      In those exact words, no.

Q:      What words did you use as a Milwaukee police officer to gain consent to go and enter a resident of a lawful owner of a residence, that being Ashley Knueppel?

A:      I don't recall what I said earlier, but I believe it was to the point of, "Do you know where the flip flops are?"' either her saying, "Yes, let's go get them'" and we both walked to the back.[2]

Page 54 he indicates the following:

Q:      Now, you -- when she said, "Okay let's go and get it," which is what you just said now, right? "Let's go and get them."

A:      something to that effect.

Q:      Right.  Because you don't remember the exact words that she used, as you sit here today.

A:      Correct

Q:      All right.  And in your report that you wrote, it indicates that" and I'll read it:

> "I observed that he was not wearing any shoes.  McMillian stated that he wanted his Air Jordan flip flops.  I asked Ashley where they were located, to which she stated, they are in our bedroom.' I walked with Ashley to the bedroom and bent over to pick up the flop flops."  Et cetera and so forth.

Do you remember that in your report.  (In his report there is no exchange that Knueppel said anything about going to get them like let's go).

Page 55 he indicates:

---
[2] It is also interesting to note that the officer does not remember what he testified to on direct and therefore had difficulty answering this specific question.  Obviously this goes to his credibility.

> Q:   All right. So, when you wrote your report and put that she responded with "Okay, let's go and get them, right? You agree with that.
>
> A:   Correct.
>
> Q:   But you remember those words, as you sit here today that she said something along that lines
>
> A:   Something along the lines of the positive, because if she would have said no, he would never have gotten his Air Jordan flip flop, he would have went barefoot.
>
> Q:   Right. Because she had the right to say, "I'm not getting his flip flops," right?
>
> A:   Correct

The Government wants this Court to place great weight into an officer that testified to words of Ashley Knueppel that form the basis of his belief that he received consent from her to enter the home. However, his recollection is extremely inconsistent with his report and his testimony on the witness stand. He only assumes the words that were used by Knueppel. He does not recall any specific words. He changes the words on numerous occasions throughout his testimony. Finally he does not even recall the words he used during in his direct testimony to his cross-examination.

If the Court is somehow going to rely on his testimony that he believed he received consent to enter the home to retrieve the shoes, then the Court is going to be in a position of which testimony to rely on. Does the Court pick page 11 as the testimony to rely on from Officer Shull that he indicated that he said "lets go" into the home not Knueppel? Or should the Court pick page 54 as the testimony to rely on that Knueppel said "okay let's go get them?" Or should the Court rely on what his report states which is void of any of the information of the exchange with Ashley Knueppel?

6

The Government has relied on United States v. Gwinn, 219 F.3d 326 (2000) to support its position. However, there are some unique aspects of Gwinn that we do not have in this matter. First off in Gwinn, the initial entry of the police into the trailer was legal and justified. In this matter the protective sweep was not legal and not justified. In order for any warrantless search to be justified it must be strictly circumscribed by the exigency that justified the exception to the warrant requirement. Mincy v. Arizona, 437 U.S. 385, 393, 98 S.Ct. 2408.

In Gwinn the Court indicated that exigent circumstances were in existence by the substantial risk of injury to Gwinn were he to be transported and processed following his arrest without shoes and a shirt and the limited degree of intrusion represented by the reentry to seize the boots. Id. at 333. In the matter at hand, there was not a limited degree of intrusion. The home was already frozen therefore there was not a limited degree of intrusion because the home was already frozen which distinguishes this matter from Gwinn.

The Government on page 16 has cited in great length the Courts analysis as to justifying the reentry into the trailer in Gwinn. However for some reason the Government has left out an important part of the third factor. The third factor that the Court found in this matter was:

> Third, the intrusion into Gwinn's trailer was slight and temporary, **particularly in light of the fact that the officers had only moment before lawfully been in the trailer to ensure the safety of Harrah and her baby and had neither completed their business at the site nor left it. Id. at 334.**

This was obviously an important part of this factor. In Gwinn the police were lawfully on the premises conducting police business, specifically checking the welfare of the victim and her baby

Furthermore in <u>Gwinn</u> the court noted that the Trooper had legally entered the trailer and was in the process of completing his tasks incident to Gwinn's arrest before leaving the site. He had legally exercised custody and control over the trailer and his temporary departure from the trailer to place a shotgun that was found in the trunk left him with a form of custody or control of the trailer. <u>Id</u>. at 334.

