# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    **Plaintiff,**

    v.                                    **Case No. 11-CR-193**

TYRONE McMILLIAN,

    **Defendant.**

## RECOMMENDATION ON DEFENDANT'S
## PRETRIAL MOTIONS CHALLENGING PROTECTIVE SWEEP
## AND TO QUASH THE SEARCH WARRANT

On October 18, 2011, a grand jury in this district returned an eight-count superseding indictment charging Tyrone McMillian ("McMillian") with sex trafficking of a child in violation of 18 U.S.C. § 1591 and § 1594 and coercion and enticement in violation of 18 U.S.C. § 2422(a). (Docket # 24.) This indictment superseded an earlier indictment returned on September 7, 2011. (Docket # 6.) He was arraigned on the charges and entered a plea of not guilty. A final pretrial conference is scheduled for April 26, 2012 and jury trial is scheduled for May 14, 2012 before the Honorable Charles N. Clevert.

Pending before the court are the defendant's motions. First, the defendant challenges the protective sweep of his residence and the entry of Milwaukee Police into his bedroom as violative of the Fourth Amendment. (Docket # 27 and # 34.) Second, the defendant challenges a warrant authorizing the search of his residence on two grounds: (1) the warrant fails to comply with oath requirement of the Fourth Amendment (Docket # 28) and (2) the warrant lacks probable cause. (Docket # 42.)

On November 29, 2011 the Court conducted an evidentiary hearing on the defendant's motions. The motions have now been fully briefed and are ready for resolution. For the reasons that follow, I recommend that McMillian's motion challenging the protective sweep be granted and his motion to quash the search warrant be denied.

## FACTS

The following witnesses testified at the evidentiary hearing: Milwaukee Police Officer Brian Shull, Milwaukee Detective Rodolfo Gomez, and Ms. Ashley Knueppel.

### McMillian's Arrest and Entry Into Residence

*1. Police Officer Shull*

On July 6, 2011, Milwaukee Police Officer Brian Shull reviewed a suspect card detailing probable cause for the arrest of Tyrone McMillian for his alleged involvement in a double homicide. (Transcript of Nov. 29, 2011 hearing ("Tr.") at 4-5, Docket # 41.) After reviewing the suspect card, Officer Shull conducted a "workup" or "background" on McMillian, which ultimately lead him to the address of 6333 West Darnell Avenue in Brown Deer, Wisconsin. Officer Shull arrived at the address around 1:00 p.m. and observed a red Lexus, which was registered to Ashley Knueppel. (Tr. at 6.) Officer Shull also observed a maroon Bentley with no plates parked in front of the residence which he determined belonged to McMillian. (*Id.*) While waiting for backup to arrive, Officer Shull observed the red Lexus leave the residence and then return; however, he did not see who was driving the vehicle. (*Id.*)

Because this arrest was for a double homicide, it was considered by the Milwaukee Police Department ("MPD") to be a "high felony arrest" or "dangerous arrest." (Tr. at 7.) Thus, the MPD's tactical enforcement unit was called to assist with the arrest. (*Id.*) Officer Shull testified approximately

- 2 -

six or seven officers in total were on scene, including officers from the Brown Deer Police Department, as well as members of the MPD's tactical enforcement unit. (*Id.*) The officers surrounded the house and Officer Shull knocked on the side door stating "Milwaukee police, Ashley, come to the door." (*Id.*) A woman came to the door and confirmed she was Ashley Kneuppel. (Tr. at 8.) Officer Shull asked Kneuppel if anyone else was in the house with her, to which she responded, "Yes, my boyfriend Tyrone." (*Id.*) Officer Shull confirmed that Tyrone was Tyrone McMillian and advised all the squads around the house that the suspect was inside the residence. (*Id.*)

Officer Shull asked Kneuppel to step outside, which she did. (*Id.*) Officer Shull called out for McMillian to come to the door two to three times. (*Id.*) On the third time, McMillian came to the door. (*Id.*) Officer Shull recognized McMillian from prior booking photos. (Tr. at 9.) While McMillian was inside the frame of the doorway, Officer Shull handcuffed him and placed him into custody. (Tr. at 9-10.)

Before handing McMillian off to his partner, Officer Kenneth Walkowiak, Officer Shull noticed that McMillian was barefoot. (Tr. at 10.) Officer Shull asked McMillian if he wanted any shoes. (*Id.*) McMillian responded that he would like his black Air Jordan Nike flip flops. (*Id.*) Officer Shull noticed a pair of black and white Air Jordan Nike flip flops at the door and asked McMillian if those were the shoes he wanted. (*Id.*) McMillian responded "No, those are hers, mine are in the back bedroom" (*Id.*) Based on McMillian's statement, Officer Shull believed that he was to retrieve the flip flops for McMillian. (Tr. at 20.)

At this time, the tactical officers were conducting a protective sweep of the residence. (Tr. at 11.) When the tactical officers finished, they advised Officer Shull that the house was clear, but they had observed a long, black rifle case in one of the bedrooms. (*Id.*)

- 3 -

After the sweep, Officer Shull asked Knueppel if she knew where the flip flops were located. Although Officer Shull could not recall Knueppel's exact response, he testified she responded with words to the effect of "yes, let's go get them."[1] (Tr. at 11, 30, 33, 53-55.)

