UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

        v.                               Case No. 11-CR-193

TYRONE McMILLIAN, a/k/a "HK,"

        Defendant.

---

**TRIAL MEMORANDUM**

---

The United States of America, by and through its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Joseph R. Wall and Melvin K. Washington, Assistant United States Attorneys for said district, hereby file this Trial Memorandum as an aid to the Court regarding various evidentiary and legal matters anticipated to be in issue at the trial of this matter.

**SUMMARY OF CHARGES**

The indictment charges the defendant with eight counts of sex trafficking related charges involving one adult female and four minor females.    Count One charges the defendant with trafficking Jessica, an adult, in the prostitution business from November 2006 until July 2009 through the use of force, fraud, and coercion.    Counts Three, Six, and Eight, charge the defendant with persuading, inducing, and coercing Jessica to travel from Wisconsin to Minnesota for the purposes of committing acts of prostitution on or about the following dates: December 3, 2006, June 8, 2008, and July 2, 2009, respectively.    Count

Two charges the defendant with trafficking Jade in the prostitution business, knowing that she was a minor under the age of 18, from November 2006 through January 2007. Count Four charges the defendant with trafficking Jazmine in the prostitution business, knowing that she was a minor under the age of 18, from June 2007 through July 2007. Count Five charges the defendant with attempting to traffic Cherish in the prostitution business, knowing that she was a minor under the age of 18, from approximately July 2007 through November 2007. Count Seven charges the defendant is charged Kasandra in the prostitution business, knowing that she was a minor under the age of 18, during July 2008.

## FACTS

The evidence in this trial will consist of the testimony of the five victims, several family members, owners and other personnel of establishments that the defendant and the victims frequented, vendors, law enforcement agents who had police-citizen encounters with the defendant and the victims at various times during the offense conduct, and law enforcement agents and officers who gathered and summarized corroborating physical evidence. The physical evidence will include the defendant's use of the internet site, Craigslist.org, to post prostitution advertisement offering the victims' sexual services; records confirming the defendant's email address from which he posted the prostitution advertisements; records of the actual prostitution postings to Craigslist; hotel records corroborating the defendant's trips and stays in Minneapolis; dancer "Contract Agreements" from the strip club in Minneapolis to which the defendant took the victims to earn money for him from stripping and prostitution "dates"; evidence of the defendant's

2

use of cash to purchase expensive jewelry and an auto during the time period that the victims were prostituting for him and giving him their cash earnings; a recording of a jail call between the defendant and one of the victims in which he admits to his previous "pimping" activities; official law enforcement records documenting contacts with the defendant and the victims; and tax and other records confirming that the defendant earned no legitimate income during the period that he was prostituting the five victims.

## Victim Testimony

### Jessica

In summary, Jessica is expected to testify to the following: She met Tyrone McMillian in Milwaukee in the summer of 2006 when she was 19-years old. She was living with her mother in Appleton at the time. The next day, McMillian drove to Appleton, picked her up, and returned to Milwaukee with her. She lived with him through the end of their personal and business relationship in approximately July 2009.

At the urging of McMillian, approximately one month after meeting him, Jessica began working as a stripper at various clubs in and near Milwaukee. McMillian usually drove her to and from her jobs at the various strip clubs. At his direction, she gave McMillian all the money she earned from stripping. McMillian gave her the nickname "Tease," which she used as her dancing name – and the name under which McMillian eventually posted her prostitution ads on Craigslist.

Soon after she began stripping for McMillian, he convinced her to earn money for

Case 2:11-cr-00193-CNC   Filed 05/27/13   Page 3 of 29   Document 78

him through prostitution. He told her to charge the customer $300 for "everything," meaning oral sex and intercourse, and $150 for oral sex alone. Prior to her first prostitution "date," McMillian told her that she would be giving him all of her prostitution earnings. Jessica agreed to do so because she loved McMillian and wanted to make him happy. Jessica has stated that when she returned from a prostitution date, she felt proud because she could give her money to McMillian. She recalls an earlier prostitution date in 2006 in which she was in a customer's car and he became forceful with her and would not let her leave. Because she had her cell phone on with an open line to McMillian, he heard the struggle and came to the location. When he arrived, he fired three shots from a handgun into the customer's car. The individual drove away.

In 2006, McMillian began posting her prostitution services to craigslist.org.[1] McMillian took pictures of her for the ads and wrote the ad descriptions. Following that, Jessica began getting phone calls on her cell phone from customers. Jessica obtained prostitution dates from the Craigslist ads and from customers she met when working at the strip clubs. If Jessica obtained a date in Milwaukee, she would conduct the date at the customer's location, including area hotels. McMillian usually drove her to these locations and waited in the car until she completed the date.

McMillian also took her to Minneapolis to strip and date. She stripped at a

---

[1] Craigslist is an internet site, which at that time, included an "Erotic Services" section which featured prostitution-related advertisements. The wording of these ads was sexually suggestive. The first prostitution posting of Jessica to Craigslist from McMillian's email account occurred on October 10, 2006. The last posting was on May 30, 2007. McMillian posted Jessica's services to Craigslist at least 47 times.