In this matter the home was unlawfully searched and the home was frozen based upon the finding of a black gun case. (Tr. 56). Therefore, there was not legitimate reason for the police to have been on the premises and that is a major distinguishing factor from <u>Gwinn</u>.

"The burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." <u>Vale v. Louisiana</u>, 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). In <u>Gwinn</u> the Court noted that "…the Government bears the burden of demonstrating particularly that the arrestee had a substantial need for the clothing and that the governments responses was limited strictly to meeting that need." <u>Welsh v. Wisconsin</u> 466 U.S. 740, 750, 104 S.Ct. 2091, 809 L.Ec.2d 732 (1984). The undersigned submits that the Government has not met this burden.

The Government contends that McMillian directed the officers to his footwear. McMillian did not direct the officers to the footwear. The officers asked him if the shoes at the front door were his and he responded that those were not his footwear his were in

the back bedroom. He did not state "you can go back and get them." (Tr. 30). He did not direct them to go into the bedroom and retrieve them. He only responded to the question that those were not his and his were in the back bedroom.

The Government argues on page 10 that the extent of the intrusions by Shull is almost *de minimis*. The undersigned would agree that if Shull walked into the residence and retrieved the shoes that would be a situation of a de minimis intrusion. However it is preposterous to suggest that is what occurred in this matter. There was not a *de minimis* intrusion when Shull entered that home to retrieve the shoes. The house was frozen at the time that Shull entered the home therefore this was not a *de minimis intrusion* but it was a momentous intrusion of the home due to the fact that law enforcement had seized the home due to the unlawful protective sweep of the home. That is a factor that must come into play when examining this case.

The Government also relies on <u>United States v. Butler</u>, 980 F.2d 619 (1992). The undersigned suggests that there is a major difference in the Butler matter. In that case, Deputy Marshals and Sheriffs officers went to Butler's trailer to serve a warrant for his arrest. The grounds were strewn with litter, including broken glass, several hundred beer cans and the parts from various motor vehicles. When the officers arrived, Butler eventually came out of the house and was arrested. They noticed while searching him that he did not have shoes on and had noticed that there was broken glass on the ground. Furthermore, the officers noticed that there was no route by which Butler might be conveyed safely to the officers' vehicles. The officers asked Butler if he had any shoes and he indicated that he did but they were in his trailer. An outside citizen had asked his girlfriend if she would get Butler's shoes. The officer told Butler well let's go in and get

Case 2:11-cr-00193-CNC   Filed 12/29/11   Page 9 of 26   Document 44

them. The officer helped Butler, a convicted felon, inside the trailer. Id. at 620. When they went into the trailer they noticed the two long rifles. The Court indicated that based upon the safety issues, this was a reasonable entry into the home because it was clear from the record that taking Butler to the officers vehicles would have posed a serious risk to his health. Id. at 621.

There was no serious risk to McMillian's health in this matter. There is no evidence that he could not have been transported to the booking room without shoes. There was no glass or items on the ground that would have been problematic to his health. Furthermore, when Shull entered the house, McMillian was safely in the squad and therefore, there were no immediate concerns for his safety. Finally, McMillian would not have been able to wear his flip flops in the jail. Therefore, this was not a situation where McMillian needed shoes because he needed them in the jail. The jail would have supplied him with shoes.