Officer Shull testified that Knueppel did not object to his retrieving the flip flops. (Tr. at 18.) He further testified that with the discovery of the rifle case during the protective sweep, he would not have allowed Knueppel to retrieve the flip flops on her own, for purposes of officer safety. (Tr. at 18-19.) The testimony diverges regarding how Officer Shull and Knueppel got to the bedroom to retrieve the flip flops. Officer Shull testified that Knueppel "led the way" to the bedroom because "she knew where she was going." (Tr. at 34.) Knueppel testified that "I didn't walk him to the bedroom . . . I was behind him." (Tr. at 112.)

When Officer Shull and Knueppel entered the bedroom, Officer Shull went to the right side of the bed and Knueppel went to the left side of the bed. Officer Shull saw the black and white Nike Air Jordan flip flops sitting on the floor. (Tr. at 13.) Officer Shull bent down to pick them up and asked "Are these them?" (*Id.*) As Officer Shull bent down, he observed two gun cases in-between the bed and the nightstand. (*Id.*) Officer Shull testified he did not touch either case. (Tr. at 14.)

After retrieving the flip flops and verifying with Knueppel that the flip flops were the ones McMillian had requested, Officer Shull and Knueppel left the bedroom and Officer Shull passed the flip flops off to another officer. (Tr. at 17-18.)

Officer Shull testified that he had no intent to search the bedroom or any other area of the house, and that he did not search the house at this time. (Tr. at 12.)

---

[1] Officer Shull's testimony is not consistent regarding who stated "let's go get" the flip flops. On direct, Officer Shull testified that when he asked Knueppel whether she knew where the flip flops were located, Knueppel responded "yes" and Officer Shull stated "Let's go get them." (Tr. at 11.) However, on re-cross, Officer Shull testified that Knueppel stated, "Yes, let's go get them." (Tr. at 53.)

### 2.    *Ashley Knueppel*

Ashley Knueppel testified that she is McMillian's girlfriend. (Tr. at 105.) Knueppel testified that on July 6, 2011, she resided at 6333 West Darnell Avenue. (*Id.*) Knueppel stated that sometime in the afternoon on July 6, 2011, she was in the bedroom with McMillian when she heard a knock at the door. (Tr. at 106.) When she went to the door, she realized it was the Milwaukee police. (*Id.*) The police told her to step outside, which she did, and asked her if anyone else was in the house. (*Id.*) Knueppel told the officers that her boyfriend Tyrone was in the house. (*Id.*) Knueppel stepped out into the driveway. (*Id.*) Knueppel testified that later Officer Shull came up to her while she was in the driveway and told her that he needed to get McMillian's flip flops from inside the house. (Tr. at 109.) Knueppel stated that Officer Shull "probably" asked her where the flip flops were and that she responded that the flip flops were either by the door or were in the bedroom. (Tr. at 111.) While Officer Shull and Knueppel were by the door "where all the shoes are," Knueppel stated that "No, they're not here," and that's when they walked to the bedroom. (Tr. at 112.) Knueppel testified that she told Officer Shull that if the flip flops were not by the door, they were in the bedroom. (*Id.*)

Knueppel testified that she walked Officer Shull to the side of the bed to get the flip flops. As he was bending down to pick up the flip flops he pointed to some cases and asked her what they were. She further testified that he told her that they looked like gun cases. (Tr. at 110.)

Knueppel testified that she was not asked for consent to allow Officer Shull in the house nor did she give consent. (*Id.*)

### The Search Warrant for the Residence

Milwaukee Police Detective Rodolfo Gomez testified that on July 6, 2011, he was instructed to make contact with Detective William Smith regarding a homicide search warrant. (Tr. at 60.)

- 5 -

Detective Smith informed Detective Gomez that they were currently at 6333 Darnell, and the homicide suspect was Tyrone McMillian. (Tr. at 61.) Detective Gomez understood his assignment was to type up an affidavit for a search warrant of the 6333 Darnell residence. (Tr. at 61-62.) In addition to speaking with Detective Smith, Detective Gomez began reading the "M" file, or the homicide file, for the double homicide of which McMillian was a suspect. (Tr. at 62.) Detective Gomez also spoke with Detective Eric Gulbrandson, who was personally involved in the investigation of the double homicide. (Tr. at 62, 94.) Detective Gomez began typing up the face sheet for the search warrant and the affidavit. (Tr. at 62-63; Ex. 4.)

Detective Gomez testified that although Detective Smith had originally given him the address of 6333 West Darnell, Detective Gomez inadvertently typed 6633 West Darnell. (Tr. at 64.)

After completing the affidavit, Detective Gomez had his lieutenant and an assistant district attorney review it. (Tr. at 68.) Detective Gomez then made contact with the duty judge, who signed the warrant. (*Id.*) Detective Gomez then proceeded to 6333 West Darnell and when he arrived, he noticed the warrant incorrectly stated 6633 West Darnell instead of 6333 West Darnell. (Tr. at 69.) Detective Gomez notified his lieutenant, who recommended they call the judge. (*Id.*) Detective Gomez contacted the judge and explained the error. (*Id.*) The judge instructed Detective Gomez to go through the entire affidavit and search warrant and "line through" the incorrect number 6 and put the correct number 3 in its place and initial every correction. (*Id.*) Detective Gomez went through and made the changes and noted on the affidavit that he spoke to the judge and received his approval. (*Id.*, Ex. 4 at 5.)