4

nightclub called Augie's Cabaret in Minneapolis, and obtained dates in Minneapolis through Craigslist postings and clientele from the strip club.  In Minneapolis, she usually conducted her prostitution dates in the hotel room that McMillian rented for them.

McMillian established rules for Jessica (and the other women who stripped and prostituted for him).  Among other things, he told her to call him "Daddy," that she was not to look another man in the eye, not to raise her voice to him, and not to disobey or disrespect him.  Early in the relationship, McMillian told her, "don't ask me any questions and stay in your place."

Jessica was in love with McMillian the entire time she was with him and would do anything he told her to do just to make him happy.  He promised her "the world" if she would strip and date for him, and it was that promise, and many other promises that he made to her, that kept her working for him.  He kept none of his promises to her and, instead, physically and psychologically abused her on a regular basis in connection with her prostitution activities for him.

**Jade**

Jade met McMillian on Thanksgiving Day 2006 at the Cheetah Club where she was a dancer.  She was 16-years old but had a fake identification document that listed her age as 21.  McMillian gave her his phone number and told her to call him.  She did and met him at his residence.  Jessica and another female were there at the time.

McMillian told Jade that he was a pimp and that he wanted her to prostitute for him.

5

He also told her that he was a rap artist and she heard some of his songs. He also promised her that she would become famous, too, and that she would have fame, glamour, nice clothes, and other material items. She found all of those promises to be very attractive. She agreed to work for him as a prostitute and within a week he had posted her services on Craigslist.[2] McMillian had taken photos of her wearing a schoolgirl outfit for the ads, which he had purchased for her. He posted the ads to Craigslist using the computer at his residence. He used the name "Cocoa" in her Craigslist postings.

McMillian gave her directions and rules for prostitution. He told her to make the customer pull down his pants in order to confirm that he was not a law enforcement officer; that she should not accept any money until she determined the customer was not a law enforcement officer; to always use a condom – which he always provided for her; and to charge the customer $200 for "full service" (intercourse) and $100 for "half service" (oral sex). McMillian also told her that she was required to always do what he told her to do, call him "Daddy," and give him all the money that she earned from prostitution. McMillian gave her a cell phone so that she could receive phone calls from the Craigslist postings.

Jade obtained her prostitution dates from the Craigslist postings and from private parties that McMillian arranged. Her dates were all "outcalls," meaning that she went to the customer's location. McMillian drove her to the dates and then picked her up when the date was over. There were days when she completed up to four prostitution dates, but

---

[2] The first prostitution posting of Jade to Craigslist from McMillian's email account occurred on December 1, 2006. McMillian posted Jade's services to Craigslist at least 17 times.

it was usually two or three dates a day.

On one occasion, McMillian drove her and Jessica to Minnesota to dance and to "date." They drove there with McMillian's pimp friend, "Tut" (Todd Carter), and two of Tut's prostitutes. Using a false identification card, she obtained employment at Augie's Caberat. While in Minnesota, they stayed at a Super 8 Motel in Brooklyn Center. She performed six or seven prostitution dates while in Minneapolis – several through Craigslist, and others through customers she met at the strip club.

At the very latest, McMillian found out that she was 16-years old early in the evening on December 31, 2006. McMillian spotted Jade walking down the street with a friend. She had not been answering his phone calls and she was smoking. He was angry at her, slapped her, and took the phone away from her. During the course of engaging in text messages with one of her friends, McMillian discovered that she was 16. He confronted her, and she admitted that she had lied to him and that she was 16. McMillian had already arranged for her and Jessica to dance and date at a private New Year's Eve party in Mequon. Jade told him that she did not want to work at the party, but McMillian told her that she had to go. They then picked up Jessica and one of Tut's prostitutes.

The females drove to the Mequon party in one car, and McMillian and Tut followed in a second car. When they pulled up to the address of the party, the Mequon police stopped McMillian. After the officers left, Jade, Jessica, and the other female went into the residence. Tut and McMillian followed later. Jade danced (stripped) at the party and completed two prostitution dates. At the end of the evening, Jade gave McMillian the

$600 that she had earned.

McMillian then drove her to her friend's house telling her that she could not work for him anymore. Two days later, they talked on the phone regarding Jade's clothes, which were still at McMillian's residence, and McMillian agreed to take Jade back into his stable. He asked her if still had her identification card, which she did, and told her that she had to be very careful from then on.

McMillian picked her up and took her back to his house. That night he drove her to Silk, a strip club in Juneau, Wisconsin, where she obtained employment. While McMillian continued to advertise her services on Craigslist, she worked every night at Silk until January 10, 2007. That evening, the management of Silk discovered that she was underage, fired her, and confiscated her false identification card. McMillian then picked her up and eventually brought her to Todd Carter's house. McMillian and Carter had a private discussion, and she no longer worked for McMillian. Jade performed one or two prostitution dates after she returned to McMillian following the New Year's Eve party. Jade gave that money to McMillian.