The Government also relies on United States v. Di Stefano, 555 F.2d 1094, 1101 (2nd Cir. 1977). This is also misplaced because Di Stefano was an arrestee that was arrested outside the residence in her nightgown and bathrobe. The Court reasoned that going with the defendant into the bedroom so that she could change into clothes was reasonable for safety purposes. Di Stefano was the person arrested and the undersigned would agree that it was reasonable for the officers to follow the arrestee to the bedroom to obtain clothes. Id. at 1101. However in this matter, McMillian was not followed into the bedroom because he was in the squad. If the officers took McMillian to the bedroom to get his shoes, Di Stefano would apply. In this matter only Knueppel was in the bedroom.

The Government has also offered the opinion that Shull needed to follow Knueppel to the bedroom for officer's safety. It should be noted that there is no evidence in the record to suggest that she was anything other than polite and cooperative with the officers. She was not hostile. She was not violent. Therefore there are no outward safety concerns with her conduct when the officers were on scene. The undersigned would agree that officer's safety may require them to escort Knueppel through the house. However, in this matter there was no claim that Knueppel was violent, obstructive or rude. Instead in this case and this specific situation at the time that Knueppel and Shull went into the home, it can only be assumed that she needed to escorted not for safety reasons but because the house was in the control of police and had been seized by police based upon the black gun case that was found during the protective sweep. Knueppel needed to be escorted not for safety but so that she would not destroy or tamper with evidence.

The undersigned is not suggesting that officers will always allow a person into a home unescorted to retrieve an item of clothing. However in this matter there are a couple of facts that are clear. The home was searched and a black gun case was found in a bedroom. The house was frozen at that point in time. (Tr. 30). Officer Shull was aware that a gun case was found. (Tr. 32). Officer Shull escorted Ms. Knueppel not because he was concerned for his safety with her walking through the house unescorted but because the house was frozen and there was a gun or a gun case in the house. (Tr. 32). Also he did not need consent to go into the house because no one other than law enforcement could enter the home unless they were escorted because the house was frozen.

The undersigned will freely admit and agree that if the facts were that the house was not frozen there might be a possibility that Knueppel needed to be escorted for safety reasons. However, to suggest that this was the only reason, to wit: officers' safety; that she needed to be escorted is an excuse that is being invented to solve a problem. She was escorted because the house was frozen and inventing excuses is not the manner in which to rectify the problem.

The Government also claims that McMillian gave consent by his statement that "mine are in the back bedroom." The undersigned submits that this is not consent. This issue was somewhat address in United States v. Winston, 444 F.3d 115 (2006). In Winston, agents went to Winston's house to arrest him. They eventually knocked on the door and entered the home somewhat by force. Once inside the house, Winston was located and by gun point Winston was arrested and handcuffed in a hallway on the second floor. Agents then asked him for identification to verify that they had the correct person. Winston responded that it was in the nightstand in his bedroom. The Agents went to look fro the nightstand but could not find it due to clothing piled on top of the nightstand. The agents brought Winston into the bedroom and asked him again. Winston pointed to the nightstand with his shoulder. The agents opened the drawer of the nightstand and found his identification and a large amount of cash. Id at 117.

In Winston that court had to decide whether or not Winston had given consent for the agents to obtain his Identification. It should be noted that the court indicated that it is inherently reasonable for the agents to ask Winston for identification to verify his identification. Id at 121. This does not implicate the Fourth Amendment. Id. at 121. The Court found that Winston had given consent for the agents to enter his nightstand.

The Court stated that the fact that Winston identified a specific location, to wit: the nightstand and then at a later point in time, he indicated with a shoulder movement the direction of the nightstand this would allow the agents to conclude that he was consenting to allow the retrieval of his wallet.  Id. at 122.

This case gives us some insight when we compare it to the case at hand.  As previously noted, McMillian indicated that he wanted his Air Jordan flip flops.  He only responded to the location of his shoes when asked if the shoes by the front door were his. It has been previously stated that a statement explaining a location of an object does not in itself indicate consent for police to search beyond the scope of their lawful authority. United States v. Zertuche-Tobias, 953 F.Supp. 803, 827 (1996).

He did not accompany the officers to the bedroom.  He did not identify a specific location in the room where they were located at.  He did not tell them to go into the bedroom to retrieve them.  Therefore, his conduct was not like Winston's conduct.  He did not point out the direction of his shoes.  Furthermore, this matter deals with shoes. Winston's case deals with Identification.