# ANALYSIS

The challenges raised by the defendant arise from the July 6, 2011 entry of McMillian's home, particularly his bedroom, and the resulting warrant authorizing the search of his home. Specifically, McMillian argues that: (1) a protective sweep of the residence was unlawful; (2) the entry into the bedroom was unlawful; (3) the warrant did not comply with the oath requirement; and (4) the warrant lacks probable cause. I will address each in turn.

## Legal Standards

The Fourth Amendment to the United States Constitution proscribes unreasonable searches and seizures. U.S. Const. amend. IV. Among those places that can be searched by the police, one's home is the most sacrosanct, and receives the greatest Fourth Amendment protection. *See Payton v. New York*, 445 U.S. 573, 583-84 (1980)(the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed). "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001). It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586 (internal quotation and citation omitted).

By its terms, however, the Fourth Amendment's protection against warrantless searches and seizures is not absolute. *See United States v. Sharpe*, 470 U.S. 675, 682 (1985). Courts recognize that there are situations in which the public interest requires some flexibility in the application of the general rule that a valid warrant is a prerequisite for a search. *See, e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 555 (1976). Courts allow departure from that general rule in only a few, exceptional circumstances. For example, when executing an arrest warrant in a person's home, the police may,

- 7 -

in certain instances, conduct a limited, protective search or sweep of the premises. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). The police may also depart from the warrant requirement and enter a private dwelling to respond to a dangerous or emergency situation, "when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). If the police see contraband in plain view while inside a home executing an arrest warrant, or responding to a legitimate emergency, they may seize it as evidence of a crime. *Coolidge v. New Hampshire*, 403 U.S. 443, 465-66 (1971). Consensual searches are also an established exception to the warrant requirement. *United States v. Glasby*, 576 F.2d 734, 737 (7th Cir. 1978).

In all cases, when the government searches a citizen's home without a warrant, it bears the burden of showing that the search fell within one of the exceptions to the warrant requirement. *United States v. Jeffers*, 342 U.S. 48, 51 (1951). If the scope of a search "exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 140 (1990). However, "[a]s in other Fourth Amendment contexts . . . the 'reasonableness' inquiry . . . is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989)(citation omitted).

### Application to This Case

> 1.    *The Initial Protective Sweep of the Residence*

After arresting McMillian at his front door, the police conducted a protective sweep of the residence. In the course of the sweep, they observed a black plastic rifle case in a child's

- 8 -

bedroom.[2] The observation was included in the affidavit in support of the search warrant for the residence. (Ex. 4 at ¶ 6.) McMillian argues that the sweep and the resulting observation were unlawful. The government correctly concedes that the sweep was unlawful.

When the police makes an arrest in a home, the Fourth Amendment allows them to conduct a limited search of the premises, solely to protect their safety and the safety of others. *Buie*, 494 U.S. at 327. However, the police must "possess[ ] a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337. Here, it is undisputed that McMillian was the only suspect and that the officers held no information that any other individuals might be present in the house and might pose a danger to them during the arrest. Accordingly, the protective sweep conducted here was unlawful. The resulting observation of the black plastic rifle case in the child's bedroom must be excised from the affidavit.

### 2. Entry Into the Bedroom

McMillian challenges Officer Shull's entry into the back bedroom of the residence which resulted in the observation of two gun cases being included in the affidavit for the search warrant. The government argues that the entry into the bedroom was justified under two exceptions to the Fourth Amendment warrant requirement: the "clothing and accessories" exception and consent.

---

[2] The affidavit states an AK-47 rifle was observed. (Ex. 4 at ¶ 6.) The government states this was a mistake. It should have stated rifle case. I agree with McMillian that this is one of many mistakes which plagued this warrant. First, the affidavit was arrested pursuant to a warrant. (Exhibit 4 at ¶5.) He was not. He was arrested pursuant to a suspect card. Second, the affidavit originally contained the wrong house number. Third, although the affidavit in support of the warrant references probable cause for two offenses, felon in possession and homicide, the warrant signed by the judge only includes the crime of felon in possession of firearm. Fourth, the warrant authorizes the search for monies which may constitute drug contraband. There is no statement in the affidavit that McMillian was involved in drug trafficking. These errors are particularly troubling considering the affidavit was prepared for an investigation of a double homicide.

- 9 -

### 2.1    Clothing and Accessories Exception

The "clothing and accessories" exception purports to justify a law enforcement officer's warrantless entry into a partially clothed arrestee's home for the limited purpose of retrieving clothing or shoes for that arrestee.[3] *United States v. Jackson*, 414 F. Supp. 2d 495, 504 (D.N.J. 2006). A review of the cases from the circuits that have recognized the exception shows that the exception generally fall under one of two categories. The first and more common category is an off-shoot of the already recognized exigent circumstances exception to the Fourth Amendment. *United States v. Clay*, 408 F.3d 214 (5th Cir. 2005)(finding that the need to procure footwear for barefoot arrestee constituted exigent circumstances justifying officer's return to the bedroom); *United States v. Gwinn*, 219 F.3d 326 (4th Cir. 2000)(finding an arrestee's partially clothed status may constitute an exigency justifying an officer's temporary reentry into the arrestee's home to retrieve clothes reasonably calculated to lessen the risk of injury to the arrestee); *see also United States v. Nascimento*, 491 F.3d 25, 50 (1st Cir. 2007)(finding the need to dress a defendant may constitute an exigency justifying officers in entering another room to obtain clothing; however, also finding "[g]eneralizations are hazardous"); *United States v. Butler*, 980 F.2d 619, 621-22 (10th Cir. 1992)(allowing officers to retrieve shoes for defendant because broken glass in the area where defendant was arrested presented a legitimate health and safety risk; however, finding that "entry into the defendant's residence cannot be effected, in the absence of consent or exigent circumstances, solely upon the desire of law enforcement officers to complete the arrestee's wardrobe").