### Jazmine

In summary, Jazmine is expected to testify to the following: She met McMillian in early June 2007 at Walmart, where she worked, the day after her high school graduation. At the time she met McMillian, Jazmine was 17-years old. Jazmine was attracted to him, and they became intimate the next day. From that day on, she essentially lived with McMillian until they separated. Upon meeting him, Jazmine did not tell McMillian her

age.   However, and soon after they met, the first time McMillian picked Jazmine up at her home, Jazmine's mother told McMillian that Jazmine was 17-years old and that she was too young for him.   Regardless, at that time, Jazmine considered the two of them to be boyfriend-girlfriend.   On numerous occasions when Jazmine expressed anxiety to McMillian over her family's concern about her whereabouts and safety, McMillian told her that what she was doing was her own business and that she needed to stand up for herself and tell her family to "butt out" of her life.

Within a short period of time, McMillian told Jazmine that he wanted her to start stripping for him.   McMillian had a stripper's pole in his residence and told her that he wanted to make sure that she knew how to strip.   McMillian also told her that she needed to get a fake identification card because she could not work at a strip club if she was under 18-years old.   Jazmine did obtain a fake identification card and began stripping at the Airport Lounge in Milwaukee.   McMillian picked out her clothes.   When she was not stripping, McMillian kept possession of the fake identification card.   Although Jazmine was able to secretly keep some of her earnings, she gave McMillian most of her stripping money.   That was the understanding.

Sometime after she began stripping for McMillian, he told her that he wanted her to make money for him through prostitution.   McMillian chose outfits for her and took pictures of her that he then posted to Craigslist.[3]   McMillian also gave Jazmine a cell phone to receive customer calls.   (That first cell phone carried the same number as the

---

[3] The first prostitution posting of Jazmine to Craigslist from McMillian's email account occurred on July 1, 2007.   The last posting was on July 21, 2007.   McMillian posted Jazmine's services to Craigslist at least 21 times.

phone that McMillian gave Jade when she began prostituting.)   From the postings, Jazmine had two prostitution dates before July 10, 2007.   As required, she gave McMillian all the money she earned from those two dates.   On July 10, 2007, McMillian, along with Cherish, drove Jazmine to a date at the Suburban Motel on South 47th Street in Milwaukee.   Jazmine had received a call from a Craigslist customer and arranged the date over the phone.   Identifying herself as "Sparkle" (as named in the ad), Jazmine told the customer that she was only doing "out calls" and would charge him $200 for "full service."[4]   With McMillian and Cherish waiting in the hotel parking lot, Jazmine walked into the hotel room where a Milwaukee Police Department officer arrested her for prostitution.   As that was occurring, McMillian attempted to drive away, but was stopped by another officer who was part of the surveillance team.   McMillian and Cherish were identified (Cherish had turned 16 two weeks earlier) and released.

The next day, McMillian bailed Jazmine out of jail, posting her cash bond of $250 and signing her bail worksheet that showed her age as 17.   Later that week, McMillian drove Jazmine, Jessica, and Cherish to Minneapolis to strip at Augie's Cabaret.   For this trip, McMillian had posted prostitution ads for Jazmine and Cherish to the erotic services section of the Minneapolis-St. Paul Craigslist site.   They danced at Augie's at least two nights and earned between $500 and $600 each night.

When they returned to Milwaukee, McMillian gave Jazmine a new phone and, for a short while, posted her prostitution ads to Craigslist using a different email address.   Also,

---

[4] "Full service" usually means oral sex and intercourse, but sometimes it refers to intercourse only.

10

for the first time, he dropped the name "Sparkle" from Jazmine's Milwaukee postings.

When Jazmine left McMillian for the final time, he kept her false identification and the phone that he had given her for Craigslist prostitution calls.

**Cherish**

In summary, Cherish is expected to testify to the following:   She met McMillian on July 4, 2007, through her long-time friend, Jazmine.   Cherish had celebrated her sixteenth birthday less than a week earlier.   Jazmine introduced McMillian as her boyfriend, but very soon after, Cherish considered McMillian to be *her* boyfriend.   That same day she went to McMillian's house with Jazmine and met Jessica.

The next day, McMillian and Jazmine picked Cherish up at her mother's house and McMillian took them to the Mayfair Mall where he paid for their nails to be done.   From there, McMillian took Jazmine to work at the Airport Lounge.

McMillian told Cherish that she was pretty and that he was going to take care of her, promising to buy her a house, buy her clothes, buy her a car, and have her nails done, among other things.   He told her that she was his girlfriend, which, apparently, she very much wanted to believe.   In return for these promises, and at his request, she started working as a stripper at the Airport Lounge.   He told her that she needed identification in order to work as a stripper, but when she was unable to obtain a identification card, he gave her one that showed her age as 20.   Cherish worked four to five nights a week, earning between $600 and $700 a night.   She gave all that money to McMillian.