If Milwaukee Police would have escorted him to the bedroom for McMillian to point out the exact location of the shoes, this matter would be consistent with Winston. However, McMillian only identified a room and a not a specific part of the room and this was only because of the question that he was asked by Shull.  Therefore, there is no manner in which it can be argued the he consented when he only made the statement he did, to wit: mine are in the back bedroom; because Shull asked him a question.  The undersigned would submit that this is not valid consent that was voluntarily given and the government failed to me the necessary burden.

In closing on this issue, it must be mentioned that use of the word "let's" in the exchange between Knueppel and Shull. This is the contraction for "let us." The use of this word by Shull through out his testimony shows that this was a demand, order, command or requirement for Knueppel to go into the house jointly with Shull. As a result the undersigned would suggest that the use of the word "let's" is indicative not of consent but as a request, order, demand or something else consistent with these words.

## ISSUES REGARDING SEARCH WARRANT

The first issue in regards to the search warrant is whether or not the information provided in the search warrant was stale.[3] The issue regarding staleness has been discussed in <u>State v. Ehnert</u>, 160 Wis.2d 464, 466 N.W.2d 237 (Ct.App.1991). In <u>Ehnert</u> the Court stated that "the probable cause determination in the face of a staleness challenge depends upon the nature of the underlying circumstances, whether the activity is of a protracted or continuous nature, the nature of the criminal activity under investigation, and the nature of what is being sought." <u>State v. Ehnert</u>, 160 Wis.2d 464, 469-70, 466 N.W.2d 237 (Ct.App.1991). In addition the Court cited a Maryland case that discussed the factors that should be considered when addressing the issue of staleness. It stated:

> "The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do

---

[3] This argument only applies if the Court decides that Shull did not enter the home with the proper consent. If the Court decides that Shull did not lawful enter the home then that observation in the affidavit would be stricken as well as the observation of black gun case. The question would then become if the search warrant and affidavit had the necessary probable cause for issuance.

not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc. The observation of a halfsmoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later." *Andresen v. State,* 24 Md.App. 128, 331 A.2d 78, 106 (1975), *aff'd, Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *see also* Wayne R. LaFave, *2 Search & Seizure* § 3.7(a), 341 (3d ed.1996).

This is not a child pornography case in which the law has given some leeway to in regards to the staleness of information being used to support a search warrant due to the fact that child pornographers have been known to keep porn images for years. Many courts have given substantial weight to testimony from qualified law enforcement agents about the extent to which pedophiles retain child pornography to counteract the staleness issue in regards to search warrant affidavits. United States v. Lemon, 590 F.3d 612, 615 (8th Cir. 2010) cert. denied, 130 S. Ct. 3305, 176 L. Ed. 2d 1206 (U.S. 2010). *See also, United States v. Chrobak,* 289 F.3d 1043, 1046 (8th Cir.2002); *see also United States v. Morales-Aldahondo,* 524 F.3d 115, 119 (1st Cir.2008); *United States v. Irving,* 452 F.3d 110, 125 (2d Cir.2006); *United States v. Riccardi,* 405 F.3d 852, 861 (10th Cir.2005); *United States v. Lacy,* 119 F.3d 742, 746 (9th Cir.1997).

In this matter there only exists a two sentence statement from a cooperating individual, Todd Carter that are months old. The Government suggests that somehow these two statements have some indicia of reliability. However, Detective Gomez clearly indicated that he prepared the affidavit based upon his review of the M File and his discussion with other members of the police department. (Tr. 64). Therefore, an

argument could be made that Todd Carter did not supply the address of the homicide or the date of birth of Tyrone McMillian.