---

[3]    This is distinct from the situation in *Washington v. Chrisman*, 455 U.S. 1 (1982). In that case, the police arrested a student on campus but allowed him to go to his dorm room to get his identification card. While in the dorm room, the police observed contraband in plain view. The court held that the officer's entry into the student's dorm room was lawful. *Id.* at 7. The Court explained that incident to his arrest of the student, the officer's "need to ensure his own safety-as well as the integrity of the arrest" was "compelling" justification for him to accompany the student to his dorm room. *Id.*

The second and outlier category stems from a so-called duty to find clothing for a defendant. *United States v. DiStefano*, 555 F.2d 1094 (2nd Cir. 1977)(finding the officers had a duty to find clothing for an arrestee clad only in a nightgown and bathrobe or permit her to do so).

To date, two circuits have rejected the underlying rationale for the clothing exception. *United States v. Whitten*, 706 F.2d 1000, 1016 (9th Cir. 1983)(finding officer's entry into room without specific request or consent unlawful); *United States v. Kinney*, 638 F.2d 941, 945 (6th Cir. 1981)(entry cannot be justified when defendant did not request permission to secure additional clothing and did not consent to an entry of his home).

The Seventh Circuit has not addressed either variant of the clothing exception. Indeed, the clothing exception appears to expand the Supreme Court's and this circuit's exigent circumstances line of cases. *U.S. v. Marshall*, 157 F.3d 477, 482 (7th Cir. 1998)("Exigent circumstances exist when there is a compelling need for official action and no time to secure a warrant"); *U.S. v. Webb,* 83 F.3d 913, 916 (7th Cir. 1996)("Exigent circumstances exist when there is a reasonable belief by police that their safety, or the safety of the public, may be threatened."). Accordingly, I agree with the district court in *Jackson*, 414 F. Supp. 2d at 504 n.11, that it is "a dubious proposition that the Court contemplated the evanescent risks associated with transporting a barefoot or shirtless criminal suspect to police headquarters as exigent circumstances sufficient to dispense with the Fourth Amendment's warrant requirement."

Moreover, even if I were to apply the "clothing and accessories" exception advanced by the government, the record does not support that McMillian's lack of shoes amounted to an exigent circumstance or posed any risk to his health or safety. McMillian was arrested in the daytime, in July, in Milwaukee - not in the dead of night in a typical Milwaukee winter. *See, e.g.*, *Gwinn*, 219 F.3d 326

- 11 -

at 333 (the court found exigent circumstance to enter trailer and retrieve clothing and shoes where defendant was arrested shirtless and barefooted on a cool late night in May in a remote location in rural West Virginia). There is also no evidence that any dangerous conditions such as broken glass, hazardous waste, not even rain existed to impede McMillian's walk to the squad car. *See e.g.*, *Butler*, 980 F.2d at 621-22 (court found police's warrantless entry into defendant's residence justified by health and safety concern for barefooted defendant who was arrested in area with broken glass).

Given the lack of authority from the Seventh Circuit on this exception and the lack of a factual record justifying its application, I do not find that the "clothing and accessories" exception validates the warrantless entry into the bedroom in this case.

### 2.2 Consent

I now turn to the government's alternative justification for entering the bedroom: consent. It is well established that consent is an exception to the Fourth Amendment's warrant requirement. *Glasby*, 576 F.2d at 737. Voluntary consent "lifts" the warrant requirement. *United States v. Stribling*, 94 F.3d 321, 324 (7th Cir. 1996)(quoting *United States v. Quinones-Sandoval*, 943 F.2d 771, 774 (7th Cir. 1991)). Consent can be express or it may be implied from the circumstances. *See, e.g.*, *United States v. Wesela*, 223 F.3d 656, 661 (7th Cir. 2000). The government bears the burden of proving by a preponderance of the evidence that consent was voluntarily given. *See United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). To determine the voluntariness of a consent, the court must inquire whether, under the totality of the circumstances, law enforcement officers have overborne the will of the accused. *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

- 12 -

This is not a case of express consent. Detective Shull testified that he never expressly asked consent of either McMillian or Knueppel. It is also undisputed that neither McMillian nor Knueppel expressly consented. Thus, the question is whether there was implied consent to enter the bedroom. More precisely stated, the issue is whether Officer Shull reasonably believed that he had consent to enter the back bedroom to retrieve the black Air Jordan Nike flip flops. *See United States v. Long*, 425 F.3d 482, 486 (7th Cir. 2005)(internal citation omitted)("In determining the scope of a defendant's consent, we apply an objective standard: 'what would the typical reasonable person have understood by the exchange between the officer and the suspect?'")