11

Setting aside McMillian's previously procurement of a false identification card for Cherish, without a doubt, McMillian found out that Cherish was definitely a minor following Jazmine's arrest on July 10, 2007, at the Suburban Motel. As Jazmine was being arrested, McMillian attempted to leave the area but the police stopped them. Cherish told an officer that she was 16-years old and he told that fact to McMillian (possibly, with words to the effect that, "you know you can get in a lot of trouble with a 16-year old"). When the police left, McMillian asked her if she was 16, and she told him that she was.

McMillian took pictures of Jazmine and Cherish to post on Craigslist for prostitution purposes.[5] McMillian told her how to talk to customers, and what prices to charge them for the services. He told her to talk professional and not use certain words. Although she received calls from customers on the phone listed in her Craigslist postings, she did not answer the calls and did not do any prostitution dates.

When she left McMillian, he kept her false identification card.

**<u>Kasandra</u>**

Kasandra began prostituting in April or May 2008 at the urging of her high school boyfriend, Nicholas Harrison, the son of pimp Todd Carter. Carter gave her most of her instructions, but she considered Harrison to be her pimp. Carter and Harrison knew that she was 17-years old. After a series of often violent fights with Harrison, she left him in early July 2008. She knew McMillian, and knew that he was a pimp, because McMillian

---

[5] The first prostitution posting of Cherish to Craigslist from McMillian's email account occurred on July 8, 2007. The last posting was on July 22, 2007. McMillian posted Cherish's services to Craigslist at least five times.

Case 2:11-cr-00193-CNC   Filed 05/27/13   Page 12 of 29   Document 78

brought his prostitutes on working trips with Carter and Harrison's prostitutes.

After leaving Harrison, Kasandra joined McMillian's stable because she thought that she could make some money on the side (by "cuffing," or holding back proceeds) by prostituting for McMillian. She told McMillian that she was 17 and McMillian told her that he already knew that.

When she began working for McMillian, he took pictures of her and posted them to Craigslist.[6] Kasandra had her own cell phone at the time and McMillian used that number in her ads.

Kasandra completed two prostitution dates for McMillian. The first date was in Brookfield and McMillian drove her to the customer's apartment. Sometime after that, McMillian took her, Jessica, and another female to a bachelor party at a hotel. McMillian arranged for them to dance and, if the opportunity arose, conduct prostitution dates at the party. Kasandra was propositioned, and called McMillian to get his approval to do the date. McMillian told her that she should charge the customer $200. She performed the date in a bathroom and collected $200, which she gave to McMillian.

McMillian arranged a trip to the Wisconsin Dells for the females to dance at a strip club and perform prostitution dates. McMillian attempted to get Kasandra a false identification card so she could strip. Before the trip, Kasandra told McMillian that she did not want to go. He told her that she had to go. After they returned, she told McMillian that she was going to leave him. McMillian became very angry with her and

---

[6] There were two prostitution postings of Kasandra to Craigslist – July 18, 2008, and July 20, 2008.

13

would not let her get her belongings from his house or out of his truck. She eventually called the Brown Deer Police Department, and officers responded to her call (July 22, 2008). They were unable to retrieve her property. She was with McMillian for a little more than one week.

**Other Witnesses**

### Marjorie J.

Marjorie J. is Jazmine's mother. She met McMillian the first time he drove up to her house to pick up Jazmine. It was within a week of Jazmine's high school graduation. As soon as he asked for Jazmine, Marjorie stated to him, "how old are you?" He told her that he was 26-years old. Her response to McMillian was that Jazmine was 17-years old, that he was too old for Jazmine, and that he had to leave. He did drive off, but stopped at a place around the corner and called Jazmine.

Marjorie saw the Craigslist posting of Jazmine and Cherish. On July 23, 2007, she filed a "Missing Persons Report" with MPD listing information from the Craigslist ads as well as identifying information that she had gathered regarding McMillian.

### Uniquca E.

Uniquca is Marjorie's daughter and Jazmine's sister. When Jazmine essentially disappeared from her family home, Uniquca obtained McMillian's phone number and called him. She told him, "what are you doing with my 17-year old sister?" It was her belief that McMillian was in his late 20's. At this time she understood that McMillian was prostituting Jazmine through Craigslist. McMillian repeatedly told Uniquca that

Case 2:11-cr-00193-CNC   Filed 05/27/13   Page 14 of 29   Document 78

Jazmine's affairs were none of her business. As to Uniquca's comments to McMillian that Jazmine could go to jail if she were arrested for prostitution, McMillian told her that the worst thing that could happen to Jazmine is that the police would give her a ticket.

### Ron Stevens, MPD

City of Milwaukee Police Officer Ron Stevens was assigned to do a follow-up investigation on Marjorie J.'s "Missing Persons Report" on July 23, 2007. Among other things, Stevens went to the address Marjorie listed for McMillian and found that McMillian no longer lived there. Stevens called the phone number Marjorie provided for McMillian. McMillian answered the phone, identified himself as Tyrone McMillian, and told Stevens that he did not know a Jazmine or a Cherish. McMillian refused to give Stevens his new address.