The Government goes on to suggest that Det. Gomez recitation of what evidence might be found is again misplaced. Detective Gomez used a bunch of words without one single piece of information to tie McMillian and the "evidence" sought into the homicides. First off, clothes can contain DNA of the victims. However, there were four years since the homicides. Therefore, if McMillian did the homicides, this means that he would have the clothes from the night of the homicide and not washed them. Most likely implausible. A cell phone could contain a record of calls or texts between the McMillian, the victims or others involved in the homicides. That would assume that McMillian had the same phone and phone number that he had in 2007. That would also mean that if he had the same phone that the texts and calls would still be saved on his phone. Of course, one would assume that if McMillian was truly a suspect in the homicides that a competent police officer would have obtained his call logs and texts directly through the cell phone provider. Furthermore, one would also assume that a competent police department would potentially examined the cell phones of the victims in this matter to see if their cell phones showed any evidence of cell phone calls or texts from McMillian. Detective Gomez also indicated that sometimes a perpetrator could still maintain photos of their weapons or them posing with their weapons. The undersigned would agree that could happen. However, that would assume that McMillian still had the same cell phone. Detective Gomez also states that a perpetrator could still maintain a firearm or the ammunition used in the homicides. Sure that could also happen but this is not a situation of a serial killer who keeps mementoes of his killings.

So under the Government's suggestion using Detective Gomez's testimony here is what we have - Tyrone McMillian killed the two victims in 2007 wearing clothing that contained the victims' blood or DNA that he took home to his house took off his body, did not wash them, after using a cell phone to text or call the victims or others that were involved, did not change his cell phone number, kept the cell phone, kept the text messages and call logs and may have taken a video or picture of the gun and/or ammunition and finally kept the gun that was used. Of course that supposes the following information - that Tyrone McMillian did the homicides, that he had a cell phone, that cell phone calls and texts were made, that he still had the same cell phone.

If the affidavit had information to support the above again, we would not be discussing this matter. If the affidavit had information like, Milwaukee Police obtained the phone number for McMillian and there are calls back and forth from the victim or victims' cell phones. That would have certainly assisted the Government in their position. The only connection that we have here is a statement by Todd Carter that McMillian made a statement that he was going to do something in the future. Nothing more and the undersigned submit that they need more.

The law has never been that the Government can just throw a bunch of words on a piece of paper and attempt to justify those words after the fact. That is what has transpired here. The undersigned readily admits that if the observation of the black gun case was a legitimate and lawful observation we would not be addressing any of these issues. However, since the observation of the black gun case is out of the affidavit the Government has to somehow rescue the problems with the affidavit and application. To somehow suggest that the affidavit was valid because there might be DNA, there might

17

be a cell phone, there might be a gun, there might be ammunition, there might be a text, there might be a log of a call without more, does not allow it to pass muster.   The law is clear on this matter "[a] 'bare bones' affidavit lacks the facts and circumstances from which a magistrate judge can independently determine probable cause." <u>United States v. Restrepo,</u> 994 F.2d 173, 188 (5th Cir.1993).  In this case, this is a **bare bones affidavit**.

The Government also contends that the fact that a district attorney reviewed the affidavit and application for the search warrant somehow results in it being legitimate under the law.   It is clear that the affidavit that Detective Gomez indicated that an Assistant District Attorney reviewed it.   However, it can only be assumed that when ADA Huebner reviewed the document he believed that the address that was being searched was 6633 West Darnell.   So when there was an approval given by the Assistant District Attorney in this matter he approved 6633 West Darnell to be searched.   He did not approve 6333 West Darnell to be searched.

This is important to note insomuch as if the Government wants to add some veracity of legitimacy to the search warrant and affidavit, the information contained in the document is incorrect.   Therefore, when ADA Huebner reviewed it, he either did not know the true facts of the matter because one would assume that he would have noticed that the information regarding the address was wrong.   Or he just reviewed it for form rather than substance.

When Judge Martens signed his name to the document he signed that 6633 West Darnell can be searched.   He did not sign the document for 6333 West Darnell to be searched.   Again the same argument applies that Judge Martens did not review and sign

the document because the substance was correct, he signed because he believed the form of the document was correct.