The parties do not dispute what occurred at the initial contact between McMillian and Officer Shull. (Docket # 44 at 3.) Officer Shull arrested and handcuffed McMillian at the threshold of the residence. While still at the front door, Officer Shull noticed that McMillian was barefoot. Officer Shull's testimony regarding the exchange between him and McMillian at the front door is as follows:

> Q. Okay. You -- he's in custody, do you hand him off to any other officers?
>
> A. I hand him off to my partner, Police Officer Walkowiak.
>
> Q. Before you did that did you notice whether he had shoes on or was barefoot?
>
> A. I noticed he had no shoes on.
>
> Q. And did you make a comment about that to him?
>
> A. Yes, I asked him if he wanted any shoes.
>
> Q. And what did he say?
>
> A. He said, he requested he would like his black Air Jordan Nike flip flops.

- 13 -

Q. And at that time did he go with your partner Ken -- sorry.

A. He did. Before that I did notice a pair of black and white Air Jordan Nike flip flops at the door and I asked him were these them right here, he said, "No, those are hers, mine are in the back bedroom."

(Tr. at 10.)

The defendant argues that "there is no manner in which it can be argued that he consented when he only made the statement he did, to wit: mine are in the back bedroom; because Shull asked him a question." (Docket # 44 at 13.) I disagree. A summary of McMillian statements are: (1) Yes, I want shoes; (2) I want my black Air Jordan Nike flip flops; and (3) No, those are hers, mine are in the back bedroom. Taking the entirety of his statement in context, I am persuaded that it was objectively reasonable for Officer Shull to believe that McMillian had consented to have him retrieve his shoes from the back bedroom.

First, it was entirely reasonable for Officer Shull to ask a barefoot arrestee whether he wanted shoes. The question was about shoes and not likely to illicit an incriminating statement which would implicate constitutional rights. Not all questions of a suspect in custody are off limits. *See, e.g.*, *United States v. Edwards*, 885 F.2d 377, 385-86 (7th Cir. 1989).

Second, although Officer Shull initiated the conversation about the shoes, he did not command McMillian to wear shoes. *Cf. Giacalone v. Lucas*, 445 F.2d 1238 (6th Cir. 1971)(where pajama clad arrestee twice told the officers that he was ready to leave, but the police responded each time by telling the defendant that he should change into street clothes before leaving for the station). Instead, Officer Shull asked McMillian if he wanted shoes. Although McMillian was undisputably in custody, he had the option of answering that he did not want shoes. As discussed above, this arrest occurred in July and there was no indication that there were any risks to McMillian's feet such that

- 14 -

he was compelled to wear shoes. Thus, given that McMillian was not commanded to wear shoes, rather was asked and had a choice, this was not a case of mere acquiescence to a show of lawful authority. *Bumper v. North Carolina*, 391 U.S.543, 548-49 (1968).

Next, it was objectively reasonable for the officer to understand the degree of specificity with which McMillian described the shoes (black Air Jordan Nike flip flops) as direction to which shoes he wanted.

Furthermore, the identification of the specific room in the house (back bedroom) also indicated that McMillian was directing the officer to the back bedroom where can he find the specific shoes. True, a statement of location of an object does not itself indicate consent. *See, e.g.*, *United States v. Zertuche-Tobias*, 953 F. Supp. 803, 827 (S.D. Tex. 1996). But, in context here, the statement of the location is reasonably understood as direction for the officer to retrieve the shoes. Clearly, McMillian was handcuffed and in custody and could not have retrieved the shoes himself. However, when asked whether the flip flops at the door were his, McMillian had choices. He could have simply indicated "no." Alternatively, not wanting the police in the bedroom, he also had the option of stating that the shoes were in the bedroom but request that his girlfriend be permitted to get them. He opted for neither. From this I find that although McMillian did not tell the officer "go in and get them for me," by identifying the specific pair of shoes (black Air Jordan Nike flip flops) and their specific location in the house (back bedroom), and not limiting who can retrieve them, it was reasonable for Officer Shull to conclude that McMillian was directing him to get the shoes from the bedroom. A defendant can limit the scope of his consent. *Florida v. Jimeno*, 500 U.S. 248, 251-52 (1991). The burden to limit the scope is on the defendant. *United States v. Stribling*, 94 F.3d 321, 324 (7th Cir. 1996).

- 15 -

To be clear, I do not find that the exchange between Officer Schull and McMillian authorized Officer Shull to search the back bedroom, or any place else, for that matter. The scope of the exchange here was simply authority to go into the back bedroom and retrieve the Air Jordan Nike flip flops. "Government agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search." *United States v. Dichiarinte*, 445 F.2d 126, 129 (7th Cir. 1971).

My conclusion that the officer reasonably believed McMillian requested he retrieve his shoes from the bedroom is strengthened by the lack of evidence that the conversation about the shoes was a ruse on the part of Officer Shull to get into the back bedroom. Although Shull initiated the dialogue about the shoes, it was McMillian who mentioned the bedroom. Additionally, Officer Shull's decision to follow-up with McMillian's girlfriend about the shoes and have her present in the bedroom when he went to retrieve the shoes also demonstrates that he was not seeking a pretext to enter and explore the bedroom.