### Steve Herrmann, MPD

City of Milwaukee Police Officer Steve Herrmann was part of the surveillance team for the July 10, 2007, vice squad sting operation that resulted in the arrest of Jazmine Johnson. Following Jazmine's arrest at the Suburban Motel, Herrmann observed McMillian attempting to drive away from the motel. He stopped the car, identified McMillian, and, despite some resistance, identified Cherish as the passenger. As a result of his inquiries, Cherish disclosed that she was 16-years old.

### Lucas Kuehne, Brown Deer P.D.

City of Brown Deer Police Officer Lucas Kuehne responded to Kasandra's call for assistance on July 22, 2008. He met her in the parking lot of Brown Deer High School,

which was approximately two blocks away from McMillian's residence at that time, 6333 W. Darnell Avenue. Kasandra was attempting to retrieve two of her purses that McMillian held and refused to return to her.

Kuehne went to McMillian's residence and talked to McMillian, who told Kuehne that he goes by the name "HK." McMillian stated that he did not know a Kasandra and that he did not have anyone else's purses. He allowed Kuehne to search his Tahoe, with negative results. He declined to let Kuehne search his residence for the purses.

### Recorded Jail Call

In January 2009, McMillian was serving a short jail sentence at the Dodge County Detention Facility for traffic infractions. On January 26, at approximately 7:50 p.m., he called Jessica. The call was recorded and a transcript has been prepared for trial. A relevant excerpt follows:

TM: Yeah, I was just thinking about how much I'm glad I made you my girlfriend.

J: Huh?

TM: I said I was just thinking how much I was glad I made you my girlfriend.

J: You glad you what?

TM: Made you my girlfriend.

J: Why?

TM: I was just glad I stopped pimping.

J: Why?

TM: Huh?

16

J: Why?

TM: I don't know. [Inaudible] headache. Just uhh, a lot of the um, problems that I'm going through now, that we going through now, came from that. Like I'm in jail because I was taking somebody to trying to get a job. And I got to go to court again because I was trying to pick somebody up from another job.

**Records and Custodians**

### Craigslist Ads

As mentioned in footnotes above, the United States has identified and obtained 89 postings to Craigslist by McMillian of the five females named in the indictment. All but three of the Craigslist postings are from an email account subscribed to by McMillian: <loudenuffproductions@yahoo.com>. Following Jazmine's arrest on July 10, 2007, McMillian's next three relevant prostitution postings to Craigslist in Milwaukee were from a new email account: <sweethoneyent@yahoo.com>. By the time he began posting Kasandra to Craigslist in July 2008, he had resumed using the loudenuffproductions email account.

Craigslist retains the images in the postings for a very short time. As such, only three postings with the actual images of the victims are available – all obtained contemporaneous with the investigation of, and search for, Jazmine. In addition to identifying McMillian's email address, many of the posted ads contain the nicknames used by the victims, the phone numbers that they used to take customer calls, and McMillian's own cell phone number.

Case 2:11-cr-00193-CNC   Filed 05/27/13   Page 17 of 29   Document 78

### Hotel Records

When McMillian drove his females to Minneapolis to strip and date at Augie's Cabaret, they usually stayed at the Super 8 Motel in Brooklyn Center, Minnesota. McMillian and his stable usually traveled there with Todd Carter ("Tut") and his stable and everybody stayed in one room.  Super 8 Motel records show McMillian renting a room on three occasions, Jessica renting a room on one occasion, and Carter renting a room (corresponding to trips with McMillian) on at least three occasions.  On four occasions corresponding to these hotel stays, McMillian posted one or more of the victims to the "Erotic Services" section of the Minneapolis-St. Paul Craigslist.

### Cash Expenditures

A review of records obtained from Pak's Jewelers show McMillian making a number of large cash purchases during the time period covered in the indictment.  On or about October 12, 2006, McMillian purchased an "HK" pendant and necklace with $5,500 in cash.  Between May 11, 2007, and November 27, 2007, McMillian purchased a diamond pendant in the shape of the State of Wisconsin for $22,400 in cash.  Pak's appropriately filed an IRS Form 8300 for the transaction.  On or about January 12, 2008, McMillian purchased a diamond necklace for Jessica with $2,202 in cash.  Between February 23, 2008, and March 15, 2008, he purchased a "3-D" custom piece pendant containing the initials "BRN" with $14,000 in cash.  Pak's appropriately filed an IRS Form 8300 for the transaction.  Between December 11, 2008, and January 2, 2009, McMillian paid Pak's an additional $6,124 in cash for further enhancements to the "BRN"

18

pendant.

On March 12, 2009, McMillian purchased a BMW automobile from Saab Downers Grove in Illinois with $13,000 in cash. The dealership appropriately filed an IRS Form 8300 for the transaction. At 1:00 a.m. on July 2, 2009, an employee of Augie's Cabaret saw Jessica enter a BMW that was being driven by either McMillian or Frederick Black, a known associate of McMillian's. The license plate on the BMW listed to a 2000 Cadillac Deville owned by Andre McMillian, Tyrone McMillian's brother.