As a result of the above, the search warrant and affidavit does not somehow have more legal credibility because ADA Huebner and Judge Martens reviewed and signed it. It was the responsibility of the Milwaukee Police Department to ensure that when conducting a double homicide investigation that they are correctly following the law. In this matter, the undersigned submits that this did not occur.

Finally, it should be noted that there is no information in the record as to what crime was being approved to be searched. Did Judge Martens sign and approve the search warrant for police to search 6633 West Darnell for evidence of the crime of Felon in Possession of a Firearm based upon the fact that is what is reflected on the front application. Did Judge Martens believe that this was a felon in possession of firearms search or a search for evidence of the homicides? The undersigned believes that Judge Martens signed and approved the document based upon the observations of the officers while inside the residence and not because it was a homicide search warrant.

In regards to the issue of the good-faith exception set forth in Leon which the Government has correctly set forth the law. The undersigned would submit that there is no good-faith exception in this matter. This statement is based upon a couple of factors.

First and foremost the Government somehow contends that because a prosecutor reviewed the documents that this gives some sort of weight to the affidavit. Detective Gomez only indicated that ADA Huebner reviewed the document. (Affidavit paragraph 11). Furthermore in his testimony he again indicated that ADA Huebner reviewed the document. (Tr. 87). There is no evidence in the record that ADA Huebner was consulted

about issues in this matter. There is no evidence that the Milwaukee Police Officers involved obtained advice from ADA Huebner.

In United States v. Pappas, 592 F.3d 799, 802 (7th Cir. 2010) cert. denied, 131 S. Ct. 594, 178 L. Ed. 2d 452 (U.S. 2010) the issue regarding the good-faith exception of Leon was discussed. One aspect that was looked at is whether or not law enforcement **consulted** with a prosecutor and therefore acted upon good-faith when executing the search warrant. The record in this matter is clear. There is absolutely no evidence that any Milwaukee Police Officer or Detective **consulted** with ADA Huebner or anyone other prosecutor. Consulting "with the prosecutor prior to applying for [a] search warrant provides additional evidence of [that officer's] objective good faith." *United States v. Bynum,* 293 F.3d 192, 198 (4th Cir.2002). *See also United States v. Johnson,* 78 F.3d 1258, 1264 (8th Cir.1996) (stating that obtaining advice of a county attorney is an indication that an officer's reliance on a search warrant was objectively reasonable); *United States v. Brown,* 951 F.2d 999, 1005 (9th Cir.1991) (noting "an officer's consultation with a government attorney is of significant importance to a finding of good faith ... [and it is] of even greater importance where, as here, a point of law relating to the scope of a Fourth Amendment search and seizure was not yet settled at the time the warrant issued"); *United States v. Taxacher,* 902 F.2d 867, 872 (11th Cir.1990) (explaining that officer's consultation "with the local district attorney before seeking the search warrant, and then submit[ting] the matter to a neutral magistrate" was "indicative of objective good faith").

The undersigned would suggest that have a prosecutor review a document is completely different than having a consultation with a prosecutor. It is also completely different than obtain advice from a prosecutor.

The Government also suggests that the officers acted in good faith because the authorizing judge found probable cause. (Gov. Br. 27). It is true that the judge did find probable cause but he found it on the face of the totality of the affidavit. Specifically that there were observations made by police inside the residence of 6633 West Darnell. These observations were a AK-47 and two gun cases. One can only assume whether or not Judge Martens would have signed the document if the two observations were not made. The undersigned submits that he would not have without more information connecting Tyrone McMillian to the homicides.

The issue of the good-faith exception was addressed in State v. Eason, 245 Wis.2d 206, 629 N.W.2d 625, 2001 WI 98 (2001). In this matter the Court held that the "good faith exception applies where the State has shown, objectively, that the police officers reasonably relied upon a warrant issued by an independent magistrate. The burden is on the State to show that the process used included a significant investigation and was reviewed by either a police officer trained and knowledgeable in the requirements of probable cause and reasonable suspicion or a knowledgeable government attorney." Id. at 215.