I must also consider whether the consent was voluntary. Voluntariness is determined by examining the totality of the circumstances. *See Schneckloth*, 412 U.S. at 227. The court should consider the characteristics of the person, including the age, intelligence, and education of the individual; whether the individual understands her constitutional rights and her right to refuse to consent; the details and length of any detention and the use of coercive conduct by the police. *See, e.g.*, *id.* at 226-27. In assessing the voluntariness of consent, the court must determine whether, under the totality of the circumstances, law enforcement officers have overborne the will of the accused. *Haynes*, 373 U.S. at 513-14.

- 16 -

Looking at the totality of the circumstances in this case, I find that McMillian's consent was voluntary. An in-home arrest is an inherently coercive situation. As the defendant correctly points out, he was handcuffed and a sweep of the residence was under way. But such a situation does not preclude a finding of voluntariness. *See United States v. Watson*, 423 U.S. 411, 424 (1976). In this case, the benign subject matter of the consent, the retrieval of McMillian's flip flops, weighs heavily in favor of voluntariness. Additionally, McMillian was not repeatedly asked for permission to enter the bedroom. As discussed above, although Officer Shull started the conversation about the shoes, it was McMillian who mentioned the bedroom. In all, this record is devoid of any evidence of badgering, coercion, or duress to obtain consent from McMillian.

Because McMillian voluntary consented to Officer Shull's retrieval of the flip flops in the bedroom, Officer Shull's presence in the back bedroom was lawful. The defendant argues even if Officer Shull's presence was lawful in the bedroom, the observation of the two gun cases was unlawful because it was either not in plain view or beyond the scope of the police officer's authority to be in the bedroom. (Docket # 34 at 2.) This is not supported by the record. Officer Shull testified that he went in the back bedroom with Knueppel to get the flip flops. Once in the bedroom he saw a pair of pants and black and white Nike flip flops on the floor. As he bent down to pick them up, he observed two gun cases between the bed and the nightstand. (Tr. at 13.) He testified he did not move them. (Tr. at 14.)

Similarly, Knueppel testified that she walked Officer Shull to the side of the bed to get the flip flops. Knueppel testified that as Officer Shull was bending down to pick up the flip flops he pointed to some cases and asked her what they were. She further testified that he told her that they looked like gun cases. (Tr. at 110.) Significantly, Knueppel did not testify that the Officer moved the cases.

- 17 -

On this record, I cannot find that Officer Shull's observation of the two gun cases were not in plain view or beyond his lawful presence in the bedroom.

Finally, because I find that Officer Shull's presence in the back bedroom was authorized by McMillian's implied consent, I need not address whether Knueppel also consented. McMillian's authority to consent is not in dispute. Knueppel testified that McMillian lived at the residence with her. (Tr. at 105.) Additionally, this is not a case where one occupant consents and another objects or refuses. *Georgia v. Randolph*, 547 U.S. 103 (2006).

In summary, the record supports that it was objectively reasonable for Officer Shull to believe that he had consent from McMillian to retrieve the shoes from the bedroom. Thus, he was lawfully in the bedroom. Once in the bedroom and not acting beyond the scope of the permission to be in the bedroom, it was lawful for him to observe the gun cases in plain view. *Gentry v. Sevier*, 597 F.3d 838, 849. Accordingly, the observation of the two gun cases in the bedroom was lawfully included in the affidavit to the search warrant.

### 3. Validity of The Warrant

McMillian challenges the validity of the search warrant alleging a variety of deficiencies. He contends the warrant fails for failure to comply with the oath requirement of the Fourth Amendment. He also attacks the warrant for lack of probable cause.

### 3.1. Failure to comply with the oath requirement

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

In this case, Detective Gomez submitted a sworn affidavit to a Milwaukee County Circuit Court Judge in support of a search warrant to search 6633 West Darnell Street. The warrant was

granted. Upon arriving at the scene, Detective Gomez noticed that the correct address was 6333 West Darnell Street. He telephoned the issuing judge. After explaining the mistake to the judge, he was advised by the judge to correct the address on the warrant. Detective Gomez made a handwritten notation of the judge's authorization of the correction on the warrant. (Ex. 4 at 5.) However, Detective Gomez was not put under oath during the telephone conversation prior to correcting the address. Does the failure to place Detective Gomez under oath prior to correcting the warrant render the warrant invalid?

The Ninth Circuit confronted very similar facts in *United States v. Kurt*, 986 F.2d 309 (9th Cir. 1993). In *Kurt*, officers obtained a warrant to search for a murder weapon at Kurt's residence. When the officers arrived at the address on the warrant, they found it to be the address of Kurt's parents, who in turn gave the police Kurt's correct address. The search warrant affiant, Detective Bart, then telephoned the dispatcher in an effort to change the warrant to state Kurt's correct address. Unable to reach the issuing judge, Detective Bart instead spoke with another judge. During their telephone conversation, that judge authorized the change to the warrant without placing Detective Bart under oath. The officers then went to Kurt's house and executed the warrant which turned up contraband.