Records certified by the Internal Revenue Service show that McMillian did not file a federal income tax return for the years 2006 through 2010, inclusive. Records obtained from the Wisconsin Department of Workforce Development show that McMillian had no reportable wages for that same time period. On May 2, 2007, in connection with a child support hearing in Milwaukee County Circuit Court, McMillian signed a financial statement listing no employer, no gross pay, no net pay, and no hours worked each week, but enumerating "monthly expenses" in the amount of $1,778.[7]

## LEGAL ISSUES

### Rule 412 – Inadmissibility of Victims' Sexual Conduct

This is a "criminal proceeding involving alleged sexual misconduct," which triggers Rule 412 of the Federal Rules of Evidence and, as such, renders inadmissible any evidence

---

[7] In contrast, the child's mother listed full-time employment with net pay of $1,100 a month.

19

of any victim's "other sexual behavior" or "sexual predisposition." *See* Fed. R. Evid. 412(a).

The courts interpret Rule 412 broadly. *See United States v. Torres*, 937 F.2d 1469, 1472 (9th Cir. 1991). It proscribes using the banned evidence for either substantive or impeachment purposes, and it covers all behavior that precedes the date of trial, even if that behavior occurred after the events giving rise to the prosecution. *See Torres* at 1472-73. Thus, evidence of a victim's employment as a "call girl," for example, or other evidence of her sexual history, which has no relevance other than to establish her alleged sexual disposition, should be excluded under Rule 412(a)(2). *Chamblee v. Harris & Harris, Inc.*, 154 F. Supp. 2d 670, 680 (S.D.N.Y. 2001).

The provisions of Rule 412 apply in "any civil or criminal proceeding involving alleged sexual misconduct," including human trafficking cases involving allegations of sex trafficking and forced prostitution. *See United States v. Cephus*, 684 F.3d 703 (7th Cir. 2012) (victim's previous involvement in prostitution is irrelevant as to whether defendant forced her to commit acts of prostitution). One of the avowed purposes of the rule is "to protect [victims] from the degrading and embarrassing disclosure of intimate details about their private lives," 124 Cong. Rec. H. 11944 (daily ed. Oct. 10, 1978) (statement of Rep. Mann), and to "prevent wasting time on distractive collateral and irrelevant matters." *United States v. Torres*, 937 F. 2d 1469, 1472 (9th Cir. 1991) (internal citations omitted).

Thus, Rule 412 bars admission of evidence offered to prove that any alleged victim engaged in other sexual behavior apart from her victimization by the defendant which is

the basis of the charges in the Indictment. *See, e.g.*, *United States v. Powell*, 226 F.3d 1181, 1198-99 (10th Cir. 2000) (evidence of minor victim's past sexually suggestive and flirtatious behavior with other men properly excluded); *United States v. Saunders*, 943 F.2d 388, 391-92 (4th Cir. 1991) (affirming exclusion of evidence of victim's sexual relationship with another person and alleged prostitution). Similarly, any such sexual behavior on the part of the victims does not support a defense to the charged offenses. *United States v. Elbert*, 561 F.3d 771, 777 (8th Cir. 2009) (holding that evidence that minor victims engaged in other acts of prostitution did not establish a defense to child sex trafficking).

There are three narrow exceptions to the ban. *See* Fed R. Evid. 412(b). None of those exceptions apply here. Regardless, in order to take advantage of those exceptions, a defendant "must" file and serve a specific motion at least 14 days before trial, and the court "must" hold an *in camera* hearing on the motion. *See* Rule 412(c). Any such motion, related materials, and the record of the hearing "must be and remain sealed." Rule 412(c)(2).

Here, the defendant has failed to file and serve a motion under Rule 412(c). As such, any evidence of any victim's "other sexual behavior" or "sexual predisposition" can and should be excluded.[8] *See*, *e.g.*, *United states v. Powell*, 226 F.3d 1181, 1196-98 (10th

---

[8]   In the present case, in order to provide context, Jade will testify that McMillian passed her off to Todd Carter and that she prostituted for a time for Carter. Likewise, Kasandra will necessarily testify that she knew McMillian, and that he was a pimp, through her prostitution activities with Carter and his son, Nicholas Harrison. The government's introduction of these facts to provide context and "complete the story" does not open the door for the defense to introduce additional evidence otherwise barred by Rule 412.

21

Cir. 2000) (defendant's failure to comply with Rule 412 warranted exclusion of all Rule

412 evidence); *United States v. Ramone*, 218 F.3d 1229 (10th Cir. 2000) (same); *United

States v. Eagle*, 137 F.3d 1011, 1014-15 (8th Cir. 1998) (same); *United States v. Rouse*, 111

F.3d 561, 569 (8th Cir. 1997) (same).   Such exclusion does not necessarily entail a Sixth

Amendment violation.   *See Michigan v. Lucas*, 500 U.S. 145, 149 (1991).   *See also*

*United States v. Culver*, 598 F.3d 740, 749-50 (11th Cir. 2010) (no Constitutional error in

district court's excluding evidence under Rule 412); *United States v. Bordeaux*, 400 F.3d

548, 558 (8th Cir. 2005) (same).