In order to fully understand the aspects of Eason and how that matter is distinguished from this matter, the undersigned must set forth below the affidavit that was used in Eason. It states:

> WHEREAS, John Fahrney, being first duly sworn, on oath has this day complained in writing to said court upon oath ... [t]he facts

tending to establish the grounds for issuing a Search Warrant are as follows:

1.) Your affiant ... states he is familiar with the confidential files kept by the Beloit Police Department Special Operations Bureau and as a result knows that the Beloit Police Department has received 2 pieces of intelligence indicating that Clinton Bentley is a drug dealer.

a.) Within the past seventy two hours your affiant met with a reliable confidential informant at a pre arranged location. Upon meeting with this reliable confidential informant your affiant searched the reliable confidential informant for controlled substances and U.S. currency and found none. Your affiant provided this reliable confidential informant with less than $100.00 in U.S. currency so the reliable confidential informant could purchase a quantity of cocaine from Clinton Bentley. Your affiant then observed the reliable confidential informant travel directly to 802 Bluff St Apt B. Your affiant also observed the reliable confidential informant leave 802 Bluff St and travel directly back to another prearranged location. Once at this prearranged location the reliable confidential informant gave your affiant a quantity of suspected cocaine that he/she had purchased from Clinton Bentley. The reliable confidential informant was again searched for controlled substances and U.S. currency and again none was found.
Your affiant then went to the Beloit Police Department and tested a sample of the suspected cocaine using the cobalt thiocyanate field test and in doing so your affiant received a positive test for the prescence [sic] of cocaine. The cocaine was then placed into evidence at the Beloit Police Department.

2.) Your affiant did a subscriber check for the residence at 802 Bluff St Apt B through WP & L and learned that Shannon Eason has been responsible for the utilities since October 1997.

3.) Your affiant checked Beloit Police computer records which indicate that Clinton Bentley resides at 802 Bluff St. Clinton Bentley was arrested in April 1998 and listed 802 Bluff St as his residence.

4.) Your affiant has checked the criminal histories of both Clinton Bentley and Shannon Eason and in doing so has learned that BENTLEY was arrested by the Belviere Illinois Police Department in 1989 for AGGRAVATED ASSAULT. Your affiant also learned that EASON has been arrested for such things as larceny (nine times), Obstructing (three times), and ASSAULT (twice).

5). Your affiant has been a police officer since 1990 and has participated in approximately 70 drug raids. Your affiant is assigned to

the Special Operation Bureau and my duties are to investigate complaints of drug trafficking, gang involvement, and other quality of life issues.

Your affiant is a K–9 officer and has had specialized training in narcotic detection using the K–9. This training was received at North Central Canine Institute in 1992 and has received updated training on a yearly basis.

Your affiant has also been involved in the investigations of other serious criminal offenses including, but not limited to, aggravated batteries, burglaries, robberies, sexual assaults, thefts and child abuse offenses.

Your affiant knows through training and experience that short term traffic where controlled substances are transported to and from a drug dealers residence is common and that often times drug dealers who don't reside there are present, arrive or are leaving at the time we execute our search warrants. These drug dealers often have vehicles to transport them that are not owned by them or registered to them. Affiant, based on his training and experience with others in that field believes that where illegal drugs are sold by one person, they are purchased by others and commonly carried on the persons of both. It is also true of locations where drug use takes place, persons commonly carry illegal drugs on their body.

Based on affiant's training, experience and associations with others in those fields, he is aware that persons involved in many illegal activities, including drug related crimes often arm themselves with weapons, including firearms and sometimes use those weapons against the police and others. These persons will also destroy or conceal evidence if given time. Affiant, based on the stated experience, training and association, is aware that a very important factor in controlling persons and in particular, during drug raids, is surprise and speed. Affiant is also aware that control reduces the likelihood of injury to all involved. Affiant is aware that announcement eliminates surprise and provides persons within a residence time to take actions that would require a reaction by officers. For these reasons affiant requests that a NO KNOCK search warrant be issued.  Id. at 215-16.