Kurt challenged the search warrant arguing it was defective because the officer making the change in the address was not placed under oath. The Ninth Circuit affirmed the district court's decision finding that the officer who amended the search warrant had relied in objective good faith on the judge's instructions. *Id.* at 311. The court observed that the exclusionary rule exists "to deter unlawful searches by police, not to punish the errors of magistrates and judges." *Id.* (internal quotations and citations omitted). Additionally, the Ninth Circuit explained that a police officer is not "required to disbelieve a judge who has just advised him . . . that the warrant he possesses

- 19 -

authorizes him to conduct the search he has requested." *Id.* (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 989-90 (1984)).

Other circuits addressing similar situations have also applied the *Leon*[4] good-faith exception. In *United States v. Richardson*, 943 F.2d 547, 548 (5th Cir. 1991), an Assistant United States Attorney (AUSA) read to a magistrate judge over the telephone an unsigned affidavit which had been prepared by a case agent. Based on the contents of that affidavit, the warrant was issued and executed. However, the AUSA had not been placed under oath. The Fifth Circuit applied the *Leon* good-faith exception and reversed the district court's decision to suppress. The court ruled the magistrate judge's failure to administer the oath was not a departure from his neutral and detached role, but was an inadvertent mistake. The Fifth Circuit explained that the exclusionary rule functions as a judicially created remedy devised to protect Fourth Amendment rights "through its deterrent effect, rather than a personal constitutional right of the aggrieved." *Id.* at 551 (internal quotation and citation omitted).

Like the Ninth Circuit in *Kurt*, the Fifth Circuit further explained that the exclusionary rule's deterrent purpose would not be served by penalizing the officer for the judge's mistake, because "[t]he rare occasion when a magistrate accidentally fails to administer an oath cannot be eliminated by suppressing the evidence in that situation." *Id.* at 551. The court also found it was unlikely police will recklessly or willfully try to evade the oath or affirmation requirement. *Id.* According to the Fifth Circuit, "suppressing the evidence seized in the case will add nothing to protect against an affiant who misrepresents the facts to the magistrate, nor will it encourage officers to take their chances in submitting deliberately or recklessly false information, for they will expect to be sworn when preparing their warrant applications." *Id.*

---

[4]     *United States v. Leon*, 468 U.S. 897 (1984).

- 20 -

Similarly, in *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988), the Second Circuit rejected a claim that a warrant was invalid because government agents applying for the warrant were not placed under oath or formally sworn. In *Matias*, an AUSA recited over the telephone to the federal magistrate judge facts relayed by a Drug Enforcement Administration (DEA) agent, who was also on the line and confirmed the facts were "truthful to the best of [his] knowledge and belief." *Id.* (alteration in original). However, the magistrate judge issued the warrant without placing either the AUSA or the DEA agent under oath. *Id.* Noting the magistrate judge's failure to administer an "oath was obviously an oversight," the court applied the good-faith exception and ruled "the agents' reliance on the facially valid warrant was clearly reasonable under the circumstances." *Id.; see also United States v. Hessman*, 369 F.3d 1016 (8th Cir. 2004)(applying the good-faith exception where a magistrate judge had not placed the affiant under oath prior to signing the warrant).

I find the reasoning of the above cited cases persuasive. Here, the judge instructed Detective Gomez to change the address without administering the oath. Even if the judge's failure to place Detective Gomez under oath violated the Fourth Amendment, the error was the judge's, not the detective's. Consequently, the good faith exception applies. The exclusionary rule's deterrent purpose would not be served by penalizing the officer for the judge's mistake. Accordingly, the inadvertent failure to place Detective Gomez under oath prior to correcting the warrant does not invalidate the search warrant.

### 3.2     Probable Cause

Finally, McMillian challenges the sufficiency of the warrant. To determine whether to suppress evidence obtained pursuant to an allegedly defective search warrant, the court employs a sequential two-step test. *See United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002). First, the court

- 21 -

determines whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant. *United States v. Lloyd*, 71 F.3d 1256, 1262 (7th Cir. 1995). Second, if the court concludes that the warrant was not supported by probable cause, it asks whether the warrant is nonetheless saved by the good-faith exception to the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 920-24 (1984).

An affidavit establishes probable cause when it alleges facts sufficient to induce a reasonably prudent person to believe that a search will uncover evidence of a crime. *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003). The Supreme Court has explained that: "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Though the affiant need not state each and every detail of the suspected crime, mere conclusory statements are insufficient. *See United States v. Reddrick*, 90 F.3d 1276, 1280 (7th Cir. 1996). The affidavit must contain sufficient evidence to enable the magistrate to exercise independent judgment rather than simply ratifying the conclusions of others. *Gates*, 462 U.S. at 239.

A reviewing court must read the affidavit in a realistic and common sense manner, determining whether it alleges specific facts and circumstances that would permit the issuing magistrate to reasonably conclude that the evidence sought to be seized was associated with the crime alleged and located in the place indicated. *United States v. Koerth*, 312 F.3d 862, 866-67 (7th Cir. 2002)(citing *United States v. Spry*, 190 F.3d 829, 835 (7th Cir. 1999)). A court should give a

- 22 -

magistrate's determination of probable cause considerable weight and resolve doubtful cases in favor of upholding the warrant. *United States v. Quintanilla*, 218 F.3d 674, 677 (7th Cir. 2000).