## Cash Expenditures

Like narcotics dealing and other racketeering- related crimes, prostitution is a cash

business.   Prostituted women remit that cash to their pimps, as required by his rules.   The

same is true with this defendant.   As detailed above, during the time period covered in the

indictment, McMillian made a number of large cash expenditures and shows no legitimate

source of income – cash or otherwise.

In *United States v. Hogan*, 886 F.3d 1497, 1507 (7th Cir. 1989), a bribery case, the

court stated:   "We have previously held that evidence of wealth may be admissible to

establish that a person engaged in a cash-intensive criminal enterprise, even if there is

another explanation for the extra money.   *See United States v. Bowie*, 515 F.3d 3, 9 (7th

Cir. 1975); *United States v. Higgans*, 507 F.2d 808, 813 (7th Cir. 1974)."   In *United States*

*v. Penny*, 60 F.3d 1257, 1263 (7th Cir. 1995), a drug case, the court stated: "Evidence of

unexplained wealth is probative and therefore admissible if it creates a reasonable

Case 2:11-cr-00193-CNC   Filed 05/27/13   Page 22 of 29   Document 78

inference of the defendant's involvement in the drug conspiracy or trafficking." (internal quotes omitted).   The government may present that type of evidence "as long as other evidence, mainly that the wealth was not derived from legitimate sources" is presented to support the charge. *Id.*   The evidence "must relate to wealth acquired during the period in which" the illegal activity occurred. *Id.*

Here, because prostitution is a cash business, McMillian's cash expenditures for jewelry and a car, is relevant evidence.   The inference is obvious and clear, other evidence will be presented to show that McMillian did not earn the money through legitimate means, and the cash transactions took place during the same time period that he was prostituting these five women.

## Rule 611(c)(2) – Leading Questions

Because of the extent and nature of their past relationship with McMillian, it is apparent that some of the testifying victims continue to feel some emotional or psychological tie to the defendant.   Also, some, if not all, of these witnesses are embarrassed and nervous as a result of that prior relationship and may become frightened, hesitant, or even hostile during the course of direct examination.   "Rule 611(c) of the Federal Rules of Evidence permits the Court to allow leading questions when 'necessary to develop testimony.'   Once the District Judge exercises his discretion in that regard, appellants must establish an abuse of discretion to obtain a reversal."   *United States v. O'Brien*, 618 F.2d 1234, 1242 (7th Cir. 1980).    Rule 611(c) permits the government to use leading questions when examining frightened or even soft-spoken witnesses.   *See, e.g.,*

Case 2:11-cr-00193-CNC   Filed 05/27/13   Page 23 of 29   Document 78

*United States v. Salameh*, 152 F.3d 88, 128 (2nd Cir. 1998) (leading questions were "necessary to . . . elicit information from a nervous witness."); *United States v. Grey Bear*, 883 F.2d 1382, 1393 (8th Cir. 1989) (leading questions were used "in order to develop testimony given by an unusually soft-spoken and frightened witness. Such questioning is not improper.").

## Rule 801(d)(1)(A) – Use of Grand Jury Testimony as Substantive Evidence

All five victims testified in the grand jury, although Jade and Kasandra were subpoenaed to the grand jury to provide testimony in the Todd Carter investigation. Thus, their testimony about their relationship with McMillian was not the primary focus of the questioning.

In the event that a witness provides testimony inconsistent with her testimony before the grand jury, the government intends to introduce the prior testimony as substantive evidence. Such prior testimony is admissible under Rule 801(d)(1)(A), which provides that a statement is not hearsay if : "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." *See also United States v. Keeter*, 130 F.3d 297, 302 (7th Cir. 1997). "Inconsistent" as used in this Rule is not "confined to statements [that are] diametrically opposed or logically incompatible . . ." *United States v. Williams*, 737 F.2d 594, 608 (7th Cir. 1984). Inconsistency" may be found in evasive answers, . . . silence, or change in positions." *Id.*

24

"[A] gap in the witness's recollection concerning the content of the prior statement does not preclude admission of the statement under the Rule." *United States v. DiCarlo*, 772 F.2d 1314, 1323 (7th Cir. 1985). *See also United States v. Gajo*, 290 F.3d 922, 932 (7th Cir. 2002) (a genuine lack of memory may be inconsistent with the prior testimony, "which naturally occurred closer in time to the actual events described.")

Vague or incomplete responses can trigger the use of prior inconsistent statements. *See United States. v. Distler*, 671 F.2d 954, 958 (6th Cir. 1981). Contrived memory loss can also trigger the use of prior inconsistent statements. *See United States v. DiCarlo*, 772 F.2d 1314, 1321-25 (7th Cir. 1985).

## Summary Exhibits and Summary Witness

### Summary Exhibits are Admissible Evidence

The 89 prostitution ads that McMillian posted to Craigslist are summarized in an eight-page Excel spreadsheet prepared by a law enforcement agent who will testify at trial. Spreadsheets organized and separated by victim will also be introduced as substantive evidence. Direct testimony and circumstantial evidence will prove the identity of the specific victims in each spreadsheet entry. Federal Rule of Evidence 1006 provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.

"The admission of a summary under Fed.R.Evid. 1006 requires a proper foundation

25

as to the admissibility of the material that is summarized and . . . [a showing] that the summary is accurate . . ." *United States v. Briscoe*, 896 F.2d 1476, 1495 (7th Cir. 1990). Rule 1006 "does not require that it be literally impossible to examine all the underlying records, but only that in-court examination would be an inconvenience." *United States v. Possick*, 849 F.2d 332, 339 (8th Cir.1988). Long ago the government made available to the defense the Craigslist records in discovery. Furthermore, the government recently disclosed the summary charts and 89 ads along with other trial exhibits. In this case, the 89 underlying Craigslist ads will be admitted through a stipulation between the parties.

## Use of a Summary Witness

The defendant has stipulated to the admissibility of the vast majority of exhibits that the government intends to introduce as evidence in this case. As such, neither custodians nor witnesses with knowledge need to be called to describe, explain, or authenticate the exhibits – most of which are documents.

Standing alone, these documents are quite lifeless. Therefore, to assist the jury in understanding and appreciating the contents of the documents and their relevance to the matters in issue, the United States intends to call two separate summary witnesses. IRS Agent Robert Warren will provide testimony about several exhibits of a financial nature and MPD Detective Lynda Stott will testify about other evidentiary items. Although agent Warren is qualified to testify as an expert in tax and financial cases, and detective Stott is qualified to testify as an expert in sex-trafficking cases, neither witness will be

26

providing testimony or giving opinions of that type or nature. Detective Stott's testimony is expected to be broader in that she will also testify about the relationship and significance of documents and to both other documents and other evidence introduced in the government's case. "When a summary witness simply testifies as to what the government's evidence shows, [s]he does not testify as an expert witness." *United States v. Pree*, 408 F.3d 855, 869 (7th Cir. 2005). *See also United States v. Swanquist*, 161 F.3d 1064, 1073 (7th Cir. 1998). This testimony is appropriate and will assist the jury.

**Applicable Asset Forfeiture Law**

The United States no longer seeks the direct forfeiture of any specific property items. But the United States does seek a money judgment of forfeiture against which judgment, if entered, the United States will then seek to forfeit specific property items as substitute assets.

Specifically, if McMillian is found guilty of sex trafficking of a minor or through force, fraud, or coercion, in violation of Title 18, United States Code, Section 1591, as set forth in Counts One, Two, Four, Five, and Seven of the Superseding Indictment, the United States intends to see, under Title 18, United States Code, Section 1594, a money judgment of forfeiture equal to the amount of the gross proceeds McMillian obtained, directly or indirectly, as a result of his offense or offenses of conviction.

Because the United States intends to seek only a money judgment of forfeiture in this case, there will be no forfeiture issue to present to the jury as the issue of the proper amount of the money judgment is an issue for this Court to decide. *See United States v.*

*Tedder*, 403 F.3d 836, 841 (7th Cir. 2005) (the defendant's right under Federal Rule of Criminal Procedure 32.2(b) is to have the jury determine if the government has established the required nexus between the property and his crime; the rule does not give the defendant the right to have the jury determine the amount of a money judgment).

The Court's determination as to the amount of the money judgment may be based on evidence already in the record as well as any additional evidence or information that the parties submit during the forfeiture phase of the trial that the Court accepts as "relevant and reliable." Rule 32.2(b)(1)(B).

The United States bears the burden of proving, by a preponderance of the evidence, the amount of the proceeds that should be subject to a personal money judgment. *United States v. Prather*, 456 Fed. Appx. 622, 625 (8th Cir. 2012).

However, the rules of evidence do not apply to the forfeiture phase of the trial. *See United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010) (because forfeiture is part of sentencing, less stringent evidentiary standards apply in the forfeiture phase of the trial; the evidence need only be "reliable"); *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir.

2007) (Rule 32.2(b)(1) allows the court to consider "evidence or information," making it clear that the court may consider hearsay).

If the court imposes a money judgment of forfeiture, the United States intends to seek an order under Rule 32.2(e)(1)(B) of the Federal Rules of Criminal Procedure and Title 21, United States Code, Section 853(p) forfeiting any valuable property items, in

28

which McMillian has an interest, as substitute property, in order to satisfy any such money judgment.

## CONCLUSION

This memorandum is submitted as an aid to the Court.

Dated at Milwaukee, Wisconsin this 27st day of May, 2013.

JAMES L. SANTELLE
United States Attorney

By:

s/Joseph R. Wall
Assistant United States Attorney
Joseph R. Wall Bar Number: 1009796
Attorney for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin    53202
Telephone: (414) 297-1721
Fax: (414) 297-1738
E-Mail: joseph.wall@usdoj.gov