In Eason the attack on the search warrant only was in regards to the No Knock aspect

because there was no proof that anyone in the house was violent. Id at 219.  The Court

found that there was not a basis for a No Knock search warrant.  Id. at 231.  However the

Court found that the good faith exception applies. Id. 259. The Court found that the warrant and affidavit was not facially deficient. There were no allegations that there were technical or other glaring deficiencies with the warrant. The affidavit was also not sketchy or bare-boned. As a result the officers in Eason acted in good faith. Id. at 260.

Having stated the above that cannot be said in this matter. The undersigned specifically included the very lengthy and detailed affidavit in the Eason matter to point out the obvious. The affidavit in Eason was detailed. It had specificity of information. It had information that connected Eason to the crime. It had information about the officer's training and experience. If one would compare the affidavit in Eason to the affidavit in this matter there can only be one conclusion. The affidavit in this matter is bare-bones with technical deficiencies and does not provide any particularized information to connect McMillian and the crimes of homicide other than two sentences from Carter made months before the search warrant was issued.

The rule in Leon is designed to ensure that if a police officer is acting in good-faith that evidence is not suppressed on the basis of a mistake or minor error. As referenced in Eason the officers acted with good-faith but failed to put information in the affidavit that supported a No Knock search warrant. In this matter the undersigned would submit that the officers did not act in good-faith. Not only did we have a protective sweep that was unlawful. We have glaring technical issues with the warrant, to wit: 6633 West Darnell.

But there is one very important aspect of this matter that cannot be overlooked and the undersigned would submit that Leon does not protect the officers in this case. The undersigned is aware that the Government has agreed that the protective sweep in

this matter was unlawful. However, in regards to the good-faith exception it becomes relevant. In Paragraph Six of the affidavit it indicates that Officer Jonathan Witkowski observed a black in color AK-47 assault rifle under an [air] mattress. As we are all aware in this matter, the only observations that Officer Jonathan Witkowski had which are contained in his police reports was that he saw a black gun case. Furthermore in order to have seen an AK-47 assault rifle, someone in the Milwaukee Police Department opened that case prior to the execution of any search warrant. (Tr. 81).

Leon was not designed to allow officers acting in bad faith and beyond the scoop of what they are entitled to do. In this matter, as stated above, acted in bad faith and therefore the evidence should be suppressed.


## CONCLUSION

The undersigned has great concerns about this matter. This was a double homicide investigation. The testimony at the hearing was inconsistent. There were assumptions made as to what words were spoken. There was a protective sweep that was illegally performed. The house was frozen or seized illegally pursuant to the illegal protective sweep. That only covers the initial part of the conduct of police in this matter. The search warrant was sloppy. Mistakes upon mistakes were made in this document. A document that is supposed to be paperwork that allows for police to enter the home of a citizen and search for illegal or contra band. Instead we have major discrepancies in the address. We have other mistakes that were either crossed out or changed. We have a judge that allowed a search warrant to be modified to reflect the correct address without the officer being under oath.

It is at least disturbing to think that with all of the above problems in this matter that the entry into the home either to obtain the shoes or the search warrant can stand as a good affidavit and application. The undersigned should note that she has great respect for the difficult job that law enforcement has and the dangers that they put themselves in on a daily basis. However, in this matter there is no manner that would allow for the conduct of police to be allowed to be legitimate based upon - assumption, mistakes, errors, unlawful searches. Based upon the above, the undersigned would request that this Honorable Court find that the entry into the home be found to have been done without consent. Furthermore, the undersigned would also request that based upon the errors and omission in the search warrant and the fact that search warrant was modified in great substance without being under oath that the search warrant was invalid.

Dated this 29th day of December, 2011.

BOYLE, BOYLE & BOYLE, S.C.

By: /s/ Bridget E. Boyle
　　BRIDGET E. BOYLE
　　Attorney for Defendant

　　State Bar ID No. 1024879
　　Boyle, Boyle & Boyle, S.C.
　　2051 West Wisconsin Avenue
　　Milwaukee, WI 53233
　　bboyle@boylelaw.com
　　Telephone: (414) 343-3300
　　Facsimile: (414) 343-3310