My duty in reviewing this search warrant is limited. A court in reviewing a judicial officer's previous probable cause finding is simply to ensure that the judicial officer had a substantial basis for concluding that probable cause existed. *Gates*, 462 U.S. at 238-39. In so reviewing, I must review the affidavit with the unlawful or improper information excised. *United States v. Johnston*, 876 F.2d 589, 592 (7th Cir. 1989). Thus, I review the affidavit in this case without the information that McMillian was arrested pursuant to an arrest warrant and a AK-47 rifle was observed. Additionally, although the affiant testified at the motion hearing, because only the affidavit was presented to the issuing judge, I must also assess probable cause solely on the four corners of the affidavit. When an affidavit is the "only evidence presented to the warrant-issuing magistrate, 'the warrant must stand or fall solely on the contents of the affidavit.'" *Koerth*, 312 F.3d at 866 (quoting *United States v. Roth*, 391 F.2d 507, 509 (7th Cir. 1967)).

In this case, the affiant sought a warrant to seek evidence for two crimes: a felon in possession of firearm and a homicide. The defendant argues that the deficiencies in the affidavit render it insufficient to support probable cause. The defendant points to the error in the address, the staleness of the information from the citizen witness, the lack of reliability of the citizen witness, and the confusion over which crime the warrant was actually issued for.

Looking at the totality of the four corners of the affidavit, I agree that the warrant lacks probable cause for the offense of homicide. The sole evidence in support of probable cause to search for evidence of homicide is the statement of Todd Carter. (Ex. 4.) Carter, identified by name and date

- 23 -

of birth, states his friend McMillian told him he had "pop" the victims over an argument over a failed lease contract which involved a recording studio at 5514 W. Lisbon Avenue.

When the affidavit includes information from a police informant, the court considers the following: 1) the extent to which the police have corroborated the informant's statements; 2) the degree to which the informant has acquired knowledge of the events through firsthand observation; 3) the amount of detail provided; and 4) the interval between the date of the events and the officer's application for the search warrant. *Koerth*, 312 F.3d at 866. However, the court treats information from a citizen witness differently. This is because a citizen witness is "inherently more reliable than the usual police informants who are often mired in some criminal activity themselves." *Edwards v. Cabrera*, 58 F.3d 290, 294 (7th Cir. 1995)(citing *United States v. Towns*, 913 F.2d 434, 441 (7th Cir. 1990)).

Here, even given the inherent reliability accorded citizen witnesses as compared to other informants, the affidavit contains very little on which the issuing judge can independently assess the reliability or veracity of this citizen witness. *Gates*, 462 U.S. at 239 (affidavit must contain sufficient evidence to enable the magistrate to exercise independent judgment rather than simply ratifying the conclusions of others). An affidavit must contain a statement about some of the underlying circumstances indicating the citizen witness is credible or that the information was reliable. True, the affidavit establishes the witness' name and date of birth. But other than that, the affidavit fails to provide any background information about this witness. Not even the date of his statement is provided. Neither was the date that McMillian allegedly made the confession. This is relevant because the homicides occurred some four years before the application for the search warrant. The affidavit is also sparse in detail which would enhance the believability of the witness.

- 24 -

Most significantly, the affidavit fails to offer any basis for believing that the citizen witness is telling the truth. The government argues that the citizen witness is reliable because "the probable cause comes directly from the words of Tyrone McMillian." This argument bypasses the issue. The question is: how does the affidavit establish that what the witness, not McMillian, is saying is true? Despite this weakness, the witness' statement could be strengthened if it were corroborated, even in part. Here, the affidavit fails to show any police corroboration of the witness. On the basis of the affidavit's failure to establish the reliability and veracity of the sole information on the homicide, I find that there is no probable cause established for that offense.

This is to no avail to McMillian, however, because the warrant sufficiently establishes probable cause for the offense of felon in possession of firearm. The affidavit recited that the police had observed two gun cases in McMillian's bedroom. First-hand observations carry great weight. *United States v. Pless*, 982 F.2d 1118, 1125 (7th Cir. 1992). Additionally, a police record check revealed that McMillian was a convicted felon. Accordingly, the affidavit contained sufficient facts for the issuing judge to find probable cause for the crime of felon in possession of a firearm and to conclude that evidence of that crime could be found at the residence. A judge in reviewing a search warrant is entitled to draw reasonable inferences about where evidence is likely to be kept based on the nature of the evidence and the type of offense, and the judge need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit. *United States v. Sleet*, 54 F.3d 303, 306 (7th Cir. 1995)(citing *United States v. Malin*, 908 F.2d 163, 166 (7th Cir. 1990))(internal quotations omitted). Here, it was reasonable for the judge to conclude that the gun cases in McMillian's bedroom probably contained firearms. "[P]robable cause does not demand the certainty we associate with formal trials." *Gates*, 462 U.S. at 246.

- 25 -

Because I have determined that the search warrant issued in this case was supported by probable cause for the offense of felon in possession of firearm, I need not address whether the good faith exception applies.

**NOW, THEREFORE, IT IS RECOMMENDED** that the defendant's motion challenging the protective sweep (Docket # 27) be **GRANTED** and motion to quash search warrant (Docket # 28) be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), and Federal Rule of Criminal Procedure 59(b)(2) (as amended effective December 1, 2009), whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal.

Dated at Milwaukee, Wisconsin this 27th day of January, 2012.

BY THE COURT

*s/ Